**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

MAR 2 5 2024

**CENTRAL DIVISION**

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiff,*

*v.*

ALAN MCCLAIN, in his official capacity
as Commissioner of the Arkansas
Insurance Department,

*Defendant.*

Case No. **4:24-cv-268-BSM**

JUDGE: **Miller**

MAGISTRATE JUDGE: **Volpe**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires manufacturers to offer their products to a specific list of covered entities at steeply discounted rates. Because such price controls can disincentivize innovation and destabilize markets, Congress carefully crafted Section 340B and limited participation in the program to fifteen—and only fifteen—types of covered entities. Off-site, for-profit pharmacy chains (like CVS or Walgreens) were *not* included on the list of covered entities.

2. In fact, federal courts have already rebuffed efforts to force manufacturers to provide 340B-discounted drugs to these so-called "contract pharmacies." The U.S. Court of Appeals for the Third Circuit recently held that AstraZeneca's "restrictions on delivery [of 340B-discounted drugs] to contract pharmacies do not violate Section 340B," and it "enjoin[ed] [federal officials] from enforcing against" AstraZeneca any "reading of Section 340B as requiring delivery

of discounted drugs to an unlimited number of contract pharmacies." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023); *see AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 59 (D. Del. 2021); *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-27, 2022 WL 484587, at *5-*6 (D. Del. Feb. 16, 2022). The Third Circuit's decision was incorporated into a federal injunction protecting AstraZeneca's right to proceed with its lawful contract pharmacy policy.

3.    Apparently dissatisfied with the scope of federal law, the State of Arkansas has enacted a statute seeking to achieve under state law precisely the same result that federal courts have soundly rejected. The 340B Drug Pricing Nondiscrimination Act, known as Act 1103, requires pharmaceutical manufacturers to offer 340B-discounted pricing for sales at an unlimited number of contract pharmacies.

4.    This Arkansas statute requires manufacturers to make 340B-discounted drugs available to any and all pharmacies entering into a contractual relationship (of any kind) with a covered entity. These pharmacies are not agents of the covered entities, and the covered entities do not retain title over the products held by these pharmacies. Instead, Act 1103 purports to allow contract pharmacies to demand steep discounts on products acquired *by* the contract pharmacies. Act 1103 thus extends Section 340B's price caps beyond the scope of the federal program to reach contract pharmacy sales. This expansion of the 340B program results in a direct conflict between federal law and state law and unlawfully expands the scope of the Federal 340B program.

5.    Plaintiff AstraZeneca Pharmaceuticals LP brings this action to enjoin enforcement of Act 1103. Although the Eighth Circuit recently rejected a constitutional challenge to the statute brought by a different plaintiff, *see PhRMA v. McClain*, No. 22-3675, 2024 WL 1061438 (8th Cir. Mar. 12, 2024), AstraZeneca (which is not a member of PhRMA) does not rely here on the claims

asserted in that litigation (other than to preserve them). Instead, AstraZeneca argues that Act 1103 cannot validly be enforced against AstraZeneca for three separate and independent reasons.

6.     *First*, Act 1103 creates a direct conflict with—and thus is preempted by—federal patent law. In *Biotechnology Indus. Org. (BIO) v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007), the Federal Circuit squarely held that federal patent law "prohibits states from regulating the price of patented goods." *Id.* at 1372. Yet Act 1103 does precisely that. It requires manufacturers like AstraZeneca to provide contract pharmacies with access to their patented drugs at steeply discounted prices, thereby extending federal price caps to a category of patented drug sales—contract pharmacy sales—that federal courts have held fall *outside* of the 340B program. The Act is therefore preempted by federal patent law.

7.     *Second*, Act 1103 violates the Contracts Clause of the U.S. Constitution. *See* U.S. Const. art. I, § 10, cl. 1. The 340B program is enforced through agreements between the Secretary of the U.S. Department of Health and Human Services (HHS) and manufacturers. 42 U.S.C. § 256b(a)(1). Act 1103 substantially interferes with the operation of those agreements and with manufacturers' rights and obligations thereunder.

8.     *Third*, Act 1103 violates the Takings Clauses of the U.S. Constitution and the Arkansas Constitution. *See* U.S. Const. amend. V; Ark. Const. art. II, § 22. Under these Takings Clauses, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); *see Pfeifer v. City of Little Rock*, 346 Ark. 449, 459 (2001). But Act 1103 requires manufacturers like AstraZeneca to transfer their property (prescription drugs) to another private party (contract pharmacies and the covered entities with which they contract). This forced transfer would be unlawful even if manufacturers

were paid just compensation for these contract pharmacy sales. But in fact they are not: Manufacturers are compensated at steeply discounted prices, well below fair market value.

9.    AstraZeneca therefore seeks an order: (1) declaring that Act 1103 is preempted by federal patent law; (2) declaring that Act 1103 is unconstitutional as applied to AstraZeneca under the Contracts Clause; (3) declaring that Act 1103 is unconstitutional as applied to AstraZeneca under the federal and Arkansas Takings Clauses; and (4) enjoining Defendant Alan McClain, the Commissioner of the Arkansas Insurance Department, from enforcing Act 1103 against AstraZeneca through investigative demands, administrative proceedings, lawsuits seeking civil penalties or other relief, or in any other manner.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the Constitution of the United States). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02.

11.    This Court also has inherent equitable powers to enjoin actions of state officials that contradict the federal Constitution or federal law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because this action challenges an Arkansas law that applies to and purports to regulate the sale of AstraZeneca's products in this District. AstraZeneca makes its drugs available and sells its products to multiple 340B covered entities within this District and these entities maintain multiple contract pharmacy arrangements. The challenged law (if not invalidated) would apply to conduct and property in this District, including AstraZeneca's, and is highly likely to be enforced in this District.

13.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant maintains offices in this District, through which Defendant would enforce the law challenged in this action.

