**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

ASTRAZENECA PHARMACEUTICALS LP

*Plaintiff,*

—v—

ALAN MCCLAIN, in his official capacity
as Commissioner of the Arkansas
Insurance Department

*Defendant.*

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 1 8 2024

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

Case No. 4:24-cv-268-BRW

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**
**BY DALLAS COUNTY MEDICAL CENTER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

    I.     Legal Background ..................................................................................... 2

          A.    Intervention ..................................................................................... 2

               1.    Mandatory Intervention ...................................................... 2

               2.    Permissive Intervention ...................................................... 3

               3.    Timeliness ........................................................................... 4

               4.    Standing .............................................................................. 4

          B.    The 340B Program and 340B Drug Distribution ......................... 5

          C.    Restrictive Manufacturer Policies ................................................ 7

          D.    Arkansas Act 1103 and *PhRMA v. McClain* .............................. 8

    II.    Factual Background ................................................................................. 9

          A.    AID's Recent Enforcement Action ............................................... 9

          B.    Dallas County Medical Center .................................................... 10

ARGUMENT ....................................................................................................... 12

    I.    DCMC Has Standing to Intervene in This Litigation ........................... 12

          A.    DCMC Has Suffered an Injury in Fact ....................................... 12

          B.    DCMC's Harms Are Traceable to Plaintiff's Restrictive Contract Pharmacy Policies ....................................................................... 14

          C.    DCMC's Harms Are Redressable by This Court ........................ 14

    II.    DCMC Satisfies the Standards to Intervene as of Right Under Rule 24(a) .......... 14

          A.    DCMC Has a Significant Interest in the Subject Matter of This Action .. 15

          B.    DCMC's Interests Will Be Impaired by the Disposition of the Litigation ... .......................................................................................................... 17

          C.    DCMC's Interests Are Not Adequately Protected by the Parties ............. 18

III.   DCMC Satisfies the Standards of Permissive Intervention Under Rule 24(b)(2) .... ............................................................................................................ 20

     A.   Intervention Will Not Cause Undue Delay or Prejudice ......................... 20

     B.   DCMC Shares a Common Question of Law or Fact ............................... 21

IV.   DCMC's Motion is Timely .................................................................... 21

CONCLUSION .................................................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088 (8th Cir. 2011) .................................. 22

*Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150 (1970)......................................... 12

*AstraZeneca v. Azar*, No. 1:21-cv-27 (D. Del. May 5, 2023) ......................................................... 8

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..................................................................... 5

*Coffey v. Comm'r*, 663 F.3d 947 (8th Cir. 2011)..................................................................... 4, 20

*Corby Recreation, Inc. v. General Elec. Co.*, 581 F.2d 175 (8th Cir. 1978) ........................... 3, 18

*Curry v. Regents of Univ. of Minn.*, 167 F.3d 420 (8th Cir. 1999) .................................................. 21

*Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986) ................................................ 19

*Eckles v. City of Corydon*, 341 F.3d 762 (8th Cir. 2003) ............................................................. 13

*Granville House, Inc. v. HHS*, 715 F.2d 1292 (8th Cir. 1983) ............................................... 13, 15

*Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 60 F.3d 1304
    (8th Cir. 1995)............................................................................................... 3, 14, 17, 18

*Liddell v. Special Admin. Bd. of the Transitional Sch. Dist. of the City of St. Louis*,
    894 F.3d 959 (8th Cir. 2018)............................................................................................ 4, 14

*Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*, No. 4:82-cv-866-DPM, 2011 WL 6842642
    (E.D. Ark. Dec. 29, 2011) ................................................................................................ 4, 21

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 738 F.2d 82 (8th Cir. 1984) ..... 17

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................................... 5, 14

*Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996)......................................................................... 14

*Mille Lacs Band of Chippewa Indians v. Minn.*, 989 F.2d 994 (8th Cir. 1993) ............... 2, 3, 4, 18

*Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969 (8th Cir. 2014) .................................... 2, 13

*Pharm. Rsch. & Mfrs. of Am. v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) ........................ 9

*Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024)............................. passim

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action,* 558 F.2d 861
(8th Cir. 1977) ...................................................................................................... 15

*Ratchford v. Evans*, No. 5:11-CV-00180-DPM, 2012 WL 177855, at *1
(E.D. Ark. Jan. 23, 2012) .................................................................................... 21

*Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023) ...................................... 8

*SEC v. Flight Transp. Corp.,* 699 F.2d 943 (8th Cir. 1983) ......................................... 2

*Shelton v. Kennedy Funding, Inc.*, No. 4:02-cv-00632-WRW, 2009 WL 1890579
(E.D. Ark. June 30, 2009) ............................................................................... 4, 20

*Sierra Club v. Robertson,* 960 F.2d 83 (8th Cir. 1992) ................................................ 3

*Smith v. SEECO, Inc.*, 922 F.3d 398 (8th Cir. 2019) ................................................ 3, 4

*South Dakota ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783 (8th Cir. 2003) ......... 3, 4, 20

*Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567
(8th Cir. 1998) .............................................................................................. 15, 16

*Steel-Arkansas v. EPA*, No. 3:15-CV-00333-JLH, 2016 WL 4045425, at *2
(E.D. Ark. Apr. 13, 2016) .................................................................................... 21

*United Sates v. Union Elec. Co.*, 64 F.3d 1152 (8th Cir. 1995) ............................... passim

*United States v. Metro. St. Louis Sewer Dist.,* 569 F.3d 829 (8th Cir. 2009) ................. 13

*United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824 (8th Cir. 2010) ........... 4

**STATUTES**

42 U.S.C. § 256b(a)(1) ................................................................................................ 5

42 U.S.C. § 256b(a)(4)(N) ........................................................................................ 10

42 U.S.C. § 256b(a)(5)(A)(i) ..................................................................................... 19

42 U.S.C. § 1395i–4(c)(2) ......................................................................................... 10

42 U.S.C. § 1395i–4(c)(2)(B)(i)(I) ............................................................................ 10

42 U.S.C. § 1396r-8 ................................................................................................... 19

42 U.S.C. § 1396r-8(a)(1) ........................................................................................... 5

42 U.S.C. § 1396r-8(j)(l)(A) ..................................................................................... 19

Ark. Code Ann. § 17-92-605(d) ................................................................ 13

Ark. Code Ann. § 17-92-607 ........................................................ 11, 13, 17

Ark. Code Ann. §§ 23-92-601–606 ................................................................ 1

Ark. Code Ann. § 23-92-604(c) ........................................................ 12, 14

Ark. Code Ann. § 23-92-604(c)(1) ................................................................ 1, 8