## PARTIES TO THE ACTION

14.     Plaintiff AstraZeneca Pharmaceuticals LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware. AstraZeneca is a biopharmaceutical company focusing on the discovery, development, manufacturing, and commercialization of medicines. AstraZeneca participates in the 340B program.

15.     Defendant Alan McClain is the Commissioner of the Arkansas Insurance Department (AID). In that role, he implements and enforces the challenged legislation. This suit is brought against him in his official capacity only.

## FACTUAL ALLEGATIONS

### The Federal 340B Program Caps Drug Prices for Enumerated Covered Entities that Provide Healthcare to Certain Underserved Populations

16.     Section 340B of the federal Public Health Service Act is a federal program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

17.     As a condition of receiving coverage and reimbursement for its drugs under Medicaid and Medicare Part B, a pharmaceutical manufacturer must enter into a pharmaceutical pricing agreement with HHS. 42 U.S.C. § 256b(a)(1). In that agreement, the manufacturer must "offer each covered entity covered outpatient drugs for purchase" at a specified discount price "if such drug is made available to any other purchaser at any price." *Id*. This is known as Section

340B's "must-offer" requirement. Manufacturers that "knowingly and intentionally charge[] a covered entity a price for purchase of a drug that exceeds the [340B discount price]" are subject to civil monetary penalties. *Id.* § 256b(d)(1)(B)(vi)(III). The 340B statute also regulates covered entities, which may not obtain 340B pricing on units of drugs for which a manufacturer pays a Medicaid rebate (known as "duplicate discounts"), nor resell or otherwise transfer such drugs to persons other than their patients (known as "diversion"). *Id.* § 256b(a)(5)(A), (B).

18.     Congress enacted Section 340B to give covered entities access to prescription drugs at below-market prices, thereby helping them serve their uninsured and indigent patients. H.R. Rep. No. 102-384, pt. 2, at 7 (1992). Balanced against its goal of increasing access, however, Congress also recognized the need to "assure the integrity of the drug price limitation program." *Id.* at 16.

19.     Congress has added to the list of 340B covered entities over time, and today there are fifteen delineated categories of covered entities. 42 U.S.C. § 256b(a)(4)(A)-(*O*).

20.     Notably, Congress has *never* included contract pharmacies in the statutorily defined list of facilities that qualify as covered entities. Indeed, in drafting what would become the 340B statute, Congress considered proposed language that would have permitted covered entities to dispense 340B drugs through *on-site* contractors providing pharmacy services. *See* S. Rep. No. 102-259, at 1-2 (1992) (requiring manufacturer to provide a discounted price for drugs that are "purchased and dispensed by, or under a contract entered into for *on-site pharmacy services* with" certain enumerated covered entities) (emphasis added). But that provision was not enacted.

21.     The 340B program has its own federal enforcement provisions and administrative dispute-resolution process. Congress required the Secretary of HHS to establish an adjudicatory body to resolve disputes among the participants in the 340B program, including "claims by covered

entities that they have been overcharged for drugs purchased under this section [340B], and claims by manufacturers … of violations" by covered entities. 42 U.S.C. § 256b(d)(3)(A). Under that statutory mandate, HRSA has established "requirements and procedures for the 340B Program's administrative dispute resolution (ADR) process" in a 2020 rule. 85 Fed. Reg. 80,632 (Dec. 14, 2020) (the ADR Rule). The ADR Rule authorizes panels of federal officers to resolve claims for "monetary damages," as well as other unspecified "equitable relief" sought by claimants. 42 C.F.R. § 10.21(a). And the ADR Rule empowers ADR panels to address a range of factual and legal disputes, including "those having to do with covered entity eligibility, patient eligibility, or manufacturer restrictions on 340B sales." 85 Fed. Reg. at 80,636.

22.     HRSA continues to refine the 340B ADR process. In November 2022, it issued a Notice of Proposed Rulemaking that includes a number of revisions to the program, including making the adjudication process less formal, altering the composition of panels, and narrowing the panels' jurisdiction. *See generally* 87 Fed. Reg. 73,516 (Nov. 30, 2022). The current ADR process remain in place.

### *Contract Pharmacy Use Leads to Abuse and Profiteering*

23.     Section 340B does not require manufacturers to deliver 340B-discounted drugs to contract pharmacies—or indeed, to *any* entity not specifically enumerated in the statute. In the decades since the enactment of the program, however, HRSA has issued two non-binding "guidance" documents purporting to authorize covered entities to enter into agreements with contract pharmacies to dispense outpatient drugs under Section 340B.

24.     In 1996, HRSA issued guidance providing that "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could now enter into an agreement with a *single* outside pharmacy of its choice to provide such services for 340B drugs. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance).

25.     Then, in 2010, HRSA released new guidance stating that covered entities must now be permitted to "use multiple pharmacy arrangements"—that is, an *unlimited* number of contract pharmacies, without any geographic limits—"as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition." 75 Fed. Reg. 10,272, 10,273 (2010 Guidance). The 2010 Guidance thus purported to authorize a covered entity to enter into an unlimited number of contract pharmacy arrangements anywhere in the United States.

26.     The 2010 Guidance triggered a massive surge in the number of contract pharmacies receiving and distributing 340B drugs. In 2018, the Government Accountability Office reported that the number of contract pharmacies had ballooned from 1,300 in 2010, to nearly 20,000 by 2017. U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 2, 10 (June 2018) (2018 GAO Report), https://www.gao.gov/assets/700/692697.pdf. These numbers have continued to escalate. Today, more than 33,000 different pharmacies participate in the 340B program, with more than 194,000 individual contracts. Adam J. Fein, Drug Channels Inst., *Exclusive: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market* (Jul. 11, 2023), https://www.drugchannels.net/2023/07/exclusive-for-2023-five-for-profit.html. The vast majority of these contract pharmacies (75% as of 2018) are national, for-profit retail pharmacies; and the five largest national pharmacy chains—CVS, Walgreens, Walmart, Rite-Aid, and Kroger—accounted for a combined 60% of all 340B contract pharmacies, even though these chains represent only 35% of all pharmacies nationwide. 2018 GAO Report at 20-21.