Ark. Code Ann. § 23-92-604(c)(2) ................................................................ 8

Ark. Code Ann. §§ 23-92-604(c)(1), (c)(2) ................................................................ 8

## REGULATIONS

42 C.F.R. §§ 485.601-485.647 ................................................................ 10

42 C.F.R. § 485.610(c) ................................................................ 10

Ark. Ins. Dep't, Rule 123 340B Drug Program Nondiscrimination Requirements
(Sept. 19, 2022), http://170.94.37.152/REGS/003.22.22-005F-23027.pdf ................................ 8

## RULES

Fed. R. Civ. P. 24 ................................................................ 2

Fed. R. Civ. P. 24(a) ................................................................ 1, 3

Fed. R. Civ. P. 24(a)(2) ................................................................ 2

Fed. R. Civ. P. 24(a), (b)(1) ................................................................ 4

Fed. R. Civ. P. 24(b) ................................................................ 1, 3, 4

Fed. R. Civ. P. 24(b)(1)(B) ................................................................ 20, 21

Fed. R. Civ. P. 24(b)(1), (b)(1)(B) ................................................................ 3

## RECORDS, BRIEFS, PETITIONS AND ORDERS

Order, *PhRMA v. McClain*, 4:21-cv-00864 (E.D. Ark. May 3, 2022) ................................ passim

## OTHER AUTHORITIES

AbbVie, *AbbVie Policy* (Apr. 30, 2024),
https://www.340besp.com/AbbVie%20340B%20Integrity%20Initiative%20Update%20(07.01.
2024).pdf ................................................................ 16

Am. Soc'y of Health-System Pharmacists, *ASHP Accreditation Standard for Specialty Pharmacy Practice* (July 2020), https://www.ashp.org/-/media/assets/products-services/ASHP-Accreditation-Programs/docs/Accreditation-Standard-Specialty-Pharmacy-Practice.pdf ......... 6

H.R. Rep. No. 102-384, pt. 2, at 12 (1992) .................................................................................. 5

HHS Office of the Gen. Couns., Advisory Op. 20-06 on Contract Pharmacies Under the 340B Program (Dec. 30, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/340B-AO-FINAL-12-30-2020_0.pdf ...................................................................... 8

Letter from Booth Rand, Gen. Couns., Legal Div., Ark. Ins. Dep't, to President, AstraZeneca (May 2, 2024), https://insurance.arkansas.gov/events/event/notice-of-public-hearing-astra-zeneca ........................................................................................................................................... 10

*Mission Statement*, Dallas Cnty. Med. Ctr., https://www.dallascountymedicalcenter.com/getpage.php?name=mission&sub=About%20Us (last visited July 16, 2024) ...................................................................................................... 13

PioneerRx, How to Open a Pharmacy, https://www.pioneerrx.com/how-to-open-a-pharmacy, https://www.pioneerrx.com/how-to-open-a-pharmacy .............................................................. 6

Sarah Shoemaker-Hunt et al., Cost of Dispensing Study (Jan. 2020), https://www.nacds.org/pdfs/pharmacy/2020/NACDS-NASP-NCPA-COD-Report-01-31-2020-Final.pdf .................................................................................................................................... 6

## INTRODUCTION

Dallas County Medical Center ("DCMC") respectfully moves to intervene as a defendant in this action to defend Arkansas Act 1103 of 2021 ("Act 1103") (codified at Ark. Code Ann. §§ 23-92-601–606). In a previous case against Defendant challenging Act 1103, this Court granted intervention as of right to two stakeholders that, like DCMC, represent the interests of Arkansas 340B covered entities in upholding Act 1103. *See* Order, *PhRMA v. McClain*, 4:21-cv-00864-BRW (E.D. Ark. May 3, 2022), ECF No. 22. In its order granting intervention, this Court also stated that it would have granted permissive intervention to those stakeholders had intervention as of right not been warranted. *Id.* This Court's prior ruling was sound, and DCMC respectfully requests that this Court reach the same result here and grant the motion to intervene.

Act 1103 includes two provisions—Ark. Code Ann. § 23-92-604(c)(1) and (c)(2)—requiring pharmaceutical manufacturers to ship drugs discounted under the federal 340B drug pricing program ("340B Program") to pharmacies under contract with Arkansas safety-net providers. Plaintiff in this lawsuit seeks an order declaring both provisions of Act 1103 invalid. Act 1103 was enacted to protect Arkansas safety-net providers, yet no health care provider is a party to this action.

DCMC represents the interests of the law's intended beneficiaries. DCMC participates in the 340B Program and relies on contract pharmacy arrangements to meet the pharmacy needs of its patients. DCMC is, therefore, entitled to intervene under Rule 24(a) as a defendant because it has a significant interest in the subject matter of this action that could be impaired by the disposition of the litigation, and no party completely and adequately represents its interests. Alternatively, the Court should grant permissive intervention under Rule 24(b) because DCMC has claims and defenses that share common questions of law and fact with the action, and its

intervention will not cause undue delay or prejudice to the parties. This action is in its infancy, and the bench trial is scheduled for next year, April 15, 2025.

## BACKGROUND

I.    **Legal Background**

    A.    **Intervention**

        1.    **Mandatory Intervention**

Under Rule 24(a), a party may intervene as a matter of right if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Rule 24(a) requires a proposed intervenor to file a timely motion that satisfies a tripartite test: "1) the party must have a recognized interest in the subject matter of the litigation; 2) that interest must be one that might be impaired by the disposition of the litigation; and 3) the interest must not be adequately protected by the existing parties." *Mille Lacs Band of Chippewa Indians v. Minn.*, 989 F.2d 994, 997 (8th Cir. 1993); *see also Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 975 (8th Cir. 2014). In the Eighth Circuit, Rule 24 is construed liberally and courts should "resolve all doubts in favor of the proposed intervenors." *United Sates v. Union Elec. Co.*, 64 F.3d 1152, 1158 (8th Cir. 1995).

The requirement for a recognized interest in the litigation is construed broadly, and all parties affected by the litigation should be included if practicable. *Union Elec. Co.,* 64 F.3d at 1162 (quoting *SEC v. Flight Transp. Corp.,* 699 F.2d 943, 949 (8th Cir. 1983) (The court should be mindful "that [t]he interest test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process") (internal quotation marks omitted)); *see also Sierra Club v. Robertson*, 960 F.2d 83, 86

2

(8th Cir. 1992) ("[Intervention] serves the judicial system's interest in resolving all related controversies in a single action.").