27.     Make no mistake: The boom in contract pharmacies has been fueled by the prospect of outsized profit margins on 340B discounted drugs. The determination of whether a medicine

dispensed at a contract pharmacy is eligible for the 340B discount is not made until *after* the medicine is dispensed to the patient and paid for at a non-discounted, commercial price by the patient and his or her health plan. In practice, pharmacies generally buy their inventory of drugs from wholesalers in commercial transactions. Pharmacies then dispense those medicines to any patient with a valid prescription. Those patients could have been treated at a 340B entity or a non-340B entity. Either way, the pharmacy dispenses product from its inventory to the patient consistent with the patient's insurance. Later, for medications determined to be dispensed to a patient of the 340B entity, the wholesaler processes a chargeback reflecting the difference between the pharmacy acquisition price and the 340B price. Decl. of Krista M. Pedley ¶¶ 5-9, *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2. This means that a 340B discount is applied for the contract pharmacy sale even though it has *also* benefitted from the full insurance reimbursement. The pharmacy may well share some of its windfall with the covered entity or the covered entity's vendor, but the patient has still paid the full out-of-pocket amount designated under his or her insurance policy.

28.      As Senator Chuck Grassley put it in a letter to HRSA, for-profit pharmacies "are reaping sizeable 340B discounts on drugs and then turning around and upselling them to fully insured patients covered by Medicare, Medicaid, or private health insurance in order to maximize their spread." Letter from Sen. Chuck Grassley, S. Comm. on the Judiciary, to Mary K. Wakefield, Adm'r, HRSA (Mar. 27, 2013), https://www.grassley.senate.gov/download/2013-03-27-ceg-to-hrsa-340b-oversight-3. This "spread" amounts to "hundreds of millions" of dollars siphoned off from the 340B program in the form of contract-pharmacy profits. *See* Raymond James, *340B Pharmacy Follow Up—Less Than $1.4B but Still Yuge* (Sept. 9, 2020).

29. Although some of the money generated through contract pharmacy sales is passed on to covered entities, most of these profits are *not* going to federally qualified health centers or other federal grantees that provide services to underserved populations (such as black lung clinics, hemophilia treatment centers, urban Indian health organizations, and AIDS drug purchasing assistance programs). Instead, they are being captured by 340B hospitals and contract pharmacies, which are responsible for nearly 90% of all 340B purchases. Aaron Vandervelde et al., Berkeley Rsch. Grp., *For-Profit Pharmacy Participation in the 340B Program* 7 (Oct. 2020), https://bit.ly/3owtUwa.

30. Nor are these huge profits being passed on to patients. For example, in response to a 2018 GAO survey, 45% of covered entities admitted they do not pass along *any* discount to *any* patients that use *any* of their contract pharmacies. 2018 GAO Report at 30. As for the remaining 55%, the GAO noted that entities using contract pharmacies may provide discounts to patients only in limited cases. *Id.* Likewise, the HHS Office of Inspector General found in 2014 that many contract pharmacies do not offer 340B-discounted prices to uninsured patients at all. HHS-OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 2 (Feb. 4, 2014) (2014 OIG Report), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf. As a result, "uninsured patients pay the full non-340B price for their prescription drugs at contract pharmacies." *Id.* By contrast, the GAO noted that 17 of 23 of the surveyed covered entities that used *in-house* pharmacies reported offering discounts to their patients. 2018 GAO Report at 30 n.46.

31. In short, the widespread proliferation of contract pharmacy arrangements since 2010 has transformed the 340B program from one intended to assist vulnerable patients into a

multi-billion-dollar arbitrage scheme that benefits national for-profit pharmacy chains and other for-profit intermediaries.

32. At the same time, the explosive growth of contract pharmacy arrangements also has facilitated increased diversion and duplicate discounts. A 2011 report from the Government Accountability Office warned that "[o]perating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies." U.S. Gov't Accountability Off., GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28, (Sept. 23, 2011), https://www.gao.gov/assets/330/323702.pdf. The report further found that "HRSA's oversight of the 340B program is inadequate because it primarily relies on participants' self-policing to ensure compliance." *Id.* at 21.

33. These structural problems have only intensified over time, as the use of multiple contract pharmacies has become rampant. The 2014 OIG report determined that self-policing by covered entities has been insufficient to stop these abuses, since "most covered entities . . . do not conduct all of the oversight activities recommended by HRSA." 2014 OIG Report at 2. The 2018 GAO Report similarly criticized the continuing "weaknesses in HRSA's oversight [that] impede its ability to ensure compliance with 340B Program requirements at contract pharmacies." 2018 GAO Report at 45.

34. Indeed, HRSA's own audits of covered entities continue to identify numerous instances of abuse. The 2018 GAO Report observed that "66 percent of the 380 diversion findings in HRSA audits [between 2012 and 2017] involved drugs distributed at contract pharmacies." *Id.* at 44. And based on information from HRSA's website, over 25% of covered entities audited since 2017 have had at least one finding related to contract pharmacy noncompliance. Indeed, out of 199

audits conducted in 2019, HRSA discovered dozens of instances of duplicate discounts, as well as evidence that at least 19 covered entities had permitted diversion of 340B drugs through contract pharmacies. *See* HRSA, *Program Integrity: FY19 Audit Results*, https://www.hrsa.gov/opa /program-integrity/audit-results/fy-19-results.

### *AstraZeneca's 340B Policy and Resulting Litigation*

35.     Against this legal and factual backdrop, in August 2020 AstraZeneca announced to covered entities that, effective October 1, 2020, it would revert to the contract pharmacy approach set forth in HRSA's 1996 Guidance.