"Rule 24(a)(2) requires only that disposition of the action may as a practical matter impair or impede the applicant's ability to protect [its] interest." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 60 F.3d 1304, 1307-08 (8th Cir. 1995). A party claiming an interest in the litigation does not have to wait until he or she has suffered irreparable harm before the requirements for intervention under Rule 24(a) have been met. *Union Elec. Co.*, 64 F.3d at 1162. If the effect of an adverse ruling would have a negative stare decisis effect on a proposed intervenor's interests, that impact would provide the requisite type of impairment to warrant intervention of right. *See Corby Recreation, Inc. v. General Elec. Co.*, 581 F.2d 175, 176-77 (8th Cir. 1978).

A proposed intervenor typically has a "minimal burden" of showing that its interests are not adequately represented by the parties. *Mille Lacs*, 989 F.2d at 1001. A proposed intervenor can rebut the general presumption that the government is adequately representing its interests by showing that its interests actually differ from, or in some instances conflict with, the government's interests. *Union Elec. Co.*, 64 F.3d at 1169; *Mille Lacs*, 989 F.2d at 1001.

### 2.    Permissive Intervention

Permissive intervention under Rule 24(b) provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1), (b)(1)(B). The decision to grant or deny a motion for permissive intervention is wholly discretionary, but courts construe motions to intervene "liberally . . . in favor of the proposed intervenors." *Smith v. SEECO, Inc.*, 922 F.3d 398, 405–06 (8th Cir. 2019) (internal quotations omitted); *South Dakota ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 787 (8th Cir. 2003).

The principal factor that courts consider in ruling on a Rule 24(b) permissive intervention motion is "whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights." *Shelton v. Kennedy Funding, Inc.*, No. 4:02-cv-00632-WRW, 2009 WL 1890579, at *2 (E.D. Ark. June 30, 2009) (quoting *South Dakota ex rel. Barnett*, 317 F.3d at 787); *Coffey v. Comm'r*, 663 F.3d 947, 951 (8th Cir. 2011) (intervention is improper "only when it causes undue delay or prejudice"). Courts may consider whether the "prospective intervenors have pledged to meet the Court's existing deadlines" and the "benefit of [having] intervenors' important views." *Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*, No. 4:82-cv-866-DPM, 2011 WL 6842642, at *6 (E.D. Ark. Dec. 29, 2011).

### 3.   Timeliness

Rule 24 requires that a motion to intervene be "timely." Fed. R. Civ. P. 24(a), (b)(1). Deciding the timeliness of intervention requires the court to "consider[ ] all the circumstances of the case." *United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824, 832 (8th Cir. 2010) (quoting *Mille Lacs*, 989 F.2d at 998). When considering timeliness, the Eighth Circuit applies the following factors: "(1) the extent the litigation has progressed at the time of the motion to intervene; (2) the prospective intervenor's knowledge of the litigation; (3) the reason for the delay in seeking intervention; and (4) whether the delay in seeking intervention may prejudice the existing parties." *SEECO, Inc.*, 922 F.3d at 405. "The question for determining the timeliness of the motion to intervene is whether existing parties may be prejudiced by the delay in moving to intervene, not whether the intervention itself will cause the nature, duration, or disposition of the lawsuit to change." *Union Elec. Co.*, 64 F.3d at 1159 (citations omitted).

### 4.   Standing

The Eighth Circuit has held that an intervenor must establish Article III standing. *Liddell v. Special Admin. Bd. of the Transitional Sch. Dist. of the City of St. Louis,* 894 F.3d 959, 964

(8th Cir. 2018). Article III standing requires (1) injury-in-fact; (2) causation; and (3) redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To satisfy the injury-in-fact element, an injury must be "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

**B.**     **The 340B Program and 340B Drug Distribution**

Established in 1992, the voluntary 340B Program requires participating drug companies to offer discounts on covered outpatient drugs to statutorily defined safety-net providers, referred to as "covered entities," as a condition of the companies' drugs being reimbursed by Medicaid and Medicare Part B. 42 U.S.C. § 256b(a)(1); 42 U.S.C. § 1396r-8(a)(1). The Health Resources and Services Administration ("HRSA") within the federal Department of Health and Human Services ("HHS") administers the 340B Program. The 340B Program makes drugs more affordable for covered entities because those entities provide significant levels of uncompensated care, and the discounts available through the 340B Program help relieve that burden. Covered entities essentially lose less money on prescription drugs under the 340B Program for their uninsured and underinsured patients. By mitigating these losses, covered entities can be more generous with reducing or waiving patient copayments at the pharmacy counter. The 340B Program also generates revenue for covered entities so that they are less dependent on taxpayer support. To the extent a covered entity patient has prescription drug coverage, the difference between the insurer's payment and the discounted price is income to the covered entity to supplement federal funds, thus allowing the covered entity to stretch scarce federal resources as far as possible and enabling it to reach more eligible patients and provide more comprehensive services. H.R. Rep. No. 102-384, pt. 2, at 12 (1992) (Conf. Rep.).

Most illnesses and injuries cannot be adequately treated or managed without the patient taking one or more medications. That means that providers of health care—such as DCMC—

must ensure that their patients have access to a pharmacy to fill their prescriptions. For this reason, many providers own and operate their own pharmacies, often referred to as in-house pharmacies. However, because the construction and management of a pharmacy is expensive and requires special expertise, many providers contract with independently owned pharmacies to meet the pharmacy needs of their patients.[1] In most cases, these contract pharmacies are located in the provider's service area in locations that are convenient and accessible to the provider's patients.[2] Typically, drugs dispensed by contract pharmacies are purchased under what is referred to as a "bill to/ship to" arrangement—the drugs are billed to the hospital or clinic but shipped to the contract pharmacy. The provider purchaser takes title to the drugs but not physical possession of them. A wholesaler ships the drugs to the contract pharmacy, which then takes physical custody of the drugs and dispenses them on the provider's behalf.

It became abundantly clear after passage of the 340B statute in 1992 that, if covered entities did not possess the right to acquire drugs through bill to/ship to arrangements, many of them—specifically those lacking in-house pharmacies—would never have been able to participate in the 340B Program, even though they clearly met the eligibility criteria established by Congress. HRSA felt compelled to remind covered entities that they could still participate,

---

[1] *See, e.g.*, PioneerRx, *How to Open a Pharmacy*, https://www.pioneerrx.com/how-to-open-a-pharmacy, https://www.pioneerrx.com/how-to-open-a-pharmacy (estimating that the cost of establishing a pharmacy is between $400,000 and $600,000); Sarah Shoemaker-Hunt et al., Cost of Dispensing Study (Jan. 2020), https://www.nacds.org/pdfs/pharmacy/2020/NACDS-NASP-NCPA-COD-Report-01-31-2020-Final.pdf (stating that the cost of dispensing non-specialty drugs at retail pharmacies ranges from $692,400, for a volume of 40,000 prescriptions a year, to $1,427,988.10, for a volume of 119,999 prescriptions a year, and that the cost of dispensing specialty drugs ranges from $294,320, for a volume of 40,000 prescriptions a year, to $882,952 for a volume of 119,999 prescriptions a year); *see also* Ark. Admin. Code §§ 007.39.4-04-00-0001 to 007.39.4-04-07-0006 (stating nuanced structural, inventory, and personnel requirements of Arkansas pharmacies).