36.     Under this policy, AstraZeneca continues to make its products available at 340B-discounted prices—in unlimited quantities—to all covered entities. For covered entities that do not maintain their own on-site dispensing pharmacy, AstraZeneca delivers discounted drugs to a single contract pharmacy site for each covered entity. But AstraZeneca no longer delivers 340B drugs to an unlimited number of contract pharmacies.

37.     AstraZeneca's policy is consistent with the letter and intent of the 340B program—limiting the potential for abuse, while still enabling all covered entities and their patients to continue to access AstraZeneca's medicines at 340B prices. Under AstraZeneca's policy, several thousand covered entities that lack an on-site pharmacy have registered a contract pharmacy to which AstraZeneca continues to deliver 340B-discounted drugs, including approximately 50 covered entities in Arkansas. AstraZeneca is committed to working with all covered entities to ensure that every patient can obtain needed medicines at prices they can afford.

38.     In response to AstraZeneca's new contract pharmacy policy and other manufacturers' adoption of similar policies, HHS and HRSA issued an Advisory Opinion on December 30, 2020, asserting that the 340B statute requires manufacturers to deliver 340B-discounted drugs for unlimited contract pharmacy sales.

12

39.     In early 2021, AstraZeneca filed suit in the U.S. District Court for the District of Delaware against HHS and HRSA, challenging the Advisory Opinion. On June 16, 2021, the Delaware court issued a detailed opinion finding the Advisory Opinion unlawful. *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021). The court concluded that Section 340B "says nothing about the permissible role (if any) of contract pharmacies," and that, in light of this "total omission," the Advisory Opinion's attempt to impose an obligation on AstraZeneca to deliver discounted drugs to unlimited contract pharmacies was "legally flawed." *Id.* at 59. The agency withdrew the Advisory Opinion following the Delaware court's ruling.

40.     In a second ruling, the Delaware court addressed AstraZeneca's challenge to a "violation letter" issued by HRSA, which adopted the same position as the Advisory Opinion. The court again rejected the agency's view that Section 340B obligates drug manufacturers to deliver 340B-discounted drugs for unlimited contract pharmacy sales. *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-27, 2022 WL 484587 (D. Del. Feb. 16, 2022). The court reiterated "key points" from its prior opinion, including that Congress "did not clearly intend for drug manufacturers to be required to facilitate sales of covered drugs for dispensing by an unlimited number of contract pharmacies." *Id.* at *5-*6.

41.     The government appealed, but, on January 30, 2023, the U.S. Court of Appeals for the Third Circuit affirmed the Delaware court's rulings. In a consolidated opinion addressing AstraZeneca's case and appeals in parallel actions by other manufacturers, the Third Circuit held that the Advisory Opinion and violation letter are "unlawful," and it "enjoin[ed] HHS from enforcing against" AstraZeneca HHS's "reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi Aventis U.S. LLC v. HHS*,

58 F.4th 696, 706 (3d Cir. 2023). The court of appeals also held that AstraZeneca's "restrictions on delivery to contract pharmacies do not violate Section 340B." *Id.*

42.     The government neither sought en banc review of the Third Circuit's decision nor filed a petition for certiorari in the U.S. Supreme Court.

43.     On May 5, 2023, the Delaware court issued a final judgment in AstraZeneca's case, to which the government stipulated. The court's order provides that it is:

a.      "DECLARED that Advisory Opinion 20-06 and the Violation Letter from the Health Resources and Services Administration to Plaintiff AstraZeneca Pharmaceuticals LP (AstraZeneca), dated May 17, 2021 (Violation Letter), are unlawful;

b.      DECLARED that AstraZeneca's policy limiting the use of contract pharmacies under Section 340B of the Public Health Service Act (Section 340B), 42 U.S.C. § 256b—namely, that covered entities may use an in-house pharmacy and, if they do not have an in-house pharmacy, they may use one contract pharmacy—does not violate Section 340B;

c.      ORDERED that the Violation Letter is VACATED as contrary to law pursuant to 5 U.S.C. § 706;

d.      ORDERED that Defendants, including their officers, agents, and employees, are ENJOINED from enforcing against AstraZeneca the agency's reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies."

Final Judgment at 1, *AstraZeneca*, No. 1:21-cv-27 (D. Del. May 5, 2023), ECF No. 123.

44.     As a result of the Third Circuit's ruling and the Delaware court's injunction, AstraZeneca is entitled to proceed with its lawful contract pharmacy policy.

*Arkansas Enacts 340B Legislation Mandating Unlimited Sales to Contract Pharmacies*

45.     On May 3, 2021, while AstraZeneca's lawsuit about the use of contract pharmacies in the 340B program was already underway, Arkansas enacted Act 1103, the 340B Drug Pricing Nondiscrimination Act (formerly known as Arkansas House Bill 1881).

46.     Act 1103 expressly identifies the federal 340B program as its regulatory object. *See* Ark. Code Ann. § 23-92-601 (title); *id.* § 23-92-602(5) ("'340B drug pricing' means the program established under section 602 of the Veterans Health Care Act of 1992, Pub. L. No. 102-585.").

47.     Act 1103 does not specify any source for the State's purported authority to add requirements to a comprehensive federal healthcare program.

48.     Act 1103 enacted Ark. Code Ann. § 23-92-604(c)(1), which instructs that "[a] pharmaceutical manufacturer shall not . . . [p]rohibit a pharmacy from contracting or participating with an entity authorized to participate in 340B drug pricing by denying access to drugs that are manufactured by the pharmaceutical manufacturer." This provision contains no geographical limit.

49.     Act 1103 also enacted Ark. Code Ann. § 23-92-604(c)(2), which mandates that "[a] pharmaceutical manufacturer shall not ... [d]eny or prohibit 340B drug pricing for an Arkansas-based community pharmacy that receives drugs purchased under a 340B drug pricing contract pharmacy arrangement with an entity authorized to participate in 340B drug pricing."