[2] Some medications, however, require special storage and handling and can only be dispensed by a specialty pharmacy through a mail order program. These specialty pharmacies are generally located outside the provider's service area. *See, e.g.*, Am. Soc'y of Health-System Pharmacists, *ASHP Accreditation Standard for Specialty Pharmacy Practice* (July 2020), https://www.ashp.org/-/media/assets/products-services/ASHP-Accreditation-Programs/docs/Accreditation-Standard-Specialty-Pharmacy-Practice.pdf (noting that specialty pharmacy practice involves high cost drugs; complex treatment regimens requiring ongoing clinical monitoring and patient education infrastructure; specialty drug handling, storage, and delivery infrastructure; and other services required for complex high-touch disease states and treatments).

so, in 1996, it issued guidance explicitly recognizing covered entities' existing right to use bill to/ship to arrangements for meeting the pharmacy needs of their patients.

### C.    Restrictive Manufacturer Policies

For nearly three decades, every drug company participating in the 340B Program, including Plaintiff, honored bill to/ship to arrangements and treated contract pharmacies the same as in-house pharmacies. That changed abruptly, however, in July 2020 when one manufacturer after another either fully eliminated or significantly restricted distribution of 340B drugs ordered through bill to/ship to arrangements.

On August 17, 2020, Plaintiff announced that it would no longer honor most contract pharmacy arrangements, effective October 1, 2020. Specifically, Plaintiff announced that it would no longer honor *any* contract pharmacy arrangements entered into by 340B covered entities that operate in-house pharmacies. For covered entities without an in-house pharmacy, Plaintiff honors a contract pharmacy arrangement for a single pharmacy location only. As of the date of the filing of this memorandum, thirty-six manufacturers have unilaterally imposed similar restrictions on contract pharmacy arrangements.[3] These restrictions have reduced the resources available to covered entities to meet the needs of their vulnerable patients, including the need for affordable and accessible prescription drugs.

HHS issued a letter to Plaintiff informing it that its restrictive policy violated the 340B statute. Plaintiff then sued HHS in the U.S District Court for the District of Delaware seeking, among other actions, an order that HHS's enforcement letter was invalid. *See* HHS Office of the

---

[3] The following drug companies have restricted 340B pricing: AbbVie, Alkermes, Amgen Inc., Astellas Pharma Inc., AstraZeneca Pharmaceuticals LP, Bausch Health, Bausch & Lomb Americas, Bayer, Biogen, Boehringer Ingelheim Pharmaceuticals, Inc., Bristol Myer Squibb, Eisai, Eli Lilly and Company, EMD Serono, Exelixis, Genentech, Gilead Sciences, Inc., GlaxoSmithKline, Incyte, Jazz Pharmaceuticals, Johnson & Johnson, Liquida, Merck and Company, Novartis Pharmaceuticals Corporation, Novo Nordisk, Inc., Organon & Co., Pfizer Inc., Sandoz, Sanofi-Aventis US LLC, Sobi, Sumitomo, Takeda Pharmaceuticals, Teva Pharmaceuticals, UCB, United Therapeutics Corporation, and Vertex.

Gen. Couns., Advisory Op. 20-06 on Contract Pharmacies Under the 340B Program (Dec. 30, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/340B-AO-FINAL-12-30-2020_0.pdf. The Third Circuit held that Plaintiff's restrictions, and those of the two other manufacturers that were parties to that appeal, do not violate the 340B statute. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023). On remand from the Third Circuit, the District Court of Delaware issued an injunction prohibiting HHS from enforcing its "reading of Section 340B" to require Plaintiff to honor an unlimited number of ship to/bill to arrangements. *AstraZeneca v. Azar*, No. 1:21-cv-27 (D. Del. May 5, 2023), ECF No. 123. This injunction applies only to HHS, which is not charged with administering Act 1103, and applies to the requirements of the 340B statute and not Act 1103. *See id.*

### D.    Arkansas Act 1103 and *PhRMA v. McClain*

Act 1103, referred to as the 340B Drug Pricing Nondiscrimination Act, protects bill to/ship to arrangements for covered entities and contract pharmacies located and doing business in Arkansas. Ark. Code Ann. §§ 23-92-604(c)(1), (c)(2). Consistent with the state's authority to regulate drug distribution to pharmacies within its borders, the statute regulates 340B drug distribution through two provisions. The first provision, Ark. Code Ann. § 23-92-604(c)(1), prohibits a drug manufacturer from denying a covered entity access to 340B drugs if the covered entity uses contract pharmacy arrangements to participate in the 340B Program. The second provision, Ark. Code Ann. § 23-92-604(c)(2), prohibits a manufacturer from blocking an Arkansas-based contract pharmacy from receiving 340B drugs on behalf of a covered entity. In September 2022, Defendant promulgated a regulation ("Rule 123") implementing Act 1103. Ark. Ins. Dep't, Rule 123 340B Drug Program Nondiscrimination Requirements (Sept. 19, 2022), http://170.94.37.152/REGS/003.22.22-005F-23027.pdf.

8

The Pharmaceutical Research and Manufacturers Association ("PhRMA") brought a lawsuit before this Court alleging that Act 1103 is preempted by the 340B statute, and this Court upheld Act 1103. *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022). Plaintiff was a member of PhRMA at the time that lawsuit was filed. This Court granted intervention as of right to two covered entity stakeholders—Community Health Centers of Arkansas ("CHCA") and Piggott Community Hospital ("PCH"). Order, *PhRMA v. McClain*, 4:21-cv-00864 (E.D. Ark. May 3, 2022), ECF No. 22. On March 12, 2024, the United States Court of Appeals for the Eighth Circuit affirmed this Court's ruling that Arkansas' Act 1103 was "not preempted by federal law under any theory." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024) ("*PhRMA v. McClain*").