50.     Section 23-92-604(c)(2)'s phrase "an Arkansas-based community pharmacy" is the sole geographical limit on this provision's reach. But Act 1103 does not define "Arkansas-based" (or "community pharmacy"), so it is unclear whether this refers to the physical location of the pharmacy, the corporate headquarters of it or its parent company, or something else.

51.     Act 1103 also lacks any geographical limitation for the "entity authorized to participate in 340B drug pricing," *i.e.*, the covered entity. Ark. Code Ann.§ 23-92-604(c)(1).

52.     Act 1103's text nowhere requires that drugs purchased at a 340B price that are provided to a pharmacy must be dispensed only to patients of a covered entity.

53.     Act 1103 also does not account for HRSA's enforcement authority or the congressionally mandated procedures for administrative dispute resolution under the 340B program.

54.     Act 1103 instead provides that "[t]he Insurance Commissioner shall promulgate rules to implement this subchapter," thereby empowering Defendant McClain and AID to enforce the statute's mandates. Ark. Code Ann. § 23-92-606. Under this authority, the Insurance Commissioner has promulgated an administrative policy, Rule 123, which purports to impose penalties for violations of Act 1103. Ark. Ins. Dep't, Rule 123, *340B Drug Program Nondiscrimination Requirements* (Sept. 19, 2022), http://170.94.37.152/REGS/003.22.22-005F-23027.pdf.

55.     The operation and apparent intent of Act 1103 is to compel pharmaceutical manufacturers to deliver 340B-discounted drugs to an unlimited number of contract pharmacies, notwithstanding the Third Circuit's holding that federal law imposes no such requirement and the Delaware court's injunction.

56.     On its face, Act 1103 regulates pricing—and insofar as manufacturers are affected, *only* regulates pricing. The statute requires manufacturers to provide access to "340B drug *pricing*," which means access to drugs whose prices have been reduced under the statutory formula prescribed by Section 340B. Ark. Code Ann. § 23-92-604(c) (emphasis added). The statute says nothing about any other aspect of the acquisition or delivery of drugs—such as packaging requirements, shipping conditions, shipping costs, or other logistics and specifications of drug

16

delivery and acquisition  Pricing is thus the only thing that distinguishes a sale that complies with Act 358 from a sale that violates the law.

### Arkansas's Enforcement of Act 1103

57.     Act 1103 specified that it would take effect on July 28, 2021, by operation of law.

58.     On July 28, 2021, PhRMA petitioned Defendant McClain for declaratory relief concerning enforcement of Sections 23-92-604(c)(1) and (c)(2), enacted by Act 1103. PhRMA asked that the Commissioner stay enforcement of these provisions (1) pending decisions in the ongoing federal suits against HHS and HRSA about the use of contract pharmacies in the 340B program (including AstraZeneca's suit), or (2) for at least 120 days. That same day, the Commissioner granted PhRMA's petition in part and suspended enforcement of Sections 23-61-604(c)(l) and (c)(2) for 90 days.

59.     PhRMA then challenged Act 1103 in this Court on constitutional grounds, arguing that the law is (1) preempted by Section 340B; and (2) invalid under the Dormant Commerce Clause. *See PhRMA v. McClain*, No. 4:21-CV-864-BRW, 2022 WL 18145579, at *1 (E.D. Ark. Dec. 12, 2022). PhRMA did not argue that Act 1103 is preempted by the federal patent laws or invalid under the Contracts Clause and the federal and Arkansas Takings Clauses. This Court rejected PhRMA's preemption challenge and stayed its Commerce Clause challenge. *Id.* at *2.

60.     The U.S. Court of Appeals for the Eighth Circuit affirmed this Court's decision, holding that Section 340B does not preempt Act 1103. *PhRMA v. McClain*, No. 22-3675, 2024 WL 1061438, at *4-*6 (8th Cir. Mar. 12, 2024). The Eighth Circuit did not consider or decide whether the federal patent laws preempt Act 1103; nor did the Court consider or decide whether Act 1103 violates the Contracts Clause or the federal and Arkansas Takings Clauses. Moreover, because AstraZeneca was not a party in that case (and is not a PhRMA member), the Eighth Circuit

17

did not consider the effect of the federal court injunction precluding interference with AstraZeneca's contract pharmacy policy.

61.     Central to the Eighth Circuit's ruling that Section 340B does not preempt Act 1103 were two factual assumption regarding the relationship between covered entities and contract pharmacies: first, that "[c]overed entities maintain title legal title to the 340B drugs" when they are acquired by contract pharmacies, *id.* at *3; *see id.* at *5; and second, that a contract pharmacy acts as "an agent of the covered entity" with respect to the sale of 340B drugs. *id.* at *3. Those factual assumptions were foundational to the Court's conclusion that, under Act 1103, "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts." *Id.* at *5.

62.     Both factual assumptions are incorrect. Although HRSA has issued guidance instructing covered entities that they *should* "retain[] title" to drugs acquired by contract pharmacies, 61 Fed. Reg. at 43,553, in reality they usually do not. As HRSA's Director of Pharmacy Affairs has explained, under typical contract-pharmacy arrangements, 340B-discounted drugs are "placed on the shelf" as "'neutral inventory'"—that is, placed into "the contract pharmacy's *own* inventory," just like any other drugs—and can "be dispensed [by the pharmacy] to *any* subsequent patient" of the pharmacy, regardless of whether that patient is associated with a covered entity. Decl. of Krista M. Pedley ¶¶ 5, 10-11, *Sanofi-Aventis U.S., LLC v. HHS*, No. 21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2 (emphases added). Thus, in practice, title to 340B drugs is transferred to the contract pharmacy rather than maintained by the covered entity.