In affirming this Court's ruling, the Eighth Circuit held that the 340B statute left room for state action and that pharmacies have historically "been an essential part of the 340B Program," noting that "the text of 340B is 'silent about delivery' of drugs." *PhRMA*, 95 F.4th at 1143. The Eighth Circuit further found that Congress was aware of the role of pharmacies and state pharmacy law in implementing the 340B program and that Congress's "silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field." *Id.* at 1144. The Eighth Circuit also held that Act 1103 did not conflict or create an obstacle to Congress's objectives for the 340B Program: "rather it does the opposite: Act 1103 assists in fulfilling the purpose of 340B." *Id.* at 1144-45.

## II.    Factual Background

### A.    AID's Recent Enforcement Action

After the *PhRMA v. McClain* litigation concluded, AID began to pursue an enforcement action against AstraZeneca. By letter dated May 2, 2024, AID published an Amended Notice of Public Hearing, rescheduling its administrative complaint hearing against Plaintiff. Letter from

Booth Rand, Gen. Couns., Legal Div., Ark. Ins. Dep't, to President, AstraZeneca (May 2, 2024), https://insurance.arkansas.gov/events/event/notice-of-public-hearing-astra-zeneca. The administrative hearing is scheduled for October 9, 2024, and relates to Plaintiff's restrictive contract pharmacy policy, which violates both Act 1103 and its implementing Rule 123. *Id.*

### B.    Dallas County Medical Center

DCMC is a nonprofit, government-funded hospital located in Fordyce, Arkansas. DCMC has been designated under the Medicare program as a critical access hospital ("CAH"). Based on its CAH status, DCMC participates as a covered entity under the 340B program. 42 U.S.C. §§ 256b(a)(4)(N), 1395i–4(c)(2); 42 C.F.R. §§ 485.601–485.647. As a requirement of its CAH designation, DCMC has twenty-five or fewer inpatient beds and is located in an area where residents would otherwise be required to travel long distances to receive inpatient medical care. *See* 42 U.S.C. § 1395i–4(c)(2)(B)(i)(I); 42 C.F.R. § 485.610(c). The nearest hospital to DCMC is Ouachita County Medical Center, which is approximately thirty-five miles from Fordyce. Ex. 1, June 26, 2024, Affidavit of David Mantz ("Mantz Aff.") ¶ 11.

Because of the distance between DCMC and the closet hospital, the town of Fordyce depends on DCMC's services, as illustrated by one recent, tragic example. On June 21, 2024, a gunman shot fourteen people at a Fordyce grocery store, resulting in four deaths and ten wounded. Victims were rushed to DCMC, arriving within twenty-five minutes of the shooting, where medical professionals promptly attended to thirteen of the gunshot victims. Ex. 1, Mantz Aff. ¶ 11. If not for DCMC, victims would have been transported an additional thirty-five miles to receive care. If that were the case, many more people would have likely died that day. Ex. 1, Mantz Aff. ¶ 11.

DCMC prioritizes community engagement and uses its resources, including 340B funds, to focus on initiatives aimed at improving not only the health, but the overall wellbeing of its

patients and the community at large.  For example, DCMC runs a Senior Intensive Outpatient program that is specifically designed to assist the senior adult population in restoring emotional and mental wellbeing.  Ex. 1, Mantz Aff. ¶ 12.  This "Stepping Stones" program includes services ranging from interdisciplinary treatment planning, individualized care planning, and counseling to transportation, meals, and structured daily activities.  DCMC also hosts a public health fair and has started a partnership with Mainstreet Health, which provides a navigator to work directly with patients at no charge.  Ex. 1, Mantz Aff. ¶ 12.  DCMC operates a telehealth follow-up clinic to allow patients to receive healthcare without missing as much work, having to finding transportation, or needing to navigate other barriers that inherently accompany in-person visits.  Ex. 1, Mantz Aff. ¶ 12.  Because DCMC serves a significant amount of low-income patients, it offers a generous sliding fee scale program based on income and family size.

Arkansas law prohibits governmentally funded and/or non-profit hospitals, like DCMC, from owning and operating an on-site retail pharmacy.  *See* Ark. Code Ann. § 17-92-607 (nonprofit, tax exempt, or governmentally funded hospital may not acquire direct or indirect interest in, or otherwise hold directly or indirectly a pharmacy license for the retail sale of drugs). Therefore, for its patients who have prescriptions for self-administered drugs, DCMC relies exclusively on independently-owned contract pharmacies to fill prescriptions with 340B drugs. DCMC depends on 340B savings to engage with the community and provide charity care.  Ex. 1, Mantz Aff. ¶ 13.  AstraZenca's contract pharmacy policy has directly harmed DCMC's ability to provide charity care and the above community resources.  From October 1, 2020, when Plaintiff first implemented its policy, through the end of May 2024, DCMC has lost an estimated $121,000 in 340B savings.  Ex. 1, Mantz Aff. ¶ 15.  This loss is a direct result of Plaintiff's policy.  Ex. 1, Mantz Aff. ¶ 15.

## **ARGUMENT**

DCMC satisfies the requirements for intervention as of right and permissive intervention. DCMC is entitled to mandatory intervention because it has standing, has timely moved for intervention, and has a significant, legally-protectable interest in the outcome of this litigation, which is not adequately represented by the Defendant. In the alternative, DCMC should be granted permissive intervention because intervention will not unduly delay or prejudice an existing party, and this motion is timely and presents common questions of law and fact with the current litigation. This Court granted intervention as of right to two covered entity stakeholders in a prior case challenging Act 1103. Order, *PhRMA v. McClain*, 4:21-cv-00864 (E.D. Ark. May 3, 2022), ECF No. 22. The Court's reasoning for granting intervention in *PhRMA v. McClain* applies equally to DCMC.

## I.    **DCMC Has Standing to Intervene in This Litigation**

DCMC has standing to litigate in its own right. It satisfies the requirements for Article III standing and has interests in this litigation that are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *See Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970). Plaintiff has obstructed use of bill to/ship to arrangements by DCMC and its Arkansas contract pharmacies. Those actions deprive DCMC of access to 340B drugs and, as a result, the savings and revenue it relies on to carry out its safety-net mission. Section 23-92-604(c) of Act 1103 protects the contractual rights of Arkansas covered entities and independent pharmacies to distribute 340B drugs through bill to/ship to arrangements. A ruling in favor of Plaintiff would exacerbate the economic harms that Plaintiff is inflicting on DCMC.

### A.    **DCMC Has Suffered an Injury in Fact**

DCMC has standing to intervene because it is harmed by Plaintiff's distribution limits on

12

340B drugs to in-house pharmacies rather than contract pharmacies except in a few narrow circumstances. The harm increases every day, so if this Court rules in favor of Plaintiff, DCMC's ability to sustain its operations, let alone continue to provide uncompensated care to indigent patients, will be severely compromised. This is due in large part to an Arkansas law prohibiting government hospitals, such as DCMC, to hold a license as a "retail" pharmacy to dispense drugs. Ark. Code Ann. §§ 17-92-605(d), 607. Accordingly, DCMC can only obtain 340B discounts on self-administered drugs through contract pharmacy arrangements. Without access to 340B drugs through such arrangements, the savings and revenue upon which DCMC relies to support uncompensated care will continue to erode.