63.     Nor is it correct that the typical contract pharmacy acts as "an agent of the covered entity" with respect to the sale of 340B drugs. *PhRMA*, 2024 WL 1061438, at *3. Publicly available information indicates that contract pharmacies are usually independent contractors, not agents,

with respect to the acquisition and sale of 340B drugs. *See, e.g.*, 340B Contract Pharm. Servs. Agreement between Jackson Mem'l Hosp. & Walgreens, at 87, https://bit.ly/3o48dUm ("Independent Contractor" provision disclaiming "any relationship between the parties hereto other than that of independent entities contracting").

64.     After initially staying enforcement of Act 1103, Defendant McClain has recently indicated that state enforcement proceedings against AstraZeneca may be forthcoming.

## LEGAL ALLEGATIONS

### *Act 1103 Is Preempted by Federal Law*

65.     The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).

66.     Act 1103's mandates for drug manufacturers and its associated enforcement mechanisms are preempted by the federal patent laws under the Supremacy Clause.

67.     The Constitution gives Congress authority to establish a system of incentives "[t]o promote the Progress of Science and useful Arts." Art. I, § 8, cl. 8. Under the federal patent law, inventors are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected 'exclusive right'" to sell their inventions for a limited period. *Biotechnology Indus. Org. (BIO) v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007). The public can benefit from immediate access to new inventions during the exclusivity period; and after the period expires, the public gets "lower price[s] through unfettered competition." *Id.* at 1373. The States are not free to

upset that finely calibrated system: "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989).

68.     State laws that cap or fix the prices at which patented drugs may be sold are accordingly preempted by federal patent law, as the Federal Circuit has explained, because they "re-balance the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374. In *BIO*, the Federal Circuit struck down a District of Columbia law that prohibited patented drugs from "being sold in the District for an excessive price." *Id.* at 1365. The court explained that, notwithstanding "the District's judgment" that drug manufacturers were charging "'excessive prices'" that "'threaten[ed] the health and welfare of the residents of the District as well as the District government's ability to ensure that all residents receive the health care they need,'" the law was "contrary to the goals established by Congress in the patent laws." *Id.* at 1365, 1374 (quoting D.C. Code § 28-4551). The District's law was therefore preempted because "[t]he underlying determination about the proper balance between innovators' profit and consumer access to medication . . . is exclusively one for Congress to make." *Id.* at 1374.

69.     The same analysis applies to Act 1103. Like the District of Columbia law struck down in *BIO*, Act 1103 restricts the prices at which manufacturers can sell their patented drugs by requiring them to make their drugs available to contract pharmacies at discounted prices. Whereas Section 340B caps drug prices with respect to a limited set of specifically enumerated covered entities, Act 1103 purports to extend those price caps to a category of sales—contract pharmacy sales—that federal courts have held fall *outside* of the federal program. Accordingly, Act 1103 functions as a price cap for contract pharmacy sales that impermissibly constrains manufacturers'

"opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *Id.* at 1372.

70.     Act 1103 is thus preempted by federal patent law. States are not permitted to set the prices of patented drugs or to "re-balance" the "rewards and incentives" embodied in the federal patent laws, as Arkansas has done here. *Id.* at 1374.

71.     In addition to patent preemption, Act 1103 is also preempted by Section 340B—and by the federal court injunction that AstraZeneca has obtained thereunder—because the Arkansas law directly conflicts with that federal statute, stands as an obstacle to the achievement of Congress's purposes in enacting Section 340B, and intrudes on the exclusively federal field of the 340B program.

72.     The U.S. Court of Appeals for the Eighth Circuit recently held that Section 340B does not preempt Act 1103. *PhRMA*, 2024 WL 1061438, at *4-*6. As noted above, however, that ruling was predicated on two factual premises regarding the relationship between covered entities and contract pharmacies that are incorrect—and that AstraZeneca disputes in this Complaint. *See* ¶¶ 61-63, *supra*. In addition, because AstraZeneca was not a party in that case (and is not a PhRMA member), the Eighth Circuit did not consider the effect of the federal court injunction in AstraZeneca's favor, which forbids interference with AstraZeneca's lawful contract pharmacy policy, with which Act 1103 conflicts. *See* ¶¶ 43-44, *supra*.

73.     Insofar as this Court nevertheless believes that it would be required by the Eighth Circuit's ruling to reject a preemption claim based on Section 340B, AstraZeneca disagrees with that decision and hereby preserves the claim—in light of the differences between the allegations in this Complaint and the claims and factual findings considered by the Eighth Circuit, and also in the event that the Eighth Circuit's decision is overturned.

*Act 1103 Violates the Contracts Clause*

74.     Act 1103 also violates the Contracts Clause of the U.S. Constitution. Article I, section 10, clause 1 of the Constitution provides, "No State shall ... pass any ... Law impairing the Obligation of Contracts." Courts have interpreted the Contracts Clause to require a three-part test to balance the State's obligation not to impair contracts with the State's interest in public welfare. *See Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002). First, the court asks "whether the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." *Id.* Second, if the court finds substantial impairment, it must examine whether the State has a "significant and legitimate public purpose behind the regulation." *Id.* (citation omitted). Third, if the State presents a legitimate justification for the impairment, the court "must determine 'whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412 (1983) (alterations in original)).

75.     Act 1103 fails at every stage of this test. Act 1103 substantially impairs a contractual relationship. As explained above, the 340B program operates through contracts, which are called pharmaceutical pricing agreements (PPAs). PPAs are "uniform agreements that recite the responsibilities § 340B imposes . . . on drug manufacturers and the Secretary of HHS." *Astra USA*, 563 U.S. at 113. While PPAs are not "transactional, bargained-for contracts," *id.*, they nonetheless announce the parties' rights and obligations like any other contract, and manufacturers like AstraZeneca are entitled to rely on the PPA's terms when developing their business. Among those terms is the requirement that manufacturers offer discounted drugs only to a specifically delineated set of "covered entities." As the Third Circuit recently underscored, neither the 340B statute nor the PPA requires AstraZeneca to deliver discounted drugs to an unlimited number of

22

for-profit contract pharmacies that Congress has not designated as covered entities. *Sanofi Aventis*, 58 F.4th at 706.