DCMC's mission is to "improve the health and wellness of those [it] serve[s]." *Mission Statement*, Dallas Cnty. Med. Ctr., https://www.dallascountymedicalcenter.com/getpage.php? name=mission&sub=About%20Us (last visited July 16, 2024). DCMC's mission is compromised because its 340B Program savings and income have decreased due to Plaintiff's unilateral restrictions on shipment of 340B drugs to contract pharmacies in Arkansas. DCMC has lost an estimated $121,000 due to AstraZeneca's policy. Ex. 1, Mantz Aff. ¶ 13. DCMC, therefore, is experiencing direct financial harm that establishes injury-in-fact. *See Eckles v. City of Corydon*, 341 F.3d 762, 768 (8th Cir. 2003); *see also Nat'l Parks Conservation Ass'n*, 759 F.3d at 975. If the Court grants the relief that Plaintiff requests in this case, DCMC would "unavoidably be harmed economically." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 836 (8th Cir. 2009). Additionally, DCMC's primary mission of providing services to a vulnerable patient population would be threatened if this Court invalidates Section 23-92-604(c) of Act 1103. *See Granville House, Inc. v. HHS*, 715 F.2d 1292, 1297 (8th Cir. 1983) (in addition to economic injury, the plaintiff was injured by having "to withdraw from its primary mission of

treating the poor"). If Section 23-92-604(c) of Act 1103 is not enforced, DCMC's fiscal health will continue to decline and lead to dire consequences.

### B. DCMC's Harms Are Traceable to Plaintiff's Restrictive Contract Pharmacy Policies

The harms that DCMC suffers as the result of Plaintiff's contract pharmacy policy are undoubtedly traceable to Plaintiff. *Lujan*, 504 U.S. at 560-61. Plaintiff implemented its restrictive contract pharmacy policy on October 1, 2020. This policy restricts covered entities that do not operate an in-house pharmacy to one ship to/bill to arrangement at a single location. This restriction has significantly decreased DCMC's 340B savings, which is essential to funding programs for indigent and other needy patients. Ex. 1, Mantz Aff. ¶ 15. From October 1, 2020, through the end of May 2024, DCMC has lost an estimated $121,000 in 340B savings because of Plaintiff's policy. Ex. 1, Mantz Aff. ¶ 15. This harm is directly traceable to Plaintiff's restrictive contract pharmacy policy.

### C. DCMC's Harms Are Redressable by This Court

The harms imposed by Plaintiff are redressable by this Court because a decision upholding Act 1103 would require Plaintiff to allow distribution of 340B drugs to contract pharmacies. DCMC would, therefore, be able to order 340B self-administered medications for its patients who present prescriptions to contract pharmacies. *Cf. Liddell*, 894 F.3d at 966 (charter school parents would be redressed by a favorable decision); *Mausolf v. Babbitt*, 85 F.3d 1295, 1301-02 (8th Cir. 1996) (snowmobiling restrictions at issue were sufficiently definite and imminent enough to confer standing).

## II.    DCMC Satisfies the Standards to Intervene as of Right Under Rule 24(a)

DCMC satisfies the three-prong test for intervention as of right, which is construed liberally. *Union Elec. Co.*, 64 F.3d at 1162; *Kan. Pub. Emps. Ret. Sys.*, 60 F.3d at 1307 ("[W]e

construe Rule 24 liberally, and resolve any doubts in favor of the proposed intervenors.")
(internal citations omitted). DCMC has an interest in this litigation because it relies on 340B
contract pharmacies to receive and dispense needed medications to its patients, many of whom
are uninsured, underinsured or otherwise medically vulnerable. DCMC's interests will be
impacted by the litigation because Act 1103 protects its right to use all of its contract pharmacy
arrangements for ordering 340B drugs. In addition, Defendant does not adequately represent
DCMC's interests, which differ from, and in some respects directly conflict with, the
Defendant's interests.

A.    **DCMC Has a Significant Interest in the Subject Matter of This Action**

DCMC has a direct and substantial interest in the outcome of this litigation because
Section 23-92-604(c) protects its right to enter into contract pharmacy arrangements to order
340B drugs. *See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action,* 558 F.2d 861,
869 (8th Cir. 1977) (finding a neighborhood association had a "significantly protectable interest"
in enforcing a city ordinance). DCMC has a significant, legally protectable interest in this
lawsuit because its primary mission of providing services to Arkansas' most vulnerable patients
would be threatened if this Court invalidated Section 23-92-604(c). *Granville House, Inc.*, 715
F.2d at 1297 (finding injury when an organization's primary mission was impeded). DCMC
relies heavily on contract pharmacies to provide 340B medications to its patients. Thus, DCMC
has an interest in the Court upholding Act 1103, which addresses Plaintiff's policy restricting
distribution of 340B drugs to contract pharmacies.

DCMC's interests are not so remote that they are "contingent upon the occurrence of a
sequence of events." *Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d
567, 571 (8th Cir. 1998). Until July 2020, every drug manufacturer participating in the 340B
Program, including Plaintiff, recognized a 340B covered entity's right to dispense its 340B drugs

through contract pharmacies.  Significantly, unlike Plaintiff, other drug manufacturers have

relaxed or waived their policies in Arkansas in response to Act 1103 and the Eighth Circuit's

ruling *PhRMA v. McClain.  See, e.g.*, AbbVie, *AbbVie Policy* (Apr. 30, 2024),

https://www.340besp.com/AbbVie%20340B%20Integrity%20Initiative%20Update%20(07.01.2024).pdf;

Merck, *Merck Policy* (June 6, 2024),

https://www.340besp.com/Merck%20340B%20Program%20Integrity%20Initiative%20Letter%20-%20July%202024.pdf; Sanofi, *Sanofi Policy* (June 5, 2024),

https://www.340besp.com/340B%20Integrity%20Intiative%20Policy_July_1_24.pdf.

Thus, DCMC continues to face significant financial harms due to Plaintiff's policy—a

loss of $121,000 so far—due to conduct that Section 23-92-604(c) prohibits.  Ex. 1, Mantz Aff. ¶

15.  DCMC depends on revenue from the 340B Program to carry out services to its community.

*Id.* ¶ 14.  Plaintiff's challenge to this law, if successful, would allow it to *continue* to prevent

distribution of 340B drugs purchased by DCMC for dispensation at contract pharmacies.