76.    Act 1103 operates as a substantial impairment of AstraZeneca's PPA with the HHS Secretary. AstraZeneca joined the 340B program with the expectation and understanding that it would be required to provide discounted drugs to only a limited number of covered entities, and it accepted that obligation. Act 1103 seeks to unilaterally expand AstraZeneca's obligations under that contract—without AstraZeneca's consent—by requiring AstraZeneca to make discounted drugs available for an entirely new category of sales: contract pharmacy sales.

77.    The Supreme Court has held that similar expansions of beneficiaries to a contract constitute substantial impairment under the Contracts Clause. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245-46 (1978) (Contracts Clause prohibited Minnesota from requiring company to provide additional pension benefits after it had agreed to provide pension benefits under specific contractual conditions); *see United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010) (Contracts Clause prohibited state from enacting legislation increasing obligations on companies that had agreed to insure state employees under specific conditions).

78.    Any justification Arkansas might offer for Act 1103 would be insufficient under the Contracts Clause. Arkansas cannot claim that its law is necessary to provide access to 340B drugs to covered entities and their patients, because AstraZeneca's policy already ensures that every covered entity is offered those drugs at a discounted price. Indeed, AstraZeneca's policy goes further, allowing covered entities to designate a single contract pharmacy if it does not have an on-site pharmacy to dispense AstraZeneca's drugs.

79.    Arkansas has no legitimate justification for requiring unlimited contract pharmacy arrangements, which will advance the economic interests of for-profit pharmacies at the expense

of companies like AstraZeneca, particularly where Congress itself has not required them. *See Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 732 (8th Cir. 2019) (noting that "the Contract Clause prohibits special-interest redistributive laws, even if the legislation might have a conceivable or incidental public purpose").

80.     Nor can Arkansas justify Act 1103 as a cost-reduction mechanism for patients. Studies show that most 340B discounts to contract pharmacies are *not* passed on to patients, who must pay full price for their drugs. *See* ¶ 29, *supra*.

81.     Finally, even if Arkansas could articulate a legitimate justification for Act 1103's impairment of AstraZeneca's PPA, that justification would not be reasonable and necessary to achieve the State's goals.

### *Act 1103 Violates the Federal and Arkansas Takings Clauses*

82.     The Takings Clause of the U.S. Constitution provides that "private property" may not "be taken for public use, without just compensation." U.S. Const. amend. V.

83.     The Takings Clause of the Arkansas Constitution provides that "[t]he right of property is before and higher than any constitutional sanction," and that "private property shall not be taken, appropriated or damaged for public use, without just compensation therefor." Ark. Const. art. II, § 22.

84.     Under these Takings Clauses, although the government may take private property "for public use" so long as it pays "just compensation," the government may never take private property for *private* use, regardless of the amount of compensation paid. As the U.S. Supreme Court has explained, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); *see Pfeifer v. City of Little Rock*, 346 Ark. 449, 459 (2001). Such takings for private use are always unlawful, since

"[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).

85.     Act 1103 takes the private property of manufacturers like AstraZeneca for private, not public, use. The law forces manufacturers to transfer their prescription drugs to other private (non-governmental) entities—namely, to contract pharmacies and the covered entities with which they contract.

86.     This forced transfer would be unlawful even if manufacturers were paid just compensation for these contract pharmacy sales. *See id*. But manufacturers are *not* justly compensated for the forced transfers covered by the law: The law requires manufacturers to make these transfers at steeply discounted prices, well below fair market value.

87.     This forced transfer results in the "physical appropriation" of manufacturers' prescription drugs by contract pharmacies and covered entities, and it therefore constitutes "a *per se* taking." *Cedar Point Nursery v. Hasid*, 594 U.S. 139, 149 (2021).

88.     But even if Act 1103 did not involve a physical appropriation, it would still constitute a regulatory taking because it (1) has a profound economic impact on the value of the property subject to the law; (2) significantly interferes with manufacturers' investment-backed expectations; and (3) forces manufacturers to transfer title to their property, depriving them of the full use and enjoyment of that property. *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

89.     Act 1103 accordingly violates the Takings Clauses of the U.S. Constitution and the Arkansas Constitution.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**(Declaratory/Injunctive Relief – Act 1103 is Preempted by Federal Patent Law
Supremacy Clause, U.S. Const. art. VI, cl. 2)**

90.     Plaintiff realleges and incorporates by reference all prior and subsequent
paragraphs.

91.     The Supremacy Clause, U.S. Const. art. VI, cl. 2, prohibits a State from enacting
any law "which interferes with or is contrary to federal law," *Felder*, 487 U.S. at 138. And state
laws that cap or fix drug prices are preempted by federal patent law because they "re-balance the
statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in
order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374.

92.     Act 1103's provisions requiring manufacturers to distribute 340B drugs to
unlimited contract pharmacies, and empowering Defendant McClain and AID to pursue purported
violations of the statute, are preempted by federal patent law under the Supremacy Clause.

93.     The obligation imposed by Act 1103 on manufacturers—to deliver 340B-
discounted drugs to unlimited contract pharmacies—restricts the prices at which manufacturers
can sell their patented drugs and constrains manufacturers' "opportunity" to take advantage of the
benefits of exclusivity "during the patent's term." *Id.* at 1372. The Act therefore impermissibly
seeks to cap prices and to "re-balance" the "rewards and incentives" embodied in the federal patent
laws. *Id.* at 1374. Act 1103 is therefore preempted by federal patent law under the Supremacy
Clause.