*Standard Heating*, 137 F.3d at 571 ("[I]ntervention may be based on an interest that is contingent

upon the outcome of the litigation.").  Moreover, this Court has previously recognized the

economic interests of 340B covered entities in litigation concerning Act 1103 by granting

intervention to covered entity stakeholders in *PhRMA v. McClain*.  This Court stated that

"Intervenors have demonstrated recognizable economic interests in the present lawsuit, their

alleged interests . . . are sufficiently direct, substantial, and legally protectable to allow them to

intervene in this case."  Order at 4-5, *PhRMA v. McClain*, 4:21-cv-00864 (E.D. Ark. May 3,

2022), ECF No. 22.  The same is true here.

Thus, DCMC has a substantial and protectable interest in safeguarding its 340B savings

that ultimately promote the well-being of its patients and help DCMC fulfill its mission to

provide health care to vulnerable Arkansas patients.

     **B.**    **DCMC's Interests Will Be Impaired by the Disposition of the Litigation**

Plaintiff asks this Court to invalidate Act 1103, which will extinguish DCMC's rights to have 340B drugs distributed to contract pharmacies. Invalidating Act 1103 would harm DCMC and its vulnerable patient population. Without intervention, disposition of the current action will, therefore, "as a practical matter impair [its] interests." *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 738 F.2d 82, 84 (8th Cir. 1984) (internal quotations omitted).

DCMC does not, and cannot, operate an in-house pharmacy and relies exclusively on outside community retail pharmacies to use 340B drugs to fill prescriptions for self-administration. The requirements to obtain a pharmacy license are complex and operating an in-house pharmacy is expensive. And for governmental hospitals like DCMC, the contract pharmacy model is indispensable because Arkansas law prohibits nonprofit, tax exempt, or governmentally funded hospitals from owning and operating their own in-house retail pharmacies. Ark. Code Ann. § 17-92-607. Without the ability to order self-administered drugs at 340B discounts through contract pharmacies, DCMC cannot meet the pharmacy needs of its patients.

If the Court holds in favor of Plaintiff, DCMC, and all other 340B covered entities in Arkansas, will be at the mercy of drug manufacturers such as Plaintiff that continue to prohibit or severely restrict covered entities' ability to order and receive 340B drugs at contract pharmacies in the face of Act 1103 and the Eighth Circuit decision in *PhRMA v. McClain*. Plaintiff may, in effect, eliminate any benefit of Arkansas hospitals participating in the 340B program with respect to self-administered drugs after more than 25 years of depending on those benefits. *Kan. Pub. Emps. Ret. Sys.*, 60 F.3d at 1307-08 (applicant only needs to show that interest "may be" impaired by litigation).

Like other covered entities, DCMC uses 340B savings and revenue from drugs shipped to contract pharmacies to provide vital safety-net services to impoverished patients and communities. Ex. 1, Mantz Aff. ¶ 12-14. Contract pharmacies are, therefore, a vital component of Arkansas' public health care system. Plaintiff's refusal to distribute 340B drugs to contract pharmacies has resulted—and will continue to result—in financially needy patients no longer having access to discounted drugs at contract pharmacy locations within a reasonable distance. This, in turn, will likely result in patients forgoing prescribed medications or requesting less costly medications that may not be as efficacious. Moreover, DCMC will be forced to reduce or eliminate the services that it provides to patients, resulting in harm to its patients and creating a need for more expensive health care services. Striking down Section 23-92-604(c) would cause a serious hardship to DCMC and its vulnerable patients as well as other 340B providers and their patients. *Kan. Pub. Emps. Ret. Sys.*, 60 F.3d at 1308 (applicant successfully showed that its interests may be impaired by the operation of res judicata, collateral estoppel, or stare decisis effect of the result of the litigation); *Corby Recreation, Inc.*, 581 F.2d at 167-77.

### C.   DCMC's Interests Are Not Adequately Protected by the Parties

DCMC clearly meets the "minimal burden" of showing that its interests are not adequately represented by the parties. *Mille Lacs*, 989 F.2d at 1000. Likewise, DCMC can rebut the general presumption that the government is adequately representing its interests because its interests, which are economic, differ from Defendant's broad interest in protecting the constitutionality of Act 1103 and its ability to enforce that law. *Mille Lacs*, 989 F.2d at 1000-01; *Union Elec. Co.,* 64 F.3d at 1168-69. It was on this very basis that this Court granted intervenors' motion to intervene in *PhRMA v. McClain*:

> Defendants have a broad interest in protecting the constitutionality of duly enacted state laws and the state's ability to enforce these laws, but Intervenors have a specific economic interest regarding Act 1103. On this basis, Intervenors

18

have demonstrated that their interests are sufficiently disparate from the current
Defendants so that their interests will not be adequately protected by the existing
parties to this lawsuit.

Order, *PhRMA v. McClain*, 4:21-cv-00864 at 6-7 (E.D. Ark. May 3, 2022), ECF No. 22.

Because Defendant's interests "'cannot be subsumed within the [economic] interest'" of DCMC,

"'no presumption exists'" that Defendant will adequately represent DCMC's interests. *Union*

*Elec. Co., 64 F.3d at 1169 (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 192–93 (D.C.

Cir. 1986)).

Far from adequately representing DCMC's economic interests, Defendant has conflicting

interests. Defendant leads an agency that is a subcomponent of the state of Arkansas. State

Medicaid agencies are entitled to rebates from manufacturers on claims submitted to the

Medicaid agency or a Medicaid managed care plan for 340B drugs. 42 U.S.C. § 1396r-8.

Manufacturers are protected from having to pay both a rebate to a Medicaid program and provide

a 340B discount on the same drug. 42 U.S.C. § 256b(a)(5)(A)(i) (protecting manufacturers from

having to pay a rebate on claims submitted to Medicaid agencies); 42 U.S.C. § 1396r-8(j)(l)(A)

(protecting manufacturers from having to pay a rebate on claims submitted to Medicaid managed

care organizations). Because a Medicaid agency cannot receive a rebate if a drug is purchased

with a 340B discount, the interests of Medicaid agencies and 340B covered entities in protecting

the 340B program are not aligned. Stated differently, the Medicaid agency benefits financially if

a drug is not purchased with 340B drugs.

In addition, for a small rural hospital like DCMC, the 340B program is essential to its

survival and the health of its patients. Ex. 1, Mantz Aff. ¶ 9-12. Although the Arkansas

legislature undoubtedly endeavored to support covered entities like DCMC and their patients

through passage of Act 1103, Defendant does not have the same critical interest in supporting the

19

340B program as does DCMC.  Defendant's interests are not, therefore, wholly aligned with DCMC's interests.