### SECOND CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – Act 1103 Violates the Contracts Clause
Contracts Clause, U.S. Const. art. I, § 10, cl. 1)**

94.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

95.     Under the Contracts Clause, U.S. Const. art. I, § 10, cl. 1, "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." The Contracts Clause thus prohibits States from enacting legislation that "operate[s] as a substantial impairment of a contractual relationship." *Ass'n of Equip. Mfrs.*, 932 F.3d at 730.

96.     Act 1103 violates the Contracts Clause. It substantially impairs AstraZeneca's PPA with the HHS Secretary by requiring delivery of 340B-discounted drugs to contract pharmacies, thus purporting to substantially expand AstraZeneca's obligations under the agreement beyond what the agreement itself provides.

97.     Arkansas has no valid justification for impairing AstraZeneca's PPA. AstraZeneca's policy ensures that every covered entity is offered 340B drugs at statutorily required prices. The policy also allows covered entities without an on-site pharmacy to utilize a single contract pharmacy, which is more than the statute requires. Compelling AstraZeneca to provide 340B-discounted drugs to unlimited contract pharmacies would advance the economic interests of for-profit pharmacies at AstraZeneca's expense, with little to no cost benefit to 340B patients.

98.     Even if Arkansas could identify a legitimate justification for impairing AstraZeneca's PPA, it would not be reasonable and necessary to achieve the State's goals.

99.     Act 1103 is unconstitutional under the Contracts Clause to the extent it requires AstraZeneca to deliver discounted drugs to contract pharmacies that do not qualify as covered

entities, and which therefore are not included within the anticipated or actual scope of the PPA that AstraZeneca signed with the HHS Secretary.

### THIRD CLAIM FOR RELIEF

### (Declaratory/Injunctive Relief – Act 1103 Violates the Takings Clauses of the U.S. Constitution, amend. V, and the Arkansas Constitution, art. II, § 22)

100.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

101.    Under the Takings Clause of the U.S. Constitution, amend. V, and the Takings Clause of the Arkansas Constitution, art. II, § 22, the government may not take "private property" for private use—such as requiring the transfer of ownership from one private party to another—even if just compensation is paid.

102.    Act 1103 takes private property for private use by forcing manufacturers to transfer their prescription drugs to contract pharmacies and covered entities.

103.    Act 1103 also denies manufacturers just compensation because it requires that their drugs be transferred to contract pharmacies at below-market prices.

104.    The forced transfer of drugs under Act 1103 constitutes a taking per se or, in the alternative, a regulatory taking.

105.    Act 1103 is therefore unconstitutional under the federal and Arkansas Takings Clauses.

### FOURTH CLAIM FOR RELIEF

### (Declaratory/Injunctive Relief – Act 1103 is Preempted by Section 340B Supremacy Clause, U.S. Const. art. VI, cl. 2)

106.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

107.    Act 1103 is preempted by Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, and by the federal court injunction that AstraZeneca has obtained thereunder.

108.    The U.S. Court of Appeals for the Eighth Circuit has held that Section 340B does not preempt Act 1103. *PhRMA*, 2024 WL 1061438, at *4-*6. But that ruling is distinguishable because it was predicated on two factual premises regarding the relationship between covered entities and contract pharmacies that are incorrect and that AstraZeneca disputes in this Complaint. In addition, because AstraZeneca was not a party in that case (and is not a PhRMA member), the Eighth Circuit did not consider the effect of the federal court injunction in AstraZeneca's favor.

109.    AstraZeneca also disagrees with the Eighth Circuit's decision in *PhRMA*. To the extent that this Court believes that a preemption claim based on Section 340B is governed by the ruling in that case—notwithstanding the legal and factual differences between AstraZeneca's claim and the one adjudicated in *PhRMA*—AstraZeneca hereby asserts the claim in order to preserve it.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** AstraZeneca requests a judgment in its favor against Defendant as follows:

A.    Declare that Act 1103 is preempted by federal law and is therefore null, void, and unenforceable;

B.    Declare that Act 1103 is unconstitutional as applied to AstraZeneca under the Contracts Clause of the U.S. Constitution;

C.    Declare that Act 1103 is unconstitutional as applied to AstraZeneca under the Takings Clauses of the U.S. Constitution and the Arkansas Constitution.

D.    Declare that AstraZeneca is not required to offer 340B discounts for unlimited contract pharmacy sales under Arkansas law;

E.    Issue preliminary and permanent injunctive relief preventing Defendant from implementing or enforcing Act 1103 against AstraZeneca or any of its affiliates, officers, agents, or contractors;

F.    Issue preliminary and permanent injunctive relief preventing Defendant from seeking civil penalties, equitable relief, or any other remedy based on any alleged violation of Act 1103 by AstraZeneca or any of its affiliates, officers, agents, or contractors;

G.    Award AstraZeneca reasonable attorneys' fees and costs, as appropriate; and

H.    Grant such other and further relief as the Court may deem appropriate.

Dated: March 25, 2024  Respectfully submitted,

**ELDRIDGE BROOKS, PLLC**

Conner Eldridge, Ark. Bar No. 2003155
Emily A. Neal, Ark. Bar No. 2003087
ELDRIDGE BROOKS, PLLC
5115 West JB Hunt Drive, Suite 500
Rogers, AR 72758
(479) 553-7678 telephone
(479) 553-7553 facsimile
conner@eldridgebrooks.com
emily@eldridgebrooks.com

AND

Allon Kedem*
Jeffrey L. Handwerker*
Stephen K. Wirth*
Samuel I. Ferenc*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000 telephone
(202) 942-5999 facsimile
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com
stephen.wirth@arnoldporter.com
sam.ferenc@arnoldporter.com

*Applications to be admitted pro hac vice forthcoming*

*Attorneys for Plaintiff AstraZeneca Pharmaceuticals LP*

31