Finally, like the intervenors in *PhRMA v. McClain*, DCMC can provide the Court with the unique perspective of community-based 340B covered entities, the entities that Act 1103 was enacted to protect.  DCMC can explain how access to 340B drugs through bill to/ship to arrangements impacts the patients they serve.  DCMC can provide the Court with the perspective of Arkansas-based 340B covered entities that depend on contract pharmacies, a perspective that neither Plaintiff nor Defendant can offer because they are not health care providers.

## III.   DCMC Satisfies the Standards of Permissive Intervention Under Rule 24(b)(2)

In addition to meeting the requirements for intervention as a matter of right under Rule 24(a), DCMC meets the requirements for permissive intervention under Rule 24(b).  DCMC "shares with the main action a common question of law or fact" regarding the legality of Section 23-92-604(c) of Act 1103.  Fed. R. Civ. P. 24(b)(1)(B).  DCMC's request is timely and will not unduly prejudice or delay the adjudication of the parties' rights.  *See* Order, *PhRMA v. McClain*, 4:21-cv-00864, at 7 (E.D. Ark. May 3, 2022), ECF No. 22 (holding that permissive intervention is warranted).

### A.   Intervention Will Not Cause Undue Delay or Prejudice

Allowing DCMC to intervene will not result in undue delay or prejudice to the other parties in the lawsuit.  *Shelton*, 2009 WL 1890579, at *2; *South Dakota ex rel. Barnett*, 317 F.3d at 787 ("The principal consideration in ruling on a Rule 24(b) motion is whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights.").  DCMC's motion is timely, only one dispositive motion has been filed, and this Court declared that motion moot in light of Plaintiff's amended complaint.  Order, ECF No. 23; *Coffey*, 663 F.3d at 951 (the only material standard a court must consider is whether intervention will cause "undue delay" or

20

"prejudice the adjudication of the original parties' rights."). This assessment does not hinge on whether dispositive motions have been filed. DCMC is ready to participate fully and actively in this case and will comply with all the Court's applicable deadlines. *Little Rock Sch. Dist.*, 2011 WL 6842642, at *6 (proposed intervenors participation in the litigation "will not unduly delay the litigation or prejudice the original parties' rights" because it was the beginning of the case and the prospective-intervenors pledged to meet the court's existing deadlines).

## B.  DCMC Shares a Common Question of Law or Fact

In the alternative, DCMC should be permitted to intervene because it "shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). An intervenor can meet the commonality requirement when a "claim is sufficiently intertwined" with the underlying claims already before the Court. *Ratchford v. Evans*, No. 5:11-CV-00180-DPM, 2012 WL 177855, at *1 (E.D. Ark. Jan. 23, 2012). DCMC's defenses are sufficiently intertwined and based on the same set of facts pled in Plaintiff's complaint concerning the legality and constitutionality of Section 23-92-604(c). DCMC shares a common question of law, whether Section 23-92-604(c) is lawful and will not interject collateral issues. *Steel-Arkansas v. EPA*, No. 3:15-CV-00333-JLH, 2016 WL 4045425, at *2 (E.D. Ark. Apr. 13, 2016) (finding common questions of law and fact between proposed intervenor's defense and the defendant's defense); *Curry v. Regents of Univ. of Minn.*, 167 F.3d 420, 423 (8th Cir. 1999) (denying permissive intervention because "[m]ovants' presence in the case would interject collateral issues").

## IV.  DCMC's Motion is Timely

DCMC's request is timely. First, litigation has not progressed substantially since both the initial and amended complaints were filed. *Union Elec. Co.*, 64 F.3d at 1159 (finding a motion to intervene timely when intervenor "filed slightly more than four months after the suit

21

itself was filed" and because "litigation had progressed little" between filing the complaint and motion to intervene).  Plaintiff filed its initial complaint on March 25, 2024, slightly less than four months ago, and filed an amended complaint just last week on July 12, 2024.  The Court previously issued a final scheduling order on May 10, 2024, which sets a bench trial date of April 15, 2025, approximately nine months from the date of this filing.  The Court's scheduling order sets the discovery deadline for August 30, 2024, with dispositive motions due on September 30, 2024.  Final Scheduling Order at 2, ECF No. 18.  DCMC is moving to intervene well before the August 30, 2024, discovery deadline.  Currently there is no deadline to add parties.  *See ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1094 (8th Cir. 2011) (finding untimeliness when "more than a month after the deadline to add parties" passed).  While Defendant had filed a motion for judgment on the pleadings on June 17, 2024, this Court declared that motion moot in light of Plaintiff's amended complaint.  Order, ECF No. 23; *Coffey v. Commissioner of Internal Revenue*, 663 F.3d 947, 951 (8th Cir. 2011); *United States v. Union Elec. Co.*, 64 F.3d 1152, 1159 (8th Cir. 2011).  Granting intervention to DCMC will cause no disruption or delay in the proceedings and will not prejudice existing parties.  DCMC is ready to participate fully and actively in this case and will comply with the final scheduling order and any briefing schedule.  Therefore, this motion to intervene is timely under Rule 24.

## CONCLUSION

For the foregoing reasons, DCMC respectfully requests that the Court grant its motion to intervene as of right under Rule 24(a) or, in the alternative, to allow it to intervene under Rule 24(b). ), direct DCMC to file its proposed motion to dismiss and, if necessary, answer, and grant all other relief to which it is entitled.

22

Dated: July 18, 2024

Jess Askew, III, Ark. Bar No. 86005
Ashley W. Hudson, Ark. Bar No. 2007136
Frederick H. Davis, Ark. Bar No. 2012271
KUTAK ROCK, LLP
124 West Capitol Avenue, Suite 2000
Little Rock, AR 72201
(501) 975-3000 (Telephone)
(501) 975-3001 (Facsimile)
jess.askew@kutakrock.com
ashley.hudson@kutakrock.com
frederick.davis@kutakrock.com

*Counsel for Proposed Intervenor-
Defendant Dallas County Medical Center*

Respectfully submitted,

Ronald S. Connelly*, D.C. Bar No. 488298
Fernando Montoya*, D.C. Bar No. 90007361
Hannah Hauer*, D.C. Bar No. 90008945
POWERS PYLES SUTTER & VERVILLE, PC
1250 Connecticut Ave NW, Eighth Floor
Washington DC 20036
(202) 466-6550 (Telephone)
Ron.Connelly@PowersLaw.com

*Counsel for Proposed Intervenor-Defendant
Dallas County Medical Center*

*Applying pro hac vice