**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

ASTRAZENECA PHARMACEUTICALS LP

*Plaintiff,*

–v–

JIMMY HARRIS, in his official capacity as
Commissioner of the Arkansas
Insurance Department

*Defendant,*

DALLAS COUNTY MEDICAL CENTER

*Intervenor-Defendant.*

Case No. 4:24-cv-00268-KGB

**ARKANSAS INSURANCE DEPARTMENT AND DALLAS COUNTY MEDICAL
CENTER'S MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE TO ASTRAZENECA'S MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 7

    I.    Legal Background ................................................................................ 7

        A.    Claim and Issue Preclusion ................................................... 7

        B.    Preemption ............................................................................ 8

        C.    Contracts Clause ................................................................... 9

        D.    Takings Clause ................................................................... 10

        E.    The 340B Drug Pricing Program ........................................ 11

        F.    Arkansas Act 1103 and PhRMA v. McClain ....................... 19

    II.    Defendant and Intervenor ................................................................ 21

STANDARD OF REVIEW ...................................................................................... 22

ARGUMENT .......................................................................................................... 23

    I.    Claim and Issue Preclusion Bar AstraZeneca's Lawsuit ..................... 24

        A.    AstraZeneca's Suit Is a Facial Challenge, and Res Judicata and Issue Preclusion Apply ............................................................... 24

        B.    AstraZeneca's Suit Is Barred by Claim and Issue Preclusion ................. 28

    II.    AstraZeneca's Claims Fail as a Matter of Law ..................................... 35

        A.    Act 1103 Regulates the Distribution of Drugs and AstraZeneca's Policy Regulates Distribution of Drugs ................................... 35

            1.    Act 1103 Regulates the Distribution of Drugs ............................ 35

            2.    AID's Implementing Rule Regulates the Distribution of Drugs .. 40

            3.    The Replenishment Model Does Not Transform Act 1103 Into a Pricing Statute ........................................................... 41

            4.    AstraZeneca's Contract Pharmacy Policy Addresses Distribution 47

        B.    Federal Patent Law Does Not Preempt Act 1103 ...................... 51

i

1.    The Presumption Against Preemption Applies .............................. 52

2.    Federal Patent Law Does Not Preempt Act 1103 ........................ 54

C.    Act 1103 Does Not Violate the Contracts Clause ...................................... 61

D.    AstraZeneca's Takings Claim Is Based on a Mischaracterization of Act 1103 .................................................................................................................... 67

1.    There Is No Taking Because AstraZeneca Voluntarily Participates in the 340B Program .................................................................. 69

a.    Act 1103 is Not a Per Se Taking ........................................ 70

b.    Act 1103 is Not a Regulatory Taking ................................ 72

2.    Act 1103 is Not a Taking Under the Arkansas Constitution ........ 76

CONCLUSION ............................................................................................................... 76

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*AbbVie Inc. v. Fitch*, No. 1:24-cv-184, 2024 WL 3503965 (S.D. Miss. July 22, 2024), *aff'd*, No. 24-60375, 2025 WL 2630900 (5th Cir. Sept. 12, 2025) ..................... *passim*

*AbbVie Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) ............................................................................................... *passim*

*AbbVie, Inc. v. Bailey*, No. 4:24-cv-00996 (E.D. Mo. Jul. 11, 2025), ECF 91 (unpublished) ...............................................................................................38, 42, 46

*AbbVie, Inc. v. Brown*, No. 1:24-cv-01816 (D. Md. Sept. 5, 2024), *appeal docketed*, No. 24-1939 (4th Cir. Sept. 30, 2024) ............................................2, 7, 55

*Allen v. McCurry*, 449 U.S. 90 (1980) ...........................................................................7

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ....................................64

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................22, 28

*Arkansas Hospice, Inc. v. Burwell*, 815 F.3d 448 (2016) ............................................68

*Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727 (8th Cir. 2019).........................9, 10, 66

*Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011) ......................5, 27, 61, 67

*AstraZeneca Pharms. LP v. Bailey*, No. 2:24-cv-04143, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025)......................................................................................... *passim*

*AstraZeneca Pharms. LP v. Brown*, No. 1:24-cv-01868 (D. Md. Sept. 5, 2024) .............2, 5, 7, 52

*AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024)...................................2, 4, 27, 37, 38, 52, 55

*AstraZeneca Pharms. LP v. Harris*, No. 60CV-25-4652 (Ark. Pulaski Cir. Apr. 29, 2025), https://caseinfo.arcourts.gov/opad/case/60CV-25-4652.........................................41

*AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116 (3d Cir. 2025)...........................57, 58

*Berns v. O'Dell*, 726 F.2d 409 (8th Cir. 1984) .......................................................8, 35

*Biotechnology Indus. Org. v. District of Columbia,* 505 F.3d 1343 (Fed. Cir. 2007) ..................56

*Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362
(Fed. Cir. 2007) ..........................................................................................51, 55, 56, 57

*Boehringer Ingelheim Pharms., Inc. v. HHS.*, No. 3:23-CV-01103, 2024 WL
3292657 (D. Conn. July 3, 2024) ................................................................................70

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) ...........................56

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...............................................................25

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ....................................................................24

*Burlington N. R. Co. v. State of Nebraska*, 802 F.2d 994 (8th Cir. 1986) .....................66

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................22

*Chiesi USA, Inc. v. Robert F. Kennedy, Jr.*, No. 1:24-cv-00260 (D.D.C. Aug. 27,
2025), ECF No. 37 .......................................................................................................59

*Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540 (2d Cir. 2023),
cert. denied sub nom. *Cmty. Hous. Improvement Program v. City of New York, New
York*, 144 S. Ct. 264 (2023) ...........................................................................72, 73, 75

*Costner v. URS Consultants, Inc.*, 153 F.3d 667 (8th Cir. 1998) ........................7, 28, 29

*Crift v. Williams*, No. 5:11-cv-00136, 2012 WL 1463973 (E.D. Ark. Apr. 27, 2012) .................32

*Crumley v. United States*, No. 2022-1232, 2022 WL 16754380 (Fed. Cir. 2022) .......................25

*Doe v. Reed*, 561 U.S. 186, 194 (2010) ........................................................................24

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983) .....................64

*Eng. Mfrs. Ass'n v. S. Coast Air Quality Mgmt Dist.*, 541 U.S. 246 (2004)................................58

*Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842 (8th Cir. 2002) .........................................61

*Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)................................9

*Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121 (1st Cir. 2009) .............................73, 75

*Free the Nipple–Springfield Residents Promoting Equal. v. City of Springfield*,
923 F.3d 508 (8th Cir. 2019) ......................................................................................24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167 (2000)......................31

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) .......................................8

*Gen. Foods Corp. v. Mass. Dep't of Pub. Health*, 648 F.2d 784 (1st Cir. 1981) .........................31

*Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312 (D.S.C. 2023) .....................13, 43, 46

*Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984)..............................................................10, 75

*Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430 (8th Cir. 2007) ............63, 64, 66

*Healy v. Fox*, 46 F.4th 739 (8th Cir. 2022).................................................................................33, 34

*Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022).......................................................9

*Hicks v. O'Meara*, 31 F.3d 744 (8th Cir. 1994).................................................................................33

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707 (1985)......................................52

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ............................................................................................9

*Hurd v. Flywheel Energy Prod., LLC*, No. 4:21-cv-01207, 2024 WL 4571445
    (E.D. Ark. Oct. 24, 2024)..............................................................................................................76

*Int'l Union v. Brock*, 477 U.S. 274 (1986).......................................................................................31

*Iowa Assur. Corp. v. City of Indiana*, 650 F.3d 1094 (8th Cir. 2011) ............................................71

*John Morrell & Co. v. Loc. Union 304A of United Food & Com. Workers, AFL-
    CIO*, 913 F.2d 544 (8th Cir. 1990)...........................................................................................8, 35

*Kelo v. City of New London*, 545 U.S. 469 (2005) ..........................................................................75

*Kern v. Tri-State Ins. Co.*, 386 F.2d 754 (8th Cir. 1967)................................................................33

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) .......................................................9, 55, 56

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987) ................................66, 75

*Landscape Properties, Inc. v. Whisenhunt*, 127 F.3d 678 (8th Cir. 1997) .....................................33

*Lane v. Peterson*, 899 F.2d 737 (8th Cir. 1990), *cert. denied*, 498 U.S. 823 (1990).....8, 32, 33, 34

*Lefaivre v. KV Pharm. Co.*, 636 F.3d 935 (8th Cir. 2011)...............................................................52

*Lingle v. Chevron*, 544 U.S. 528 (2005) ..........................................................................................70

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)............................................10, 76

*Maddox v. U.S. Dep't of Def.*, 2011 WL 6027145 (E.D. Ark. 2011) ..............................................34

*Midwest Disability Initiative v. JANS Enters., Inc.*, 929 F.3d 603 (8th Cir. 2019) .............8, 30, 32

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*,
   742 F.2d 442 (8th Cir. 1984) ...............................................................................61, 66, 69, 70

*National Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ...................................................................58

*Nelson v. Banks*, No. 4:15-cv-00605, 2016 WL 6900792 (E.D. Ark. Nov. 22, 2016) .................29

*Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 489881 (W.D.
   Mo. Feb. 13, 2025) .................................................................................................... *passim*

*Novartis Pharms. Corp. v. Brown*, No. 1:24-cv-01557, (D. Md. Sept. 5, 2024) ...................2, 5, 55

*Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) ........................... *passim*

*Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024) ..........................................62

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) ..............................................................................................................9

*Penn Cent. Transp. Co. v. City of N.Y*, 438 U.S. 104 (1978) ................................................ *passim*

*Penn. Coal Co. v. Mahon*, 260 U.S. 393 (1922) .........................................................................73

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp*., 545 F. Supp. 2d 845 (E.D.
   Ark. 2008), *aff'd*, 559 F.3d 772 (8th Cir. 2009) ...................................................................30

*Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 2:24-cv-04144, 2025 WL 644281
   (W.D. Mo. Feb. 27, 2025) ...........................................................................................2, 5, 61, 63

*Pharm. Rsch. & Mfrs. of Am. v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022),
   *aff'd*, *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024) .............. *passim*

*Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024), *cert. denied*,
   145 S. Ct. 768 (2024) ..................................................................................................... *passim*

*Pharm. Rsch. & Mfrs. of Am. v. Morrissey*, 60 F. Supp. 3d 439 (S.D. W. Va. 2024) .............39, 43

*PhRMA v. Brown*, No. 1:24-cv-01631 (D. Md. Sept. 5, 2024), *appeal docketed*,
   No. 24-1978 (4th Cir. Oct. 8, 2024) ...............................................................................2, 5, 55

*PhRMA v. Fitch*, No. 1:24-cv-00160, 2024 WL 3277365 (S.D. Miss. July 1,
   2024), *appeal docketed*, No. 24-60340 (5th Cir. July 5, 2024) ...............................37, 38, 53

*PhRMA v. Minnesota*, No. 62-cv-24-5744 (2d Jud. D. Minn. Apr. 15, 2025) .............................39

*PhRMA v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024) ........................................... *passim*

*PhRMA v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) ..... *passim*

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)............................................................66, 75

*Richardson v. City of Little Rock Planning Comm'n*,
    295 Ark. 189 (1988)..................................................................................................10, 75

*Robinette v. Jones*, 476 F.3d 585 (8th Cir. 2007) ..................................................................8, 35

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ...................................................................74

*Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*,
    58 F.4th 696 (3d Cir. 2023) .......................................................................................... *passim*

*Stolfi v. PhRMA*, No. 24-1570, 2025 WL 2448851 (9th Cir. Aug. 26, 2025) ..............................74

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*,
    322 F.3d 1064 (9th Cir. 2003) ................................................................................................32

*Watkins v. Lawrence Cnty.*, No. 3:17-CV-00272, 2020 WL 13389385 (E.D. Ark.
    May 19, 2020)..........................................................................................................................75

*Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016), abrogated on other
    grounds by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ..............24, 27, 28

*Wyeth v. Levine*, 555 U.S. 555 (2009) ....................................................................................8, 52

*Yankton Sioux Tribe v. HHS*, 533 F.3d 634 (8th Cir. 2008) ....................................................8, 33

*Yee v. City of Escondido*, 503 U.S. 519 (1992)...........................................................................10

**Federal Statutes**

28 U.S.C. § 1331.....................................................................................................................3, 29

42 U.S.C. § 256b(a)(1)..................................................................................................12, 40, 59

42 U.S.C. § 256b(a)(1), (4).....................................................................................................14

42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1).............................................................................11, 69

42 U.S.C. § 256b(a)(4).............................................................................................................11

42 U.S.C. §§ 256b(a)(4)(N), 1395i–4(c)(2)...........................................................................21

42 U.S.C. § 256b(a)(5)(A)–(B)................................................................................................39

42 U.S.C. § 256b(a)(5)(A)(i)....................................................................................................16

42 U.S.C. § 256b(d)(3) ............................................................................................................17

42 U.S.C. § 1395i–4(c)(2)(B)(i)(I), (B)(iii) .................................................21

42 U.S.C. § 1395k .................................................................................11

42 U.S.C. § 1396r-8 ...............................................................................11

42 U.S.C. § 1396r-8(c)(1) .......................................................................12

42 U.S.C. § 1396r-8(c)(2) .......................................................................59

Veterans Health Care Act of 1992, Pub. L. No. 102-585, 106 Stat. 4943 (1992) .............11, 12, 57

**State Statutes**

Ark. Code Ann. § 20-64-501 ....................................................................57

Ark. Code Ann. §§ 20-64-503, -505 ..........................................................53

Ark. Code Ann. § 20-64-505 ...............................................................57, 64

Ark. Code Ann. § 23-61-103(a) .................................................................21

Ark. Code Ann. §§ 23-92-604(c)(1)–(2) .....................................................19

Ark. Code Ann. § 23-92-604(c)(1) and (c)(2) .............................................3, 20

Ark. Code Ann. § 23-92-604(c)(2) .............................................................40

Ark. Code Ann. § 23-92-606 ....................................................................41

**Rules**

Fed. R. Civ. P. 56(a) ..............................................................................22

**Regulations**

42 C.F.R. § 10.10(a) ..............................................................................59

42 C.F.R. § 10.10(b) ..............................................................................59

42 C.F.R. §§ 10.20-10.25 ........................................................................38

42 C.F.R. §§ 485.601–485.647 .................................................................21

42 C.F.R. § 485.610(c) ...........................................................................21

17 CAR § 160-1203 ...............................................................................44

17 CAR § 160-2602 ...............................................................................57

23 CAR § 152-101(1) ................................................................................................40

23 CAR pt. 152, "340B Drug Program Nondiscrimination Requirements" (Sept.
19, 2022) ......................................................................................................20, 40

**Constitutional Provisions**

Ark. Const. art. II, § 22 ..................................................................6, 23, 75, 76

U.S. Const. amend. V......................................................................................10, 76

U.S. Const. amend. XIV ......................................................................................10

U.S. Const. Article I, § 10......................................................................................61

U.S. Const. Article I, § 10, cl. 1 ............................................................................9

**Federal Registers**

340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89
Fed. Reg. 28,643 (Apr. 19, 2024) ..............................................................38

Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75
Fed. Reg. 10,272, 10,273-74 (Mar. 5, 2010) (hereinafter "2010 Guidance")
..............................................................................................15, 45, 70, 74

Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract
Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) (hereinafter
"1996 Guidance") ............................................................................14, 38, 74

**Other Authorities**

*340B ESP Resources: Policy Documents*, 340BESP,
https://www.340besp.com/resources (last visited Sept. 16, 2025) ..........................18

*Annual Report & Form 20-F Information* 2024 (Feb. 6, 2025),
https://www.astrazeneca.com/investor-relations/annual-reports/annual-report-
2024.html ....................................................................................................73

The American Hospital Association, *The 340B Drug Pricing Program*,
Healthsperian (2024),
https://www.aha.org/system/files/media/file/2024/03/The-340B-Drug-Pricing-
Program.pdf ....................................................................................................73

AstraZeneca, 340B Contract Pharmacy Pricing (Aug. 17, 2020),
https://www.340bhealth.org/files/AstraZeneca_Retail_Communication_-
_340B_-_Final.pdf?_zs=Ccipc1&_zl=DaI27 ........................................................65

AstraZeneca, 340B Contract Pharmacy Pricing (Aug. 17, 2020),
   https://www.340bhealth.org/files/AstraZeneca_Retail_Communication_-
   _340B_-_Final.pdf?_zs=Ccipc1&_zl=DaI27; .................................................................18, 50

AstraZeneca 340B Covered Entity Letter -April 2025 update.pdf ....................................................50

AstraZeneca Letter to Distribution Partners (July 3, 2023), CAH000018.pdf ............................50

AstraZeneca, Notice to 340B Covered Entities Regarding CALQUENCE
   Replenishment and CALQUENCE Capsule Formulation Discontinuation,
   HRSA, https://www.hrsa.gov/sites/default/files/hrsa/opa/calquence-notice-
   340b.pdf ............................................................................................................................71

*AstraZeneca Policy*, 340B ESP Resources (Apr. 7, 2025),
   https://www.340besp.com/resources/astrazeneca/policy.pdf; .................................................44

*AstraZeneca Policy*, 340BESP, https://www.340besp.com/resources .........................................18

Email from Ellie Likos, Contracts Operations Manager, AstraZeneca, to Dakota
   Drug, July 2, 2024..........................................................................................................50

Email from Ellie Likos, Contracts Operations Manager, AstraZeneca, to Cardinal
   Health May 29, 2024.......................................................................................................50

Email from Ellie Likos, Contracts Operations Manager, AstraZeneca, to Borth
   Carolina Mutual, July 2, 2024........................................................................................50

Expert Report of Robert Scholz, PhD (June 27, 2025).................................................................51

*FAQs*, HRSA, https://www.hrsa.gov/opa/faqs .........................................................................14

Fed. Trade Comm'n, University of Michigan Advisory Opinion Letter to Dykema
   Gossett PLLC (Apr. 9, 2010),
   https://www.ftc.gov/sites/default/files/documents/advisory-
   opinions/university-michigan/100409univmichiganopinion.pdf............................................15

H.R. Rep. No. 102-384, pt. 2 (1992)........................................................................12, 13, 43, 46

HHS, CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for
   Initial Price Applicability Year 2026* (Aug. 2024),
   https://www.cms.gov/files/document/fact-sheet-negotiated-prices-initial-price-
   applicability-year-2026.pdf...........................................................................................58, 60

HHS, Ctrs. for Medicare & Medicaid Servs. & Off. of the Assistant Sec'y for
   Plan. & Evaluation, *Inflation Reduction Act Research Series-Farxiga:
   Medicare Enrollee Use and Spending* (Nov. 2, 2023),
   https://aspe.hhs.gov/sites/default/files/documents/3950eb2fe9aaa75c39adac74
   2be3e90f/Farxiga.pdf ........................................................................................................60

Kevin Dunleavy, *2 Years After Leaving PhRMA, AstraZeneca Opts Back In*, Fierce Pharma (Apr. 22, 2025), https://www.fiercepharma.com/pharma/two-years-after-leaving-phrma-astrazeneca-opts-back ............................................................23, 30

Kevin Dunleavy, *The Top 20 Pharma Companies by 2024 Revenue*, Fierce Pharma (Apr. 21, 2025), https://www.fiercepharma.com/special-reports/top-20-pharma-companies-2024-revenue ........................................................................31

Megan Wilson, *Top Industry Group for Drugmakers Loses Third Member In Six Months*, PoliticoPro (May 12, 2023), https://subscriber.politicopro.com/article/2023/05/top-industry-group-for-drugmakers-loses-third-member-in-six-months-00096738?source=email ............................30

PhRMA Form 990, https://apps.irs.gov/app/eos/ ..........................................................30

*PhRMA Welcomes AstraZeneca to the Association*, PhRMA (Apr. 22, 2025), https://phrma.org/resources/phrma-welcomes-astrazeneca-to-the-association ......................30

Rachel Cohrs, *AstraZeneca Is Third Member to Leave PhRMA In Five Months*, STAT (May 16, 2023) https://archive.ph/4WO0k ..................................................30

Restatement (Second) of Judgments § 42, cmt. f (1980) ..............................................32

## INTRODUCTION

Defendant Jimmy Harris, Commissioner of the Arkansas Insurance Department ("Commissioner") and Intervenor-Defendant, Dallas County Medical Center ("DCMC"), respectfully ask this Court to hold as a matter of law that Act 1103 is not preempted by federal patent law, does not violate the Contracts Clause to the U.S. Constitution, and is not an unconstitutional taking. The Eighth Circuit ruled just last year that Act 1103 is constitutional in a case brought by an organization whose governing body includes the Chief Executive Officer of AstraZeneca. *Pharm. Rsch. & Mfrs. of Am. v. McClain* ("*PhRMA I*"), 645 F. Supp. 3d 890 (E.D. Ark. 2022), *aff'd*, *Pharm. Rsch. & Mfrs. of Am. v. McClain* ("*PhRMA II*"), 95 F.4th 1136 (8th Cir. 2024). *PhRMA II* addressed the threshold question of this case and held that Act 1103 regulates drug distribution, not pricing. *PhRMA II*, 95 F.4th at 1144–45. The arguments of Plaintiff AstraZeneca Pharmaceuticals, LP ("AstraZeneca") do not undercut *PhRMA II*, which is binding on this Court.

Despite lengthy allegations about inventory tracking systems and third party vendors that assist safety-net providers to comply with 340B program requirements, most of AstraZeneca's arguments can be synthesized to the question of whether Act 1103 regulates delivery or pricing. The undisputed material facts demonstrate that Act 1103 regulates delivery and that AstraZeneca's property is not transferred to contract pharmacies.

But AstraZeneca is foreclosed from making this argument in the first place. AstraZeneca cannot dispute that the Eighth Circuit has ruled that Act 1103 regulates delivery of 340B drugs and not pricing. *Id.* ("Act 1103 does not set or enforce discount pricing."); SUMF ¶ 218. Although AstraZeneca asserts otherwise, this suit is a facial challenge to Act 1103, just as

PhRMA's suit was a facial challenge.  Respectfully, this court is bound by Eighth Circuit precedent.

Aside from the Eighth Circuit's ruling on Act 1103, courts across the country have rejected the constitutional claims that AstraZeneca and other drug companies have raised in cases challenging state laws similar to Act 1103. *PhRMA v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (rejecting Takings Clause, Contracts Clause, and federal patent law preemption arguments in consolidated cases: *PhRMA v. Murrill*, *AbbVie, Inc. v. Murrill*, and *AstraZeneca Pharms. LP v. Murrill*); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 752–53 (S.D. Miss. 2024) (denying preliminary injunction on claim alleging federal patent law argument); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024) (denying preliminary injunction on claim alleging federal patent law argument); *Novartis Pharms. Corp. v. Brown*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024) (denying preliminary injunction on claims alleging federal patent law, Contracts Clause, and Takings Clause violations in four cases: *Novartis Pharms. Corp. v. Brown*, *PhRMA v. Brown*, *AstraZeneca Pharms. LP v. Brown*, and *AbbVie, Inc. v. Brown*); *AbbVie Inc. v. Fitch*, No. 1:24-cv-184, 2024 WL 3503965, at *16 (S.D. Miss. July 22, 2024), *aff'd*, No. 24-60375, 2025 WL 2630900, at *8 (5th Cir. Sept. 12, 2025) (denying preliminary injunction on claim alleging Takings Clause argument); *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 489881, at *2–3 (W.D. Mo. Feb. 13, 2025) (dismissing federal patent law claims); *AstraZeneca Pharms. LP v. Bailey*, No. 2:24-cv-04143, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (dismissing federal patent law and Takings Clause claims); *Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 2:24-cv-04144, 2025 WL 644281, at *6 (W.D. Mo. Feb. 27, 2025) (dismissing Contracts Clause claim); *AbbVie Inc. v. Skrmetti*, No.

3:25-cv-00519, 2025 WL 1805271, at *19–20 (M.D. Tenn. June 30, 2025) (denying preliminary injunction on Takings Clause claim).  This court should follow these well-reasoned decisions.

AstraZeneca's claims are barred by res judicata.  *PhRMA II* was properly decided on the merits.  *PhRMA II*, 95 F.4th 1136 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 768 (2024).  The district court and Eighth Circuit had jurisdiction under 28 U.S.C. § 1331 and held that Act 1103 is not preempted by federal law.  This suit and *PhRMA II* involve the same parties (the defendant, the Arkansas Insurance Commissioner) or parties in privity with the original parties (AstraZeneca was a member of PhRMA at the time).  Finally, both actions are based upon the same nucleus of operative facts: an allegation that Act 1103 imposes a pricing obligation that violates constitutional protections.  For these reasons, AstraZeneca is estopped from relitigating the same facts and issues decided in *PhRMA II* by this Court and the Eighth Circuit.  Similarly, claim preclusion bars AstraZeneca from asserting that Act 1103 and its contract pharmacy policy regulate pricing, not distribution.  AstraZeneca already successfully argued that its contract pharmacy policy restricts the ***delivery*** of its drug, not pricing, and thus HRSA was powerless to mandate distribution of its drugs to contract pharmacies.  *See Sanofi Aventis, U.S., LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023) (deciding district court case brought by AstraZenca).  The 340B program is "silent on delivery" and AstraZeneca's policy and Act 1103 speak only into that silence.  The Court should not permit AstraZeneca to now argue the opposite.

Even without the holdings of the Eighth Circuit and other courts, AstraZeneca's constitutional challenges fail as a matter of law.  Arkansas Act 1103 includes two provisions— Ark. Code Ann. § 23-92-604(c)(1) and (c)(2)—requiring pharmaceutical manufacturers to ship drugs discounted under the federal 340B drug pricing program ("340B Program") to pharmacies

under contract with Arkansas safety-net providers.  *PhRMA I*, 645 F. Supp. at 897.  Both of these provisions are constitutional.

Federal patent law does not preempt Act 1103.  AstraZeneca mischaracterizes Act 1103 and the contract pharmacy arrangements that facilitate safety-net providers' participation in the 340B Program.  Act 1103 and federal patent law operate in completely different spheres—while Act 1103 regulates the distribution of discounted drugs in Arkansas, federal patent law prohibits states from regulating the price of patented goods.  As discovery demonstrates, AstraZeneca understood this distinction.  Its contract pharmacy restriction policy—along with its communications and implementation of that policy—focus exclusively on determining where drugs are being distributed and delivered in order to block access to certain contract pharmacy locations.  Yet, AstraZeneca bases its argument on the false premise that Act 1103 is a pricing statute rather than a delivery statute—a contention that the Eighth Circuit already rejected.  *PhRMA II*, 95 F. 4th at 1145.

Many other courts have also rejected AstraZeneca's arguments.  A Louisiana District Court rejected AstraZeneca's claim that a similar Louisiana law was preempted under federal patent law.  *See AstraZeneca v. Murrill*, No. 6:23-cv-01042, 2024 WL 4361597, at *9 (W.D. La. Sept. 30, 2024) (A statute similar to Act 1103 "does not, on its face, target patent rights or, by its terms, apply only to patented drugs or the price of patented drugs," and 340B "discounts are set by the federal government, not the State of Louisiana or Act 358.").  Likewise, a Missouri District Court held that AstraZeneca's challenge to a similar Missouri law "does not conflict preempt federal patent laws under the Supremacy Clause." *AstraZeneca Pharms. LP v. Bailey*, No. 2:24-cv-04143, 2025 WL 644285, at *3 (W.D. Mo. Feb. 27, 2025); *see also Novartis Pharms. Corp. v. Bailey*, 2025 WL 489881, at *2–3; *AstraZeneca Pharms. v. Fitch*, 766 F. Supp.

4

3d at 664–65; *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d at 752–53 (holding that the manufacturer's patent preemption claim was unlikely to succeed on the merits); *AstraZeneca Pharms. LP v. Brown*, No. 1:24-cv-01868 (D. Md. Sept. 5, 2024); *Novartis Pharms. Corp. v. Brown*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024), *appeal docketed*, No. 24-1949 (4th Cir. Oct. 2, 2024); *PhRMA v. Brown*, No. 1:24-cv-01631 (D. Md. Sept. 5, 2024), *appeal docketed*, No. 24-1978 (4th Cir. Oct. 8, 2024).  Act 1103 does not affect the period of exclusivity for AstraZeneca or any other patent holder.

Act 1103 does not violate the Contracts Clause.  AstraZeneca cannot demonstrate substantial impairment of its Pharmaceutical Pricing Agreement ("PPA") with the federal Department of Health and Human Services ("HHS") because Act 1103 regulates delivery (not pricing) of 340B drugs.  *See AstraZeneca Pharms. LP v. Murrill*, 2024 WL 4361597, at *12–13 (rejecting AstraZeneca's Contracts Clause attack on a state law similar to Act 1103); *PhRMA v. Bailey*, 2025 WL 644281, at *6 (same); *AstraZeneca Pharms. LP v. Brown*, No. 1:24-cv-01868 (D. Md. Sept. 5, 2024) (same); *see also PhRMA v. Bailey*, 2025 WL 644281, at *6 (dismissing Contracts Clause claim).  Moreover, the PPA is merely a form contract that repeats the requirements of the 340B statute.  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011) ("PPAs are not transactional, bargained-for contracts. They are uniform agreements that recite the responsibilities § 340B imposes . . . .").  Because Act 1103 does not conflict with 340B, *PhRMA II*, 95 F.4th at 1144–45, Act 1103 does not impair the PPA, which merely recites the responsibilities of 340B.  Regardless, Arkansas enacted Act 1103 for legitimate, justifiable, and reasonable purposes that are well within its traditional police powers.

Act 1103 does not result in an unconstitutional taking because it does not regulate drug prices.  *PhRMA II*, 95 F.4th at 1145 ("Act 1103 does not set or enforce discount pricing.").  Act

1103 is not a "per se taking" because it does not physically occupy or seize AstraZeneca's property. The undisputed facts show that 340B drugs are not transferred to contract pharmacies but dispensed to covered entity patients. Act 1103 is also not a regulatory taking because any economic impact is minimal, does not interfere with AstraZeneca's investment-backed expectations—which have included contract pharmacy shipments since 1996—and promotes the important government interest of safeguarding the health of Arkansas' citizens. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The voluntary nature of the 340B Program further undercuts AstraZeneca's claim because AstraZeneca can simply withdraw from the program to avoid the alleged taking. For all of the same reasons, Act 1103 does not violate the Takings Clause of the Arkansas Constitution.

Additionally, both the United States Constitution and the Arkansas Constitution recognize that states may reasonably exercise their police power without violating the prohibition against takings.[1] Protecting distribution of 340B-priced drugs to Arkansas covered entities through their contract pharmacies is squarely within Arkansas' police power to regulate the public health and safety of its citizens. Arkansas safety-net providers rely on contract pharmacy distribution arrangements to obtain 340B-priced drugs for their patients. By preserving the right of Arkansas safety-net providers to dispense drugs to patients at community pharmacies, Act 1103 protects the public health and safety of Arkansans from restrictive and detrimental distribution policies of drug companies. Act 1103 is squarely within Arkansas' authority to regulate drug distribution.

---

[1] AstraZeneca's amended complaint includes a claim that Act 1103 violates the takings clause of the Arkansas constitution, but it did not include an argument in its brief to support this claim. AstraZeneca Am. Compl. ¶ 8, ECF No. 25 ("AstraZeneca Compl."). Although AstraZeneca apparently concedes that Act 1103 does not violate the takings clause of the Arkansas constitution, Defendant and Intervenor address it here.

A federal court in Missouri dismissed a taking claim brought by AstraZeneca to challenge a state law similar to Act 1103. *AstraZeneca v. Bailey*, 2025 WL 644285, at \*4–6; *see also PhRMA v. Murrill*, 2024 WL 4361597, at \*13–15 (rejecting a similar claim brought by AbbVie in Louisiana).  Federal courts in Maryland and Mississippi determined that AstraZeneca and another drug manufacturer do not have a likelihood of success on the merits of their claims that state laws similar to Act 1103 are an unconstitutional taking.  *AstraZeneca Pharms. LP v. Brown*, No. 1:24-cv-01868 (D. Md. Sept. 5, 2024); *AbbVie, Inc. v. Brown*, No. 1:24-cv-01816 (D. Md. Sept. 5, 2024), *appeal docketed*, No. 24-1939 (4th Cir. Sept. 30, 2024); *AbbVie, Inc. v. Fitch*, No. 1:24-cv-00184, 2024 WL 3503965 (S.D. Miss. July 22, 2024), *aff'd*, No. 24-60375, 2025 WL 2630900, at \*8 (5th Cir. Sept. 12, 2025); *see also AbbVie v. Skrmetti*, 2025 WL 1805271, at \*19–20 (holding no likelihood of success on the merits of takings claim).  AstraZeneca has not appealed the Maryland decision.

## BACKGROUND

## I.    Legal Background

### A.    Claim and Issue Preclusion

Under the principle of res judicata, sometimes known as claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been* raised in that action."  *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (emphasis added).  The Eighth Circuit applies a four-part test to determine if res judicata bars a claim: (1) the first lawsuit was decided on the merits; (2) the ruling court had proper jurisdiction over the first lawsuit; (3) both lawsuits involve the same parties or parties in privity with the original parties; and (4) the second lawsuit is "based upon the same claims or causes of action."  *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998).

The scope of res judicata extends to any party attempting to bring a subsequent lawsuit arising from the "same nucleus of operative fact" as the original lawsuit, *Lane v. Peterson,* 899 F.2d 737, 742 (8th Cir. 1990), *cert. denied*, 498 U.S. 823 (1990), and that was "in privity" with a party in the original lawsuit. *Midwest Disability Initiative v. JANS Enters., Inc.*, 929 F.3d 603, 607 (8th Cir. 2019). Res judicata bars a party from invoking new legal theories if they are based on the same facts as the first lawsuit. *See Yankton Sioux Tribe v. HHS*, 533 F.3d 634, 639–42 (8th Cir. 2008). Privity is satisfied where a party was "'adequately represented by someone with the same interests who [wa]s a party' to the [prior] suit." *Midwest Disability*, 929 F.3d at 607 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008)) (first alteration in original).

Issue preclusion forbids relitigating not only claims that were previously brought or that should have been brought but also forbids litigating issues and facts that were or could have been disputed in prior litigation. *Berns v. O'Dell*, 726 F.2d 409, 410 (8th Cir. 1984); *Robinette v. Jones*, 476 F.3d 585, 589–90 (8th Cir. 2007); *John Morrell & Co. v. Loc. Union 304A of United Food & Com. Workers, AFL-CIO*, 913 F.2d 544, 562–64 (8th Cir. 1990).

**B.    Preemption**

The Supreme Court has repeatedly held that Congress's purpose is the "ultimate touchstone" in every preemption case. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). A state law may be preempted by a federal law either (1) through an express preemption clause, where Congress explicitly states that state law is preempted; or (2) through implied preemption, where a Court infers that a state law is preempted based on a federal law, including the federal law's text, structure, and Congress's intent. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

Implied preemption can take three forms: (1) field preemption, when Congress has manifested an intention that the federal government occupy an entire field of regulation, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04 (1983) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); (2) impossibility preemption, when it is physically impossible to comply with both federal and state laws, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963); and (3) obstacle preemption, when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). When examining patent law implied preemption claims, courts consider whether a state law "clashes with the objectives of the federal patent laws." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974) (quoting *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964)).

### C.    Contracts Clause

The Contracts Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Eighth Circuit applies a two-part test to determine whether a state law violates the Contracts Clause. *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022). First, the court must ask "whether the state law substantially impairs a contractual relationship, which takes into consideration 'the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" *Id.* (quoting *Sveen v. Melin*, 584 U.S. 811, 819 (2018)). When evaluating "substantial impairment," "the governing rule is akin to a question of reasonable foreseeability: 'if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed.'" *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019) (quoting *Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383, 385 (8th Cir. 1994)). Second, "if the

first prong is met," the court considers "'whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.'" *Id.* (quoting *Burgum*, 932 F.3d at 730).

### D.     Takings Clause

The Takings Clause of the Fifth Amendment forbids the taking of private property "for public use, without just compensation," (U.S. Const. amend. V), and is applicable to the states via the Fourteenth Amendment. *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 231 (1984). The takings analysis falls into "two distinct classes." *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992). The first is "[w]here the government authorizes a physical occupation of property (or actually takes title)" and is known as a "per se taking." *Id.* at 522, 532. The second is "where the government merely regulates the use of property," and "compensation is required" to mitigate such use. *Id.* at 522–23. The Supreme Court has established three factors to determine whether a regulatory action is an unconstitutional taking: 1) the economic impact of the regulation; 2) the extent to which the regulation interferes with the investment-backed expectations; and 3) the character of the governmental action. *Penn Cent. Transp. Co. v. City of N.Y*, 438 U.S. 104, 123–125 (1978).

When a state legitimately exercises its police powers, the use of a private party's property can "be restricted, from time to time, by various measures newly enacted by the State." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992). The Supreme Court of Arkansas has likewise held that Arkansas takings clause must submit to the reasonable exercise of the police power. *Richardson v. City of Little Rock Planning Comm'n*, 295 Ark. 189, 190 (1988) (the existence of the Arkansas takings clause "does not mean, however, that an individual is

constitutionally guaranteed the right to do with such property as he or she wishes in all circumstances").

### E.    The 340B Drug Pricing Program

The 340B Program is named for Section 340B of the Public Health Service Act, which was enacted as part of the Veterans Health Care Act of 1992 ("VHCA") and requires drug companies to offer discounts on covered outpatient drugs to specified safety-net health care providers as a condition of the manufacturers' drugs being reimbursed by Medicaid and Medicare Part B.[2]  42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1); SUMF ¶ 1.  Safety-net hospitals and clinics that participate in the 340B Program—referred to as "covered entities"—provide critical health care services to the neediest individuals, regardless of ability to pay.  *PhRMA II*, 95 F.4th at 1139, 1141; SUMF ¶¶ 2–5.  Covered entities must meet strict eligibility criteria to enroll in the 340B Program.  *PhRMA II*, 95 F.4th at 1141; 42 U.S.C. § 256b(a)(4); SUMF ¶ 4.  Each category of covered entity receives some form of federal assistance to treat the nation's most vulnerable patients.  *PhRMA II*, 95 F.4th at 1141; SUMF ¶ 5.  The 340B Program is administered by the Health Resources and Services Administration ("HRSA"), which is a component of the federal HHS.  *PhRMA II*, 95 F.4th at 1141; SUMF ¶ 2.

The genesis of the 340B Program is traced to the Medicaid Drug Rebate Program ("MDRP"), enacted in 1990, to combat rising drug costs to state Medicaid programs.  42 U.S.C. § 1396r-8.  The MDRP requires drug companies to provide rebates to state Medicaid programs on claims submitted for outpatient drugs and biological products furnished to Medicaid beneficiaries.  For brand drugs, those rebates were calculated based on the difference between the drug's average price and its lowest price, or "best price," in the U.S. marketplace, subject to

_____

[2] Medicare Part B covers physician, hospital outpatient, and certain other non-inpatient services.  42 U.S.C. § 1395k.

certain narrow exceptions and a minimum difference of at least 12.5 percent.  *Id*. § 1396r-8(c)(1).  Manufacturers responded to the MDRP rebate requirements by raising their prices on covered outpatient drugs for governmental purchasers like the Department of Veterans Affairs as well as non-profit safety-net providers like federally qualified health centers and public hospitals.  H.R. Rep. No. 102-384, pt. 2, at 9–10 (1992).  Manufacturers "promptly cancelled discount contracts, terminated special-price practices, and raised the prices they charged" to safety-net providers.  *Id*. at 10.  The increased prices were an effort to reduce the Medicaid rebates that the manufacturers were required to pay under the MDRP.  Concerned about rising "[p]rices paid for outpatient drugs by the [Department of Veterans Affairs], and some Federally-funded clinics and public hospitals," Congress enacted the VHCA in order, among other things, "to enable the Department of Veterans Affairs and certain Federally-funded clinics to obtain lower prices on the drugs . . . ."  *Id*. at 7, 11; Veterans Health Care Act of 1992, Pub. L. No. 102-585, 106 Stat. 4943 (1992).  Section 602 of the VHCA added Section 340B to the Public Health Service Act, and Section 603 of the VHCA established a separate drug discount program for the Department of Veterans Affairs, the Department of Defense, the Public Health Service, and the Coast Guard.  Veterans Health Care Act of 1992 §§ 602–603.

The 340B Program is intended by Congress to provide financial support for safety-net health care providers, all of which receive federal (and often state) financial assistance.  SUMF ¶¶ 14-16.  The 340B Program is not a patient discount program.  The statute is clear that the discounts are for drugs "purchased by a covered entity."  42 U.S.C. § 256b(a)(1).  The statute includes no requirement that covered entities pass the discounts on to their patients, though many do voluntarily.  SUMF ¶ 17.  Indeed, Congress intended section 340B to allow covered entities to "stretch scarce federal resources as far as possible, reaching more eligible patients and

providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12; *see also Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) ("Put simply, the purpose of the 340B program was to provide a means to make 340B entities profitable in order for those 340B entities to 'stretch scarce Federal resources as far as possible.'" (quoting H.R. Rep. No. 102-384, pt. 2, at 12)); SUMF ¶¶ 14–16.

Covered entities provide significant levels of uncompensated care, and the discounts available through the 340B Program help relieve these financial burdens. SUMF ¶¶ 5, 14–17, 159–164, 167–168, 173–176, 177–182, 187–189. Stated differently, covered entities lose less money on purchases of prescription drugs under the 340B Program for their uninsured and underinsured patients than they would without the 340B discount. By mitigating losses, they can be more generous with reducing or waiving patient copayments for needy individuals or with providing other necessary services. The 340B Program also generates revenue for covered entities so that they are less dependent on taxpayer support. If a covered entity patient has prescription drug coverage, the difference between the insurer's payment and the discounted price is income to the covered entity to supplement or stretch federal funds to treat more patients and to provide more services. SUMF ¶¶ 14-16.

Because the construction and management of a pharmacy is expensive and requires special expertise, many covered entities, including DCMC, cannot afford to operate their own "in-house" pharmacies and instead must contract with independently-owned pharmacies to meet the pharmacy needs of their patients. *PhRMA II*, 95 F.4th at 1142 ("Although some covered entities have in-house pharmacies, many do not."); SUMF ¶¶ 19-21, 26-28, 169, 183-84. HHS recognizes that many 340B covered entities cannot fill prescriptions for their patients because they cannot afford to "expend precious resources to develop their own in-house pharmacies . . .

.["](#)  Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) (hereinafter "1996 Guidance"); *PhRMA II*, 95 F.4th at 1142 ("Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house pharmacies.").  Covered entities with large service areas also facilitate access to 340B drugs by contracting with pharmacies that are convenient to the provider's patients.  SUMF ¶¶ 19, 21, 162-163, 170, 178, 183.  In addition, some medications require special storage and handling and can only be dispensed by a specialty pharmacy, through a mail order program, or subject to a limited distribution network.  For these reasons, 340B covered entities often rely on independent retail pharmacies to dispense drugs to the covered entity's patients on its behalf.  These arrangements are established by contract between covered entities and pharmacies, so they are known as "contract pharmacy arrangements," and the pharmacies are generally referred to as "contract pharmacies."  SUMF ¶¶ 21-25.

Contract pharmacies do not purchase 340B drugs.  42 U.S.C. § 256b(a)(1), (4); *PhRMA II*, 95 F.4th at 1142 ("When covered entities enter into agreements with contract pharmacies, these pharmacies do not become beneficiaries of the 340B Program."); Decl. of Krista M. Pedley, ¶¶ 7–9, *Pharm. Rsch. & Mfrs. of Am. v. McClain*, No. 22-3675 (8th Cir. Apr. 10, 2023), ECF No. 24-1; SUMF ¶¶ 29-41, 43-45, 74-80.  Drugs dispensed by contract pharmacies are purchased by the covered entity using a "bill to/ship to" procedure—the drugs are purchased by, and billed to, the covered entity but shipped to the contract pharmacy.  *See FAQs*, HRSA, https://www.hrsa.gov/opa/faqs ("What is a 'ship to bill to' arrangement?"); SUMF ¶¶ 29-31.  After receiving the covered entity's 340B drugs, the contract pharmacy dispenses the drugs to the covered entity's patients, collects reimbursement for the drugs from the patient's third-party

payer (if any) and any applicable copayments from the patient, and remits the collected

reimbursement to the covered entity.  SUMF ¶ 32.  The covered entity pays the pharmacy a fee

for its dispensing and billing services.[3]  SUMF ¶ 33.

Covered entities are responsible for 340B program compliance at contract pharmacies.

Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg.

10,272, 10,273–74 (Mar. 5, 2010) (hereinafter "2010 Guidance").  These responsibilities include

ensuring that the contract pharmacy does not dispense 340B drugs to individuals who are not

patients of the covered entity and ensuring that the contract pharmacy does not create a

"duplicate discount" by dispensing 340B drugs purchased by the covered entity to Medicaid

beneficiaries, absent special circumstances.[4]  SUMF ¶¶ 12-13.

Covered entities employ various inventory management schemes to ensure compliance

with 340B Program requirements.  SUMF ¶¶ 34-36, 42, 46, 48, 165, 184-186.  Some covered

entities require contract pharmacies to physically segregate the 340B drugs that the covered

entity purchases from the non-340B drugs that the pharmacy purchases.  SUMF ¶¶ 34-35, 172,

185.  Use of a physically separate inventory requires that the pharmacist dispensing the drug

know at the time that the prescription is filled whether the individual is a patient of the covered

entity as that term is defined by HRSA.  SUMF ¶¶ 19, 27, 35, 183.  In the fast-paced

environment of retail pharmacies, pharmacists often do not know whether an individual who is

requesting a prescription is a patient of the covered entity.  SUMF ¶¶ 36, 42.  Determining

---

[3] While contract pharmacy arrangements are common in the 340B Program, they are not unique to the 340B Program.  *See, e.g.*, Fed. Trade Comm'n, University of Michigan Advisory Opinion Letter to Dykema Gossett PLLC (Apr. 9, 2010), https://www.ftc.gov/sites/default/files/documents/advisory-opinions/university-michigan/100409univmichiganopinion.pdf. Indeed, AstraZeneca uses replenishment and virtual inventory systems to manage pharmacy inventory for its patient assistance programs.  SUMF ¶ 50.

[4] Contract pharmacies may dispense 340B drugs to Medicaid beneficiaries only if there is an agreement between the covered entity, Medicaid program and pharmacy to avoid duplicate discounts. 2010 Guidance, 75 Fed. Reg. at 10,278.

whether an individual is a patient of the covered entity may require review of the covered entity's recent medical records to determine whether the individual received services at the covered entity within a reasonable period prior to presenting the prescription.  SUMF ¶¶ 42, 48.  In addition, pharmacies are not always certain whether an individual is a Medicaid beneficiary if, for example, the individual neglected to present his/her Medicaid card.  Providing a 340B discounted drug to a Medicaid beneficiary would be a violation of the prohibition against manufacturers having to pay "duplicate discounts."  42 U.S.C. § 256b(a)(5)(A)(i).

In order to ensure compliance with the 340B diversion and duplicate discount prohibitions, covered entities often require contract pharmacies to use what is commonly known as a replenishment system.  SUMF ¶¶ 36-40, 42, 48.  Under a replenishment system, the pharmacy dispenses a drug from its own inventory (sometimes referred to as "neutral" inventory), pending review of the covered entity's medical records to determine whether the individual is a patient of the covered entity and that the individual is not a Medicaid beneficiary.  SUMF ¶¶ 37-41.  After a determination is made that the individual is eligible to receive 340B drugs, the covered entity purchases a 340B drug on its account to replace, or replenish, the drug that the contract pharmacy dispensed.  SUMF ¶ 39.  That 340B drug is then delivered to the pharmacy to fulfill the replenishment.  SUMF ¶ 40.  Stated differently, the 340B drug that is purchased by the covered entity and delivered to the pharmacy substitutes for the one that the pharmacy already dispensed.  SUMF ¶ 39, 41-45.  Covered entities do not sell or transfer 340B drugs to contract pharmacies.  SUMF ¶¶ 14-18, 38-40, 43-45, 69, 72-80.  The covered entity's patient receives the 340B drug, and the covered entity is paying the pharmacy back for a drug that it dispensed from its own inventory.  SUMF ¶¶  39, 41-45.

Under a variation of this system known as "credit" replenishment, the covered entity makes the same determination of whether an individual qualifies to receive 340B drugs.[5]  After the covered entity verifies that the pharmacy dispensed drugs to an individual who is eligible to receive 340B drugs, a second determination is made whether the pharmacy has purchased those same drugs in the recent past.  If the pharmacy has purchased the drugs recently, the covered entity's 340B drug order substitutes for the drugs that were previously delivered to the pharmacy.

Whether a covered entity elects to use a physical inventory or replenishment to manage inventory at its contract pharmacy, the covered entity purchases the 340B drug and a delivery of the drug is made to the pharmacy.  SUMF ¶¶ 34-36; SUMF ¶¶ 38-41 (In the case of credit replenishment, the delivery has already been made to the contract pharmacy.)  A virtual inventory/replenishment system does not result in 340B drugs being dispensed to individuals who are ineligible to receive those drugs and, in fact, these systems help to prevent inadvertent dispensations to ineligible patients.  SUMF ¶ 42.  If a drug company believes otherwise, the 340B statute entitles it to audit the covered entity and bring an action before a federal administrative dispute resolution panel.  42 U.S.C. § 256b(d)(3).

For approximately 26 years, every drug company participating in the 340B Program, including AstraZeneca, honored contract pharmacy arrangements and shipped to contract pharmacies, just as to in-house pharmacies.  SUMF ¶¶ 114.  AstraZeneca did so regardless of the type of inventory system that the covered entity had arranged with its contract pharmacy.  SUMF ¶¶ 51-53.  That decades-long recognition of contract pharmacy arrangements changed abruptly beginning in July 2020, when drug companies began either to fully eliminate or significantly

---

[5] As discussed further in its response to AstraZeneca's statement of facts, AstraZeneca has failed to support its assertions regarding credit replenishment.  *See* D. Resp. to AZ SUMF, at ¶ 111.

restrict distribution of 340B drugs ordered through contract pharmacy bill to/ship to arrangements. SUMF ¶ 114. AstraZeneca announced its policy in August 2020, stating that "Beginning on October 1, 2020, AstraZeneca plans to adjust this approach such that AstraZeneca only will process 340B pricing through a single Contract Pharmacy site for those Covered Entities that do not maintain their own on-site dispensing pharmacy." AstraZeneca, 340B Contract Pharmacy Pricing (Aug. 17, 2020),

https://www.340bhealth.org/files/AstraZeneca_Retail_Communication_-_340B_-_Final.pdf?_zs=Ccipc1&_zl=DaI27; SUMF ¶¶ 115-121, 126, 127.

As of the date of the filing of this brief, over thirty-seven drug companies have unilaterally imposed restrictions on contract pharmacy arrangements. *340B ESP Resources: Policy Documents*, 340BESP, https://www.340besp.com/resources (last visited Sept. 16, 2025). Many drug companies reversed their policies for covered entities located in Arkansas in response to Act 1103. Ex. 8, AID Hearing Transcript, at 209:10 –14. Unlike many of its manufacturer counterparts, AstraZeneca refused to lift its contract pharmacy restrictions in Arkansas for years. On April 1, 2025, the same date that the Arkansas Insurance Department, which enforces Act 1103, determined that AstraZeneca was in violation of the law, AstraZeneca lifted its restrictions for Arkansas covered entities. *AstraZeneca Policy*, 340BESP, https://www.340besp.com/resources (under Attachment C: State Policies). SUMF ¶¶ 208-211. Nonetheless, AstraZeneca requires that covered entities, including Arkansas covered entities, submit pharmacy claims data in order to obtain 340B discounts at contract pharmacies. *Id.*; SUMF ¶¶ 120, 137, 221-22.

Contract pharmacies are established and operationalized in the same manner as in-house pharmacies, with the only exceptions relating to the location where 340B drugs are delivered.

SUMF ¶¶ 100, 110; Ex. 14, Handfield Report at 21, ¶ 30; Ex. 29, Scholz Report at 4. Prior to lifting its restrictions, AstraZeneca required all covered entities without an in-house pharmacy to designate a single contract pharmacy location with AstraZeneca. SUMF ¶¶ 116, 119, 126-131. Integral to this designation was the use of a Health Identification Number ("HIN"), which identifies the location of a contract pharmacy. SUMF ¶¶ 132-133, 144-57. AstraZeneca requires a separate HIN for each contract pharmacy so that AstraZeneca can determine the location where wholesalers distribute its 340B Drugs. SUMF ¶¶ 132-133, 144-45. Each week, AstraZeneca distributes by email to wholesalers a contract pharmacy spreadsheet commonly referred to as the "eligibility file" to identify designated contract pharmacy locations by HIN. SUMF ¶¶ 128, 135, 141-42, 146, 209. Through use of the eligibility file, wholesalers know that they may not deliver 340B drugs to non-designated contract pharmacies. *Id.*

AstraZeneca's contract pharmacy policy allows delivery of 340B drugs to an in-house pharmacy or designated pharmacies regardless of whether the pharmacy uses a physical inventory or replenishment inventory system. SUMF ¶¶ 140, 151, 155, 165. AstraZeneca's contract pharmacy policy prevents delivery of 340B drugs to non-designated pharmacies regardless of the inventory system used. SUMF ¶¶ 20, 116-121, 130, 139, 143, 148, 152-157, 175, 187-188, 209-210.

### F.    Arkansas Act 1103 and *PhRMA v. McClain*

Act 1103, referred to as the 340B Drug Pricing Nondiscrimination Act, protects bill to/ship to arrangements for covered entities and contract pharmacies located and doing business in Arkansas. Ark. Code Ann. §§ 23-92-604(c)(1)–(2). Consistent with the state's authority to regulate drug distribution to pharmacies within its borders, the statute regulates 340B drug distribution through two provisions:

A pharmaceutical manufacturer shall not:

> (1) Prohibit a pharmacy from contracting or participating with an entity authorized to participate in 340B drug pricing by denying access to drugs that are manufactured by the pharmaceutical manufacturer; or
>
> (2) Deny or prohibit 340B drug pricing for an Arkansas-based community pharmacy that receives drugs purchased under a 340B drug pricing contract pharmacy arrangement with an entity authorized to participate in 340B drug pricing.

*Id.* § 23-92-604(c).  The Eighth Circuit describes Act 1103 as follows:

> The first subsection of section 23-92-604(c) prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying the pharmacy access to a covered entity's 340B drugs. The second subsection prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying 340B drug pricing to covered entities who use contract pharmacies for distribution.

*PhRMA II*, 95 F.4th at 1143.  In September 2022, the Arkansas Insurance Commissioner promulgated a regulation implementing Act 1103.  23 CAR pt. 152, "340B Drug Program Nondiscrimination Requirements" (Sept. 19, 2022),

https://codeofarrules.arkansas.gov/Rules/Rule?levelType=part&titleID=23&chapterID=39&subChapterID=51&partID=885&subPartID=null&sectionID=null.[6]

PhRMA brought suit before this Court alleging that Act 1103 is preempted by the 340B statute, and this Court upheld Act 1103.  *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022), *aff'd*, 95 F.4th 1136, 1139 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 768 (2024).  AstraZeneca was a member of PhRMA at the time that lawsuit was filed.  SUMF ¶ 215.  On March 12, 2024, the Eighth Circuit affirmed this Court's ruling and held that Act 1103 is "not preempted by federal law under any theory."  *PhRMA II*, 95 F.4th at 1139.

The Eighth Circuit held that the 340B statute left room for state action and that pharmacies have historically "been an essential part of the 340B Program," noting that "the text

---

[6] Effective January 1, 2025, Arkansas administrative rules were codified into the Code of Arkansas Rules.  Before the codification, 23 CAR pt. 152 was known as Rule 123.

of 340B 'is silent about delivery' of drugs." *Id.* at 1143.  The Eighth Circuit further found that Congress was aware of the role of pharmacies and state pharmacy law in implementing the 340B Program and that Congress's "silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field." *Id.* at 1144.  The Eighth Circuit also held that Act 1103 did not conflict with, or create an obstacle to, Congress's objectives for the 340B Program: "rather it does the opposite: Act 1103 assists in fulfilling the purpose of 340B." *Id.* at 1144–45. The Eighth Circuit denied PhRMA's petition for rehearing en banc or panel rehearing, and the Supreme Court denied PhRMA's petition for certiorari.  *PhRMA I*, *reh'g denied*, No. 22-3675, 2024 WL 1919676 (8th Cir. May 2, 2024), *cert. denied*, 145 S. Ct. 768 (2024).

## II.    Defendant and Intervenor

Jimmy Harris is the newly appointed Commissioner of the Arkansas Insurance Department ("AID").  The Commissioner is responsible for enforcing Arkansas' insurance laws, including Act 1103.  Ark. Code Ann. § 23-61-103(a).

DCMC is a nonprofit, government-funded hospital located in Fordyce, Arkansas.  SUMF ¶ 158.  DCMC has been designated under the Medicare program as a critical access hospital ("CAH").  SUMF ¶ 159; Ex. 3, DCMC D. Mathews Depo. Tr. at 48:8–13; 49:3–14.  Based on its CAH status, DCMC participates as a covered entity under the 340B Program.  42 U.S.C. §§ 256b(a)(4)(N), 1395i–4(c)(2); 42 C.F.R. §§ 485.601–485.647; SUMF ¶¶ 160-63.  As a requirement of its CAH designation, DCMC has twenty-five or fewer inpatient beds and is located in an area where residents would otherwise be required to travel long distances to receive inpatient medical care.  SUMF ¶ 1159; *see also* 42 U.S.C. § 1395i–4(c)(2)(B)(i)(I), (B)(iii); 42 C.F.R. § 485.610(c).  The nearest hospital to DCMC is Ouachita County Medical Center, which is approximately thirty-five miles from Fordyce.  SUMF ¶ 163.

Because of the distance between DCMC and other area hospitals, the town of Fordyce depends on DCMC's services, as illustrated by one recent, tragic example. On June 21, 2024, a gunman shot fourteen people at a Fordyce grocery store, resulting in four deaths and ten wounded. Victims were rushed to DCMC, arriving within twenty-five minutes of the shooting, where medical professionals promptly attended to thirteen of the gunshot victims. Ex. 2, Decl. of DCMC (D. Mantz) (July 16, 2024) (Dkt. No. 30-2), at ¶ 11. If not for DCMC, victims would have been transported an additional thirty-five miles to receive care. If that were the case, many more people would have likely died that day. Ex. 2, Mantz Decl. ¶ 11.

In-house pharmacies are prohibitively expensive for hospitals to build and maintain. *PhRMA II*, 95 F.4th at 1139. Therefore, for its patients who have prescriptions for self-administered drugs, DCMC relies exclusively on independently owned contract pharmacies to fill prescriptions with 340B drugs. DCMC depends on 340B savings to engage with the community and provide charity care. Ex. 2, Mantz Decl. ¶ 13; SUMF ¶¶ 167-168, 173-174.

## STANDARD OF REVIEW

Summary judgment is granted if the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "[T]he substantive law will identify which facts are material" and "[d]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

22

**ARGUMENT**

As a threshold matter, the doctrines of res judicata and issue preclusion prohibit AstraZeneca from bringing this action. AstraZeneca was a member of PhRMA when PhRMA challenged Act 1103 before this Court and, after a hiatus from membership, recently rejoined PhRMA.  Kevin Dunleavy, *2 Years After Leaving PhRMA, AstraZeneca Opts Back In*, Fierce Pharma (Apr. 22, 2025), https://www.fiercepharma.com/pharma/two-years-after-leaving-phrma-astrazeneca-opts-back.  All of AstraZeneca's claims in this lawsuit were available to PhRMA, and PhRMA should have raised those claims in that earlier suit.  This Court should dismiss this action under the principles of res judicata and issue preclusion.

Even if the Court were not to dismiss this case on these grounds, it should dismiss this action because all of AstraZeneca's claims fail as a matter of law.  Act 1103 regulates the distribution—not the price—of discounted drugs in Arkansas and does not conflict with federal patent law.  Federal patent law prohibits states from regulating the price of patented goods, but Act 1103 does not regulate pricing.  Instead, Act 1103 governs delivery mechanisms.  Act 1103 also complies with the Contracts Clause because AstraZeneca cannot show substantial impairment of its contractual rights, and it should have reasonably expected regulation in this historically and heavily regulated area.  Lastly, Act 1103 is not a Fifth Amendment taking because it neither regulates price, nor physically occupies any property, Act 1103 only applies to manufacturers that voluntarily participate in the 340B Program, and it is a reasonable regulation under the Supreme Court's standards in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978).  For the same reasons, Act 1103 does not violate the Arkansas Constitution.

I.    **Claim and Issue Preclusion Bar AstraZeneca's Lawsuit**

A.    **AstraZeneca's Suit Is a Facial Challenge, and Claim and Issue Preclusion Apply**

AstraZeneca's challenge to Act 1103 is facial, not as-applied, as AstraZeneca claims. Indeed, this Court has already held that AstraZeneca presents a facial challenge. AstraZeneca has alleged no factual matters that are unique to it and that do not apply to all manufacturers subject to Act 1103. PhRMA, therefore, could have brought the claims that AstraZeneca raises here. Because this is a facial challenge, claim and issue preclusion apply and bar AstraZeneca's suit. The Court should not permit AstraZeneca's latest attempt to avoid the clear application of claim and issue preclusion.

When evaluating whether a constitutional challenge is "facial" or "as applied," the important consideration is whether the "claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs." *Doe v. Reed*, 561 U.S. 186, 194 (2010); *Bucklew v. Precythe*, 587 U.S. 119, 135–36 (2019). The distinction is determined not by the label a plaintiff assigns to its claim, but by the substance of the legal theory and the scope of the relief sought. *See Free the Nipple–Springfield Residents Promoting Equal. v. City of Springfield*, 923 F.3d 508, 509 n.2 (8th Cir. 2019) (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)). A facial challenge to a state law may be reevaluated as an as-applied challenge in light of "concrete factual developments" but only if those developments were unanticipated in a previous case. *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 602 (2016), abrogated on other grounds by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

As this Court previously found, AstraZeneca brings "facial" challenges to Act 1103. Order at 6–7, ECF No. 72. Here, AstraZeneca seeks to invalidate Act 1103 for all manufacturers, and if AstraZeneca prevails, Act 1103 would be unenforceable against any manufacturer

participating in the 340B Program with respect to covered entities located in Arkansas. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973).  In evaluating whether this case raises facial challenges, this Court determined:

> Plaintiff's claims are facial because they challenge provisions in the statute that apply generally to all pharmaceutical manufacturing companies that participate in the 340 B drug program in Arkansas. In its Amended Complaint, Plaintiff adds "as applied"  to its contracts clause and takings clause claims. However, the "label is not what matters." Plaintiff does not allege unique circumstances that place any of its claims on a footing specific only to it and not other drug manufacturers. Consequently, a determination that the challenged provisions in Act 1103 are unconstitutional in this case makes those provisions unenforceable as to every other 340B participant in Arkansas.

Order at 6–7, ECF No. 72 (footnotes omitted).

Discovery in this case has revealed no material, concrete factual development or unique circumstances supporting AstraZeneca's claims that this case is different than *PhRMA I or II*. AstraZeneca Br. at 2–5.  AstraZeneca has not discovered any new facts that are material to the case, and any facts that have been developed with respect to enforcement do not convert this facial challenge to an as-applied challenge because those facts were fully anticipated.  *See Crumley v. United States*, No. 2022-1232, 2022 WL 16754380, at *3 (Fed. Cir. 2022) ("[B]eing new wasn't enough; new alleged facts also needed to be material.").  Significantly, AstraZeneca relies on factual findings of the Commissioner to support its claim that new facts have been discovered.  AstraZeneca Br. at 3, 16, 22–24, 32–33, 54–55.  AstraZeneca had previously represented to this court, however, that, "AstraZeneca challenges the constitutionality of the statute that AID is currently enforcing, not any case-specific findings by the agency." AstraZeneca Opp'n to DCMC Mot. to Dismiss at 5, ECF No. 62.

The claims in *PhRMA I* relied on the same facts related to replenishment/virtual inventory that AstraZeneca asserts in this case. *Compare* AstraZeneca Br. at 3 (citing AZ SUMF ¶¶ 34–36 (AstraZeneca provides substantially discounted drugs under 340B, under

replenishment, the contract pharmacies' previously dispensed inventory is replaced), 39 (drugs

are fungible), 74 (use of "neutral" inventory), 78 (drugs are fungible, delivered to contract

pharmacies, and placed into "neutral" inventory), 86 (covered entities are not directly aware of

replenishment orders in real time), 102 (covered entity patients are not aware of replenishment),

161 (citation to immaterial and unsupported factual and legal conclusions of a preliminary order

in an administrative proceeding where AstraZeneca asserts the same facial challenges), *with*

*PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No. 4:21-cv-864), ECF No. 25, ¶¶ 2

(manufacturers must provide "substantially discounted" drugs to covered entities), 23–29

(describing replenishment and replacement of "neutral" inventory).

AstraZeneca also alleges that discovery has yielded new evidence on whether covered

entities retain title to 340B Drugs in contract pharmacy arrangements and whether contract

pharmacies act as agents of covered entities in those arrangements.  AstraZeneca Br. at 3.  Even

if the issues of title and agency were relevant to this case (they are not), AstraZeneca relied on

similar evidence to raise the same legal and factual points as PhRMA in *PhRMA I* and *II*.

*Compare* AstraZeneca Br. at 8–11 (erroneously arguing that replenishment results in diversion[7]

by relying upon contract pharmacy agreements between covered entities and contract pharmacies

like Walgreens), *with* Pl.'s Reply at 11–14, *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No.

4:21-cv-864), ECF No. 41 (arguing that "the issue of title is not actually material to the

preemption question" and in the alternative that title transferring under replenishment was

supported by a Walgreens contract pharmacy agreement) and Pl.'s Response to SOMF ¶¶ 19–20,

---

[7] AstraZeneca raised similar contract pharmacy compliance concerns when it successfully defended its delivery restrictions as compliant with federal law. *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 705 (3d Cir. 2023), judgment entered, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023) ("Finally, Section 340B's compliance measures do not implicitly preclude delivery limits. Recall that the drug makers say their restrictions were driven by concerns about contract pharmacies' compliance.")

*PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No. 4:21-cv-864), ECF No. 42.  There is nothing new in this case, nor exclusive to AstraZeneca, in the context of replenishment and other covered entity inventory management and compliance processes, the 340B price set by statute, contract pharmacy dispensing procedures, wholesaler distribution, covered entity purchases as required under a PPA, or covered entity patients filling prescriptions.

Indeed, AstraZeneca's contract pharmacy policy mirrors the policies released by other manufacturers including those that have challenged previous HRSA enforcement actions and similar state laws.  AstraZeneca Compl. ¶¶ 23–24, 35.  AstraZeneca alleges impairment of its PPA, a form contract that all participating manufacturers sign.  SUMF ¶ 48; *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011) ("PPAs are not transactional, bargained-for contracts. They are uniform agreements that recite the responsibilities § 340B imposes . . . .").[8] The argument that *AstraZeneca* is not being justly compensated relies on these same arguments and would lead to the same outcome for all manufacturers under AstraZeneca's theory that "[t]he law forces manufacturers to relinquish title to and possession of their prescription drugs at below-market prices, and to transfer those drugs to other private (non-governmental) entities . . . ." AstraZeneca Br. at 52–53.

AstraZeneca's incorrectly analogizes this case to *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016).  In *Hellerstedt*, the plaintiffs asserted a post-enforcement, as-applied challenge based on the real-life consequences of enforcement of a state law that had previously been upheld prior to enforcement as a facial challenge.  The Supreme Court noted the unique circumstances of that case:  "When individuals claim that a particular statute will produce serious

---

[8] The Commissioner's enforcement action against AstraZeneca brought after the filing of this lawsuit is also immaterial.  AstraZeneca raises the same constitutional issues in that case as in this one. And since April 2025, AstraZeneca is complying with Act 1103, just like the vast majority of other manufacturers in Arkansas. SUMF ¶¶ 207–211.

constitutionally relevant adverse consequences before they have occurred—and when the courts doubt their likely occurrence—the factual difference that those adverse consequences *have in fact occurred* can make all the difference." *Id.* at 2306. In this case, no court has doubted the likely consequences of enforcement of Act 1103. In fact, AstraZeneca represented to this Court, prior to the Court's decision that this case presented a facial challenge, that, "Act 1103 is being enforced against AstraZeneca by the Arkansas Insurance Department (AID) *right now*." Pl. Opp'n to Mot. to Dismiss at 5, ECF No. 62. In that same decision, the Court accepted AstraZeneca's assertions that "Act 1103 may 'inflict[] significant harm' on it, and that it 'is immediately in danger of sustaining some direct injury as a result of' the provisions contained in Act 1103." Order at 10, ECF No. 72 (quotations omitted). Unlike *Hellerstedt*, therefore, any harms that AstraZeneca alleges have occurred as the result of enforcement were fully anticipated by it and by this Court.

### B.    AstraZeneca's Suit Is Barred by Claim and Issue Preclusion

This lawsuit is barred by res judicata (or "claim preclusion") because the four elements for invoking res judicata are met: (1) the first lawsuit was decided on the merits; (2) the ruling court had proper jurisdiction over the first lawsuit; (3) both lawsuits involve the same parties or parties in privity with the original parties; and (4) the second lawsuit is "based upon the same claims or causes of action." *Costner*, 153 F.3d at 673. The Court should dismiss this case for lack of jurisdiction.

The first two requirements for res judicata are easily satisfied. First, this Court decided *PhRMA I* by granting a motion for summary judgment on the merits, and the Eighth Circuit affirmed based on the merits. *See, e.g.*, *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment [. . .] necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."). Second, *PhRMA* was

based on proper jurisdiction under 28 U.S.C. § 1331 to challenge Act 1103 as preempted by federal law.  Compl. ¶ 17, *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No. 4:21-cv-00864), ECF No. 1.  Third, both cases involve the same party or parties in privity with the original party. PhRMA sued Alan McClain in his official capacity as the Commissioner, and AstraZeneca also sued Mr. McClain.  Because the Commissioner is the defendant in both cases, it is not necessary that the intervenors in the two lawsuits be the same or that they be in privity.  *See Nelson v. Banks*, No. 4:15-cv-00605, 2016 WL 6900792, at *5 (E.D. Ark. Nov. 22, 2016).  Nonetheless, privity is satisfied between DCMC and the *PhRMA I* Intervenors, Community Health Centers of Arkansas and Piggott Community Hospital ("*PhRMA* Intervenors").  The *PhRMA* Intervenors expressly represented the interests of all Arkansas-based 340B covered entities, including DCMC.  Mot. to Intervene at 9, 31, *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No. 4:21-cv-00864), ECF No. 18.  The *PhRMA* Intervenors' motion to intervene stated that their role was to provide the court with the perspective of Arkansas safety-net hospitals and clinics that depend on contract pharmacies, a perspective unique to covered entities and not represented by PhRMA or the State.  *Id.*  That representative role included DCMC—an Arkansas-based 340B covered entity.  In defending the constitutionality of Act 1103, the *PhRMA* Intervenors successfully advanced the legal interests of all similarly-situated Arkansas 340B entities—including DCMC—thus satisfying the privity and adequate representation requirements.  Such representation allows DCMC to assert preclusion offensively to bar AstraZeneca from relitigating claims and issues "based upon the same claims or causes of action."  *Costner*, 153 F.3d at 673.

Likewise, there is privity between the plaintiffs in *PhRMA v. McClain* and this case. Privity exists where a party was "adequately represented by someone with the same interests

who [wa]s a party" to the prior suit.  *Midwest Disability Initiative*, 929 F.3d at 607 (quotation omitted).  AstraZeneca's interests were adequately represented by PhRMA in *PhRMA v. McClain*.  AstraZeneca was a member of PhRMA throughout the pendency of that litigation: it was a member when PhRMA filed its complaint on September 29, 2021 (No. 4:21-cv-00864, ECF No. 1), and it remained a member when this Court issued judgment against PhRMA on December 12, 2022.[9]  *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ar. 2022); SUMF ¶¶ 201-206.  AstraZeneca only departed from PhRMA effective July 1, 2023 and then rejoined on April 22, 2025.[10]  SUMF ¶¶ 201, 206.

Moreover, when *PhRMA* was being litigated, the Chief Executive Officer ("CEO") of AstraZeneca, Pascal Soriot, sat on PhRMA's Board of Directors.  *See* Rachel Cohrs, *AstraZeneca Is Third Member to Leave PhRMA In Five Months*, STAT (May 16, 2023) https://archive.ph/4WO0k.  PhRMA's publicly available 990 tax form conclusively illustrates that Mr. Soriot was a member of PhRMA's Board of Directors.[11]  As the sixth largest drug company in the world in 2024, AstraZeneca, through its CEO, had significant authority over

---

[9] AstraZeneca was also a member of PhRMA on December 29, 2022, when PhRMA appealed this Court's decision to the Eighth Circuit (Notice of Appeal, *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No. 4:21-cv-00864), ECF No. 57) and recently rejoined. Kevin Dunleavy, *2 Years After Leaving PhRMA, AstraZeneca Opts Back In*, Fierce Pharma (Apr. 22, 2025), https://www.fiercepharma.com/pharma/two-years-after-leaving-phrma-astrazeneca-opts-back.

[10] *See* Megan Wilson, *Top Industry Group for Drugmakers Loses Third Member In Six Months*, PoliticoPro (May 12, 2023) ("AstraZeneca is leaving the Pharmaceutical Research and Manufacturers of America, the top lobbying organization for drugmakers, effective July 1, [2023] the company and group confirmed."), https://subscriber.politicopro.com/article/2023/05/top-industry-group-for-drugmakers-loses-third-member-in-six-months-00096738?source=email; *PhRMA Welcomes AstraZeneca to the Association*, PhRMA (Apr. 22, 2025), https://phrma.org/resources/phrma-welcomes-astrazeneca-to-the-association.

[11] *See Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 545 F. Supp. 2d 845, 847 (E.D. Ark. 2008), *aff'd*, 559 F.3d 772 (8th Cir. 2009) (citing Fed. R. Evid. 201) (holding that "public disclosures filed with the SEC" are "the types of matters that are not subject to dispute and must be judicially noticed.").  The IRS states that a nonprofit "must make available for public inspection its annual information return (e.g., Form 990, Form 990-EZ)."  *See* https://www.irs.gov/charities-non-profits/public-disclosure-and-availability-of-exempt-organization-returns-and-applications-public-disclosure-overview.  PhRMA's 990 form is a public document and is available on the official IRS website.  *See* https://apps.irs.gov/app/eos/ (choose "Copies of Returns" from "Select Database" dropdown; then choose "Employer Identification Number (EIN)" from "Search By" dropdown; enter "530241211" in the "Search Term" box; click "Search;" click on the "Pharmaceuticals and Researchers of America" hyperlink; select the appropriate tax year; then click on the hyperlink under "Copy of Return" to download).

PhRMA's litigation decisions.  *See* Kevin Dunleavy, *The Top 20 Pharma Companies by 2024 Revenue*, Fierce Pharma (Apr. 21, 2025), https://www.fiercepharma.com/special-reports/top-20-pharma-companies-2024-revenue.

PhRMA acknowledged that it was acting on behalf of its members in the litigation.  In its complaint, PhRMA described itself as a "trade association representing the nation's leading innovative biopharmaceutical research companies."  Compl. ¶¶ 5, 14, *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No. 4:21-cv-00864), ECF No. 1.  PhRMA expressly stated that it was representing "the interests of many of the manufacturers that operate under the federal 340B program" and sought relief for "its members," which included AstraZeneca.  *Id.* ¶¶ 5, 13.  PhRMA asked this Court to "issue an order and judgment declaring that Act 1103 does not require PhRMA's members to offer price discounts under the 340B Program to contract pharmacies in Arkansas" and to "enjoin the implementation and enforcement of Act 1103 against PhRMA's members."  *Id.* at 35.  Because Act 1103 impacts only PhRMA's members—and not PhRMA as an organization—PhRMA necessarily had to represent the interests of its members.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 181 (2000) (association has standing to sue when its members would otherwise have standing and interests are germane to the organization's purpose); *Gen. Foods Corp. v. Mass. Dep't of Pub. Health*, 648 F.2d 784, 787 (1st Cir. 1981) (association's standing depends on representing members as real parties in interest).

PhRMA adequately represented AstraZeneca's interests.  The Supreme Court has recognized that "the very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests."  *Int'l Union v. Brock*, 477 U.S. 274, 290 (1986).  Even if AstraZeneca were to contend that PhRMA's

loss demonstrates inadequate representation, "[t]actical mistakes or negligence on the part of the representative . . . are not sufficient to render . . . representation inadequate for preclusion purposes." *Midwest Disability Initiative*, 929 F.3d at 609 (quoting Restatement (Second) of Judgments § 42, cmt. f (1980)). In any event, PhRMA vigorously litigated *PhRMA v. McClain*: it appealed the decision of this Court, sought rehearing en banc after losing at the Eighth Circuit, and petitioned for certiorari before the Supreme Court. *See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1069 (9th Cir. 2003) (finding adequate representation where association litigated "vigorously").

Moreover, AstraZeneca had the opportunity to contend that it was not in privity with PhRMA in its response to Intervenor's Motion for Judgement on the Pleadings and did not contest privity. In its opposition brief, AstraZeneca states only that it "does not concede that it is in privity with PhRMA." AstraZeneca Opp'n MJOP Br. 12 n.2, ECF No. 90. AstraZeneca never tried to rebut any of the facts demonstrating its privity with PhRMA. DCMC MJOP Br. 17–20, ECF No. 85. For all of the above reasons, AstraZeneca was in privity with PhRMA during *PhRMA I.*

Finally, with respect to the fourth requirement for res judicata, both this suit and *PhRMA v. McClain* are based upon the same claims or causes of action. The Eighth Circuit determines a cause of action to be the "same" if it is based on the "same nucleus of operative facts," meaning that each lawsuit arose from the same underlying factual background. *Lane,* 899 F.2d at 742; *see also Crift v. Williams*, No. 5:11-cv-00136, 2012 WL 1463973, at *2 (E.D. Ark. Apr. 27, 2012) (a "cause of action" should be interpreted broadly to "encompass various claims arising out of the same nucleus of operative fact"). A plaintiff, such as AstraZeneca, cannot do an end run around

the preclusive effect of res judicata by raising new claims based on the same set of facts. *See Lane*, 899 F.2d at 744; *Healy v. Fox*, 46 F.4th 739, 744 (8th Cir. 2022).

AstraZeneca cannot raise a new set of legal arguments applied to the same set of facts. *See Yankton Sioux Tribe*, 533 F.3d at 639; *Lane,* 899 F.2d at 742.  In *PhRMA* and again here, the plaintiffs alleged that Act 1103 unconstitutionally requires drug companies to deliver 340B drugs to pharmacies under contract with covered entities.  All of AstraZeneca's claims are based on the same factual predicates as PhRMA's claims: in both cases, 340B covered entities order drugs for shipment to contract pharmacies, drug companies refuse to honor those shipments, Act 1103 requires drug companies to ship the drugs to contract pharmacies, and PhRMA and AstraZeneca both allege that Act 1103 imposes a pricing obligation contrary to federal law.  *See Landscape Properties, Inc. v. Whisenhunt*, 127 F.3d 678, 683 (8th Cir. 1997) (res judicata barred claims arising out of the same nucleus of operative fact).  Facts are "identical" in both cases for purposes of res judicata because the "wrong sought to be redressed is the same in both actions." *Hicks v. O'Meara*, 31 F.3d 744, 746 (8th Cir. 1994).  Both lawsuits sought (seek) to invalidate Act 1103 and ask this Court to enjoin AID from enforcing it against drug companies. *See* Compl. ¶ 13, *PhRMA I*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (No. 4:21-cv-00864), ECF No. 1; AstraZeneca Compl. ¶ 9.[12]

A few samples from the PhRMA and AstraZeneca complaints show that both cases are predicated on the shipment of 340B discounted drugs to contract pharmacies.  PhRMA alleged that Act 1103 is preempted by the 340B statute because, according to PhRMA, Act 1103 is a "340B pricing mandate" and "Congress placed strict limits on the types of entities entitled to 340B pricing and . . . that may receive drugs sold at a 340B price."  Compl. ¶¶ 68–69, *PhRMA I*,

---

[12] The Court may take judicial notice of PhRMA's complaint.  *See Kern v. Tri-State Ins. Co.*, 386 F.2d 754, 755 (8th Cir. 1967).

645 F. Supp. 3d 890 (E.D. Ark. 2022). According to PhRMA, contract pharmacies may not receive drugs sold at the 340B price. *Id.* AstraZeneca's claims are all based on these same factual allegations. AstraZeneca's patent law preemption claim is premised on the allegation that "on its face, Act 1103 regulates pricing" and that "pricing is thus the only thing that distinguishes a sale that complies with Act 358 from a sale that violates the law." AstraZeneca Compl. ¶ 56. AstraZeneca claims that Act 1103 violates the Contracts Clause because Act 1103 imposes an obligation on manufacturers that ultimately "restricts the prices at which manufacturers can sell their patented drugs." AstraZeneca Compl. ¶¶ 69, 93. AstraZeneca alleges that Act 1103 constitutes a taking because "Act 1103 requires manufacturers to make transfers at "steeply discounted prices, well below fair market value, to entities that are not listed in the 340B statute." AstraZeneca Compl. ¶ 86.

PhRMA could have raised the legal arguments that AstraZeneca now presents, but it did not. *See generally Healy v. Fox*, 46 F.4th 739 (8th Cir. 2022); *see also Maddox v. U.S. Dep't of Def.*, 2011 WL 6027145, at *2 (E.D. Ark. 2011) ("[W]here a plaintiff fashions a new theory of recovery or cites a new body of law that was arguably violated by a defendant's conduct, res judicata will still bar the second claim if it is based on the same nucleus of operative facts as the prior claim."). Because AstraZeneca's lawsuit is simply "dressed up to look different" than PhRMA's lawsuit—without any substantive change in facts—it arises out of the same nucleus of operative facts. *Lane*, 899 F.2d at 744; *see also Healy*, 46 F.4th at 744 ("If the claims arose out of a single act or dispute and one claim has been brought to a final judgment, then all other claims arising out of that same act or dispute are barred.").

For all the same reasons, collateral estoppel (or "issue preclusion") bars re-litigation of the facts and issues this Court decided in *PhRMA v. McClain*. For example, AstraZeneca cannot

dispute that Act 1103 regulates distribution. *PhRMA II*, 95 F.4th at 1145 ("Act 1103 does not set or enforce discount pricing."). Yet, its entire amended complaint and summary judgement motion are premised on the contention that Act 1103 regulates pricing. AstraZeneca Compl. ¶¶ 56, 70; AstraZeneca Br. at 3, 20, 22, 24. This Court conclusively determined—and PhRMA had the opportunity to litigate—all facts and conclusions of law underpinning the Court's determination that "[e]ven though the title of Act 1103 includes pricing in its name, the effects of the disputed provisions are limited to the distribution of and access to the discounted drugs." *PhRMA I*, 645 F. Supp. 3d at 901. AstraZeneca is barred from disputing all material issues related to its claims, which were previously decided, and this Court's determinations bar AstraZeneca's claims as a matter of law. *See Berns*, 726 F.2d at 410; *Robinette*, 476 F.3d at 589–90; *John Morrell & Co.*, 913 F.2d at 562–64.

For all of the above reasons, AstraZeneca's suit is precluded by res judicata and issue preclusion, and the Court should dismiss AstraZeneca's lawsuit.

## II. AstraZeneca's Claims Fail as a Matter of Law

### A. Act 1103 Regulates the Distribution of Drugs and AstraZeneca's Policy Regulates Distribution of Drugs

AstraZeneca's claims are based on the erroneous premise that Act 1103 regulates the price of drugs, rather than distribution, and that AstraZeneca's policy does not have anything to do with distribution. As described below, these premises are false.

#### 1. Act 1103 Regulates the Distribution of Drugs

Act 1103 regulates the distribution—not the price—of drugs obtained by covered entities for distribution to contract pharmacies in Arkansas. In *PhRMA II*, the Eighth Circuit affirmed the decision of the District Court, which determined that, "the effects of [Act 1103] are limited to the distribution of and access to the discounted drugs." *PhRMA I*, 645 F. Supp. 3d at 901, *aff'd*,

95 F.4th 1136, 1145 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 768 (2024).   Indeed, the Eighth

Circuit referred to Act 1103's "distribution requirement" and held that "Act 1103 does not set or

enforce discount pricing."  *PhRMA II*, 95 F.4th at 1145.  Moreover, the Eighth Circuit agreed

with the Third Circuit that the "340B Program 'is silent about delivery'" and, therefore, the

Arkansas state legislature lawfully filled in the gap by requiring manufacturers to deliver 340B

priced drugs to contract pharmacies.  *Id.* at 1143.  Nothing in the evidence provided by

AstraZeneca changes the conclusion reached by the Eighth Circuit. This court is bound by the

Eighth Circuit's determination that Act 1103 regulates distribution, not pricing.

AstraZeneca points to the wording of Act 1103 to argue that it is a pricing statute.

AstraZeneca Br. at 14.  Act 1103 provides a definition of what constitutes a 340B drug; however,

that definition does not mean that Act 1103 regulates drug pricing.  By the time Act 1103

applies, the drug's price has already been determined under the 340B statute.  Ex. 4, Expert

Report of M. Wallack (June 27, 2025), at 7, ¶ 22; SUMF ¶¶ 9-10, 54-113.  Act 1103 refers to a

"340B drug" solely to identify which drugs fall within its delivery and distribution requirements.

The term "340B drug" functions as a descriptive label, indicating the type of drug subject to Act

1103's distribution provisions, without affecting how the drug is priced.

Multiple courts agree that laws similar to Act 1103 regulate distribution, not pricing.

PhRMA and/or individual drug companies sued Mississippi, Tennessee, and Missouri to enjoin

enforcement of the contract pharmacy access laws enacted in those states.  Those courts

consistently rejected manufacturers' arguments that these statutes impermissibly regulate pricing.

In each case, the court explained that the laws merely govern the mechanics of delivery and

access, and therefore the plaintiffs were unlikely to succeed on their motions seeking to

preliminarily enjoin that the statutes as conflicting with federal pricing provisions.  These

decisions reflect a consistent judicial view: state contract pharmacy statutes operate in the realm of delivery, not pricing.  *See PhRMA v. Fitch*, No. 1:24-cv-00160, 2024 WL 3277365, at *9 (S.D. Miss. July 1, 2024), *appeal docketed*, No. 24-60340 (5th Cir. July 5, 2024); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d at 750; *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *12, *16; *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 654–65; *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *12; *Novartis Pharms. Corp. v. Bailey*, 2025 WL 489881, at *2–3.  And even if they were not, the undisputed record shows that covered entities retain title, SUMF ¶¶ 14-18, 36-45, 75-80, and that contract pharmacies are the dispensing agents of covered entities, SUMF ¶¶ 19-48.

AstraZeneca argues that the ruling by the Eighth Circuit should be disregarded because the "factual assumptions made by the Eighth Circuit are incorrect." AstraZeneca Br. at 32.  AstraZeneca disputes whether covered entities maintain title to a 340B drug, in a contract pharmacy arrangement, and whether contract pharmacies act as agents of the covered entity.  Contrary to AstraZeneca's assertions, those statements by the Eighth Circuit were not dispositive.  *See generally*, *PhRMA II*, 95 F.4th 1136 (8th Cir. 2023).  Agency was mentioned only as background information.  *Id*. at 1142.  The court discussed title only after concluding that "Congressional silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field."  *Id*. at 1144.

Furthermore, title and agency are federal issues that have nothing to do with Act 1103.  If AstraZeneca believes that covered entities do not retain title to 340B drugs in contract pharmacy arrangements, or that there is not an agency relationship between the pharmacy and the covered entity, its remedy is to present these issues to a federal 340B administrative dispute resolution ("ADR") panel.  340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89

Fed. Reg. 28,643 (Apr. 19, 2024) (codified at 42 C.F.R. §§ 10.20-10.25).  Whether the covered

entity retains title to 340B drugs, and whether the pharmacy acts as an agent of the covered

entity, are issues governed under the 340B statute and HRSA's contract pharmacy guidelines.

1996 Guidance, 61 Fed. Reg. at 43,552. Those issues have no bearing on AstraZeneca's duty to

comply with Act 1103. Contract pharmacies merely take physical possession of 340B drugs on

behalf of the covered entity and dispense the drugs to covered entity patients.  *Id.*  A federal

district court in Missouri recently confirmed that title and agency are federal matters having no

bearing a state contract pharmacy law because the 340B statute and HRSA's guidelines require

covered entities to maintain title to 340B drugs.  Memorandum and Order at 13–14, *AbbVie, Inc.*

*v. Bailey*, No. 4:24-cv-00996 (E.D. Mo. Jul. 11, 2025), ECF 91 (unpublished).

AstraZeneca argues that this Court should defer to the analysis of the Southern District of

West Virginia,  AstraZeneca Br. at 30–31, which stated in *dicta* that a West Virginia statute,

different from Act 1103 in material respects, regulates drug pricing. AstraZeneca Br. at 30–31.

AstraZeneca is wrong that the West Virginia court is the "only court to have meaningfully

considered" whether a law similar to Act 1103 regulates distribution or pricing.  AstraZeneca Br.

at 30 (citing *PhRMA v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024)).  To the contrary, the

*Morrisey* court is one among several courts that have wrestled with this issue, and all other

courts—including this Court and the Eighth Circuit—have concluded that Act 1103 and laws

like it regulate distribution, not pricing.  *PhRMA II*, 95 F.4th at 1145; *PhRMA v. Fitch*, 2024 WL

3277365, at *9 (Mississippi law "does not require pharmaceutical manufacturers to offer 340B

drugs below applicable ceiling prices. . ."); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d at

750; *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *12, *16; *AstraZeneca Pharms. LP v. Fitch*, 766

F. Supp. 3d 654–65; *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *12; *Novartis Pharms. Corp. v. Bailey*, 2025 WL 489881, at *2–3.

The *Morrisey* decision is distinguishable in several key respects.  First, it related exclusively to a "no-audits" provision and certain enforcement language in the West Virginia law, *Morrisey*, 760 F. Supp. at 450–60, that have no analogue in Act 1103.  *See* Order at 13–14, *PhRMA v. Minnesota*, No. 62-cv-24-5744 (2d Jud. D. Minn. Apr. 15, 2025) (finding that the "*Morrisey* case's reasoning is irrelevant" to alleged preemption claims because the state statute did not contain an audit provision).

Second, the *Morrisey* court, like AstraZeneca, conflates two different types of transactions when arguing that state contract pharmacy laws govern pricing.  *Morrisey,* 760 F. Supp.3d at 455–57; AstraZeneca Compl. ¶ 70; AstraZeneca Br. at 22.  The *Morrissey* court believed that the state law governed pricing because "wholesalers and retailers already deliver . . . drug products to contract pharmacies throughout West Virginia."  *Morrisey,* 760 F. Supp.3d at 456.  But this describes transactions between *pharmacies* and a manufacturer, not transactions between *covered entities* and a manufacturer.  Act 1103 governs distribution of drugs purchased by covered entities, not pharmacies.  The 340B statute governs the price of 340B drugs and effectively sets the maximum number of eligible transactions by specifying that the drugs may only go to patients of the covered entity and forbidding duplicate discounts.  42 U.S.C. § 256b(a)(5)(A)–(B).  Act 1103 does not expand the number of eligible 340B transactions.  For this reason, the Tennessee district court found *Morrisey* unpersuasive:

> This court nonetheless would take issue with *Morrissey's* characterization of that provision as controlling price rather than delivery. The Tennessee statute says nothing about price, and, even under the replenishment model, covered entities are the only entities entitled to the 340B discount. [The Tennessee statute] would prohibit [AbbVie] from imposing restrictions on where it is willing to deliver drugs

that have been purchased by covered entities under the 340B discount. The amount of the discount is not at issue and is not affected by the state scheme.

*AbbVie, Inc. v. Skrmetti*, 2025 WL 1805271, at *18.  Likewise, if a covered entity purchases a drug at the 340B price, Act 1103 states that the manufacturer may not block delivery of that drug to a contract pharmacy.

Indeed, a key distinction—and the crux of this case—is that manufacturers like AstraZeneca refuse to *distribute* a 340B-priced drug.  Ex. 14, Expert Report of R. Handfield, PhD (June 27, 2025) at 26–28, ¶¶41, 43; SUMF ¶¶ 122-157, 208-211.  Act 1103 presumes as a starting point that the federal law is being complied with by the covered entity and, if so, says that the 340B-priced drug must be distributed to the contract pharmacy of the covered entity's choice. Act 1103 does not fix drug prices because the 340B price is determined by a formula dictated by the 340B statute.  42 U.S.C. § 256b(a)(1); Ex. 4, Wallack Report, at 7, ¶ 22 (Wallack Report).  Under Act 1103, the Arkansas contract pharmacy "receives drugs purchased under a 340B drug pricing contract pharmacy arrangement with an entity authorized to participate in 340B drug pricing."  Ark. Code Ann. § 23-92-604(c)(2).   Stated differently, the contract pharmacy receives *possession* of drugs already purchased at 340B prices by covered entities. *See PhRMA II*, 95 F.4th at 1144 ("Pharmacies do not purchase 340B drugs, and they do not receive the 340B price discounts.").  The contract pharmacy simply acts as a dispensing agent for the covered entity that has already purchased the 340B drugs.  Handfield Report at 9, ¶ 14; Ex. 4, Wallack Report at 5, ¶ 18.a.  Act 1103 does not transform contract pharmacies into covered entities because Act 1103 plainly applies to drugs already purchased by covered entities.

### 2.    AID's Implementing Rule Regulates the Distribution of Drugs

In 23 CAR pt 152, AID clarifies that Act 1103 regulates the "delivery and acquisition" of drugs already subject to a manufacturer's 340B-price.  23 CAR § 152-101(1) (defining "340B-

drug pricing"). Act 1103 specifically directs AID to "promulgate rules to implement" its provisions. Ark. Code Ann. § 23-92-606. AID's regulatory interpretation, which was properly promulgated under Rule 123, is that Act 1103 encompasses only the distribution of drugs that have already been discounted and purchased by covered entities under the 340B Program.

AstraZeneca relies on certain factual findings by the Commissioner in proceedings to enforce Act 1103 to support its argument that Act 1103 regulates pricing. AstraZeneca Br. at 22–23. However, those findings do not help AstraZeneca here, because, as AstraZeneca concedes, the Commissioner determined that AstraZeneca was in violation of Act 1103. *Id*. AstraZeneca fails to inform the Court that it has challenged the Commissioner's order to the Pulaski County Circuit Court. *See AstraZeneca Pharms. LP v. Harris*, No. 60CV-25-4652 (Ark. Pulaski Cir. Apr. 29, 2025), https://caseinfo.arcourts.gov/opad/case/60CV-25-4652. It is the Pulaski County Circuit Court's role to determine whether the factual statements by the Commissioner are accurate, and not this Court's responsibility.

### 3. The Replenishment Model Does Not Transform Act 1103 Into a Pricing Statute

AstraZeneca next focuses on the replenishment model, arguing that this inventory management system used by many (but not all) covered entities proves that Act 1103 is about pricing and not delivery. As discussed above, the replenishment model is a tool to aid covered entities in compliance with the federal diversion and duplicate discount prohibitions. AstraZeneca contends that the replenishment model is used to "generate pricing discounts" for the drugs dispensed to a pharmacy's customers but fails to mention that covered entities are entitled to provide 340B drugs to any individual who is a patient of the covered entity, including a contract pharmacy customer. AstraZeneca does not, and cannot, contend that covered entities engage in diversion by using the replenishment model because the remedy for alleged diversion

is to submit a petition through the 340B ADR process. AstraZeneca has never audited a covered entity for diversion or duplicate discounts, which is a necessary prerequisite to submitting an ADR petition. Ex. 8, AID Hearing Transcript, at 213:17 –25; 214:1–2.

AstraZeneca states that replenishment "is designed to generate pricing discounts, without changing anything about how drug products actually move in the physical world." AstraZeneca Br. at 25. But AstraZeneca fails to note that the replenishment system is not the result of Act 1103 and therefore has nothing to do with this case. The replenishment model has long been *endorsed* by HRSA. SUMF ¶ 48. Covered entities have used the replenishment model long before Act 1103 was adopted. SUMF ¶¶ 48, 50-51. A Missouri district court recently dismissed (without prejudice) a case brought by AbbVie in which AbbVie, like AstraZeneca, relied heavily on its characterization of the replenishment model to challenge a Missouri law similar to Act 1103. The court ruled that the harms that AbbVie alleged from the replenishment model were not caused by the state law. Memorandum and Order at 16, *AbbVie, Inc. v. Bailey*, No. 4:24-cv-00996 (E.D. Mo. Jul. 11, 2025), ECF 91.

AstraZeneca describes a laundry list of other reasons that the replenishment model supports its position. AstraZeneca Br. at 25–30. None of these reasons support AstraZeneca's case.

First, AstraZeneca contends that a "manufacturer's role in the 340B replenishment process differs from its role in a regular commercial sale only in terms of the price at which it offers its product" and states that wholesalers (rather than manufacturers) deliver both 340B and commercially priced drugs. AstraZeneca Br. at 25. AstraZeneca's contention is nonsensical: drug companies play no role in the replenishment process, which governs transactions between covered entities and pharmacies. Covered entities must decide whether to keep their 340B drugs

physically separate or virtually separate from the contract pharmacy's non-340B drugs to ensure that their 340B drugs are only dispensed to 340B-eligible patients.  Ex. 14, Handfield Report, at 10, ¶ 15; Ex. 4, Wallack Report, at 5, ¶ 18.b.  The latter option involves implementation of the replenishment model which is solely an inventory management tool used by the covered entity and pharmacy.  Ex. 4, Wallack Report, at 5, ¶ 18.a n.2. Manufacturers have no role in either establishing or operating the replenishment process.

Second, AstraZeneca contends that price is the only factor that distinguishes 340B drugs from non-340B drugs.  AstraZeneca Br. at 26.  Not so. A key factor distinguishing between a 340B transaction and a non-340B transaction is that, in a contract pharmacy arrangement, covered entities purchase 340B drugs and do not purchase non-340B drugs.  Ex. 4, Wallack Report, at 5, ¶ 16.  A covered entity's purchase of 340B drugs for dispensation by the contract pharmacy to the covered entity's patients allows the covered entity to fulfill the purpose of the 340B program, which is to help the covered entity provide comprehensive services to patients. H.R. Rep. No. 102-384, pt. 2, at 12 (1992); *Genesis Health Care, Inc.*, 701 F. Supp. 3d at 316.

Third, AstraZeneca states that its products remain available at commercial prices at all pharmacies.  AstraZeneca Br. at 26–27.  This is the same analytical error of the *Morrisey* court. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Morrissey*, 60 F. Supp. 3d 439 (S.D. W. Va. 2024). AstraZeneca conflates transactions between pharmacies and manufacturers with transactions between covered entities and manufacturers.  It is irrelevant that *pharmacies* can buy AstraZeneca's drugs at commercial prices.  What is at issue here is AstraZeneca's refusal to permit 340B drugs purchased by covered entities to be shipped to pharmacies.

AstraZeneca refers to scenarios "where a non-designated contract pharmacy is co-located with a covered entity's in-house pharmacy" and states that deliveries would be made to the in-

house pharmacy but not the contract pharmacy.  AstraZeneca Br. at 27.  This example is entirely

fictional.  The testimony that AstraZeneca cites to support the idea that pharmacies could be co-

located misstates that testimony.  *See* D. Resp. to AZ SUMF, ¶ 91.  Arkansas pharmacy law

prevents two pharmacies from being "co-located" because a co-location would require a lease

from one of the pharmacies to the other, and leased pharmacies must be "completely separated

from the remainder of the building." 17 CAR § 160-1203. Two pharmacies might be at the same

street address, but they would be required to have a different suite number, at the very least.

Moreover, that AstraZeneca might deliver to one pharmacy and not another pharmacy at the

same address only reinforces that AstraZeneca's policy violates Act 1103 because it is not

delivering to one of those pharmacies.  AstraZeneca's argument also ignores that it requires a

separate HIN for each contract pharmacy so that AstraZeneca knows the locations to which

wholesalers distribute AstraZeneca 340B drugs.  SUMF ¶¶ 132-33.  Significantly, AstraZeneca

has described its policy as one that focuses on location:

> Q. My 340B covered entity has contract pharmacy arrangements with multiple
> locations of the same pharmacy (e.g., six different Walgreens pharmacy locations).
> Can my entity designate all locations of the same pharmacy?
>
> A. No. AstraZeneca's policy allows qualifying 340B covered entities (i.e., covered
> entities without an on-site pharmacy) to designate a single contract pharmacy
> location. Contract pharmacy locations are registered individually on the HRSA
> database and 340B covered entities are permitted to designate only a single contract
> pharmacy location which corresponds to a single contract pharmacy registration
> with HRSA.

*AstraZeneca Policy*, 340B ESP Resources (Apr. 7, 2025),

https://www.340besp.com/resources/astrazeneca/policy.pdf; SUMF ¶¶ 114-121.  AstraZeneca's

statement that its policy relies on the identity of the purchaser and not its location, AstraZeneca

Br. at 27, is nonsensical, given that only entities  purchase 340B drugs, no matter the location.

Fourth, AstraZeneca states that "wholesalers and contract pharmacies do not handle the physical movement of 340B drugs any differently than they handle drugs purchased at contract pharmacies." AstraZeneca Br. at 27. To the contrary, wholesalers and pharmacies handle the movement of 340B and non-340B drugs differently because, in the case of a non-designated pharmacy, the 340B drug is not handled at all. The reality is that, when 340B drugs are purchased from a wholesaler for delivery to a covered entity's in-house pharmacy, the wholesaler will ship an unlimited quantity of such drugs. SUMF ¶¶ 115-116, 150; Expert Report of Robert Scholz, at 5; Ex. 14, Handfield Report at 10, ¶ 15. But when the covered entity wants them delivered to a contract pharmacy, they will not be delivered at all unless the pharmacy appears on the designated contract pharmacy list sent by AstraZeneca each week to the wholesaler. SUMF ¶¶ 29, 41, 128, 141-142, 148-157, 209-210. The only difference between a covered entity's unlimited access and no access to AstraZeneca's 340B drugs is the delivery location.

Fifth, AstraZeneca alleges that, from a covered entity's perspective, there is "no meaningful difference between 340B sale and non-340B sale other than price." AstraZeneca Br. at 27. AstraZeneca is mistaken. There is a very meaningful difference for covered entities because covered entities do not buy non-340B drugs for dispensation at contract pharmacies. Ex. 4, Wallack Report, at 5, ¶ 16; SUMF ¶¶ 24-25. AstraZeneca also asserts that covered entities do not maintain title to 340B drugs in a contract pharmacy arrangement. AstraZeneca Br. at 3, 11, 27, 32, 57. AstraZeneca is wrong because covered entities are required under federal law to maintain title and would be guilty of diversion and subject to penalties under the 340B statute. 2010 Guidance, 75 Fed. Reg. at 10,277. A federal district court in Missouri recently analyzed the same allegation by another manufacturer and determined that that this argument was negated

45

by HRSA's guidelines requiring covered entities to maintain title to 340B drugs shipped to contract pharmacies. Memorandum and Order at 13–14, *AbbVie, Inc. v. Bailey*, No. 4:24-cv-00996 (E.D. Mo. Jul. 11, 2025), ECF 91 (unpublished).

AstraZeneca states that the CEO of Community Clinic testified that he is not aware when 340B orders are placed. AstraZeneca Br. at 27–28. Of course, the CEO of a primary care clinic with multiple locations would not know when orders for 340B drugs are placed, just has he wouldn't know when orders for pencils or syringes are placed. AstraZeneca then states that 340B "orders are instead significant for covered entities only in terms of the 'revenue' that they generate for the entity[.]" AstraZeneca Br. at 28. To the contrary, Community Clinic passes along more in 340B discounts to indigent patients than it realizes in revenues for dispensation of 340B drugs to insured patients. SUMF ¶ 189.

Sixth, AstraZeneca argues that, from the perspective of the contract pharmacy, there is no difference between 340B drugs and commercially priced drugs. AstraZeneca Br. at 28. As stated above, a significant difference is that only the covered entity, not the pharmacy, is permitted to purchase 340B drugs. And, non-designated contract pharmacies no longer receive delivery of 340B drugs at all under AstraZeneca's policy.

Seventh, AstraZeneca argues that Act 1103 does not address access by patients. *Id.* at 28-29. As described above, 340B is not a patient-discount statute. It is a provider-discount statute. The 340B statute does not address access by patients. The purpose of the 340B statute is to assist covered entities to stretch scare federal resources to enable them to reach more patients and provide more services. H.R. Rep. No. 102-384, pt. 2, at 12 (1992); *Genesis Health Care, Inc.*, 701 F. Supp. 3d at 316.

Finally, AstraZeneca argues that the credit replenishment inventory model demonstrates that Act 1103 is about pricing. The covered entity pays for 340B drugs under a credit replenishment model, as AstraZeneca concedes in its SUMF at ¶112 (the wholesaler "charges the 340B price to the covered entity"). The only difference between a typical replenishment arrangement and credit replenishment is that, in the credit replenishment model, the replenishment is applied retroactively to a drug that has already been shipped to the pharmacy instead of to a drug subject to a new 340B order. In both cases, the covered entity pays for the 340B drugs and the drugs are shipped to the pharmacy consistent with the bill to/ship to model authorized by HRSA. And the adverse impact of AstraZeneca's contract pharmacy policy is just as relevant. It prevents non-designated pharmacies from obtaining 340B drugs, the only difference being that the shipment of such drugs takes place before the 340B replenishment drugs are ordered. And, as argued above with respect to a typical replenishment model, the credit replenishment model existed before Act 1103 was enacted and has nothing to do with any harms alleged by AstraZeneca. And, as argued above with respect to a typical replenishment model, the credit replenishment model existed before Act 1103 was enacted and has nothing to do with any harms alleged by AstraZeneca.

### 4.    AstraZeneca's Contract Pharmacy Policy Addresses Distribution

AstraZeneca's contention that Act 1103 is a pricing statute is a necessary factual predicate to its argument that its policy is a pricing policy and therefore protected under the Third Circuit decision in *Sanofi v. Becerra*. *Sanofi Aventis*, *U.S., LLC v. HHS,* 58 F.4th 696, 703 (3d Cir. 2023). AstraZeneca's arguments to this Court that its policy governs pricing is directly contrary to its position in the *Sanofi* case. There, it characterized its policy as a delivery policy. In briefing before that court, AstraZeneca said, "[f]or covered entities that do not maintain their own on-site dispensing pharmacy, AstraZeneca will also *deliver* discounted drugs to a single

contract pharmacy site for each covered entity. But AstraZeneca will no longer *deliver* 340B drugs to an unlimited number of contract pharmacies." Brief for Appellee AstraZeneca Pharmaceuticals LP at *15, *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023) (No. 22-1676), ECF No. 31, *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023) (emphasis added). AstraZeneca cannot argue to the *Sanofi* court that its policy is a delivery policy not addressed by the 340B statute and to this Court that its policy is a pricing policy that is protected by the *Sanofi* decision.

The record clearly demonstrates that AstraZeneca's contract pharmacy policy addresses distribution. In addition to its representations in the *Sanofi* case and before other federal courts, AstraZeneca characterizes its contract pharmacy restrictions as a "distribution" policy twice in its own policy notice. SUMF ¶ 121 (AstraZeneca discussing "a smooth transition to our new distribution model" and providing an email address for questions regarding our "340B distribution model."); *see also* SUMF ¶ 132. Act 1103 regulates distribution and AstraZeneca's policy, by its own admission, regulates distribution.

The method by which AstraZeneca enforces it contract pharmacy policy also demonstrates that it is about delivery to a location and not pricing. SUMF ¶¶ 91-99, 144-148. In a typical drug purchase transaction, wholesalers buy drugs from manufacturers at the manufacturer's wholesale acquisition cost ("WAC"), then fulfill orders for drugs to purchasers. If the purchaser has negotiated a lower price than WAC, or if the purchaser is a covered entity eligible for 340B discounts, the wholesaler charges the purchaser at the lower price. Ex. 14, Handfield Report, at 23, ¶ 34; Ex. 20, AZ (C. Mancill) Depo. Tr. Excerpts (May 19, 2025), at 104:10–105:8; 106:7–11; 110:3–5. The wholesaler then submits a request to the manufacturer, known as a "chargeback" request, for the difference between WAC and the lower purchase price

48

paid to the wholesaler.  Ex. 14, Handfield Report, at 23, ¶ 34; Ex. 20, Mancill Dep.. at 104:10–

105:8; 106:7–11; 110:3–5; SUMF ¶¶ 95.

Because AstraZeneca's contract pharmacy policy restricted access to 340B drugs to only

one pharmacy location, AstraZeneca required information about a pharmacy's location to

determine whether it would honor the wholesaler's chargeback request. SUMF ¶¶ 158–61.

AstraZeneca requires that each covered entity/contract pharmacy combination have a unique

HIN[13] to identify a pharmacy's location.  The HIN is reported through an Electronic Data

Interchange ("EDI") between the wholesaler and manufacturer called the EDI 844.[14]  SUMF ¶¶

94, 145.  AstraZeneca also publishes a weekly "eligibility report" to wholesalers to identify the

pharmacy locations that are eligible to receive 340B drugs under its policy.  Ex. 12, Smith Drug

(J. Henderson) Depo. Tr. Excerpts (June 11, 2025), at 30:12–16; Ex. 20, Mancill Dep., at

199:15–19, 210:16–25 to 211:1–13; SUMF ¶¶ 135, 141-142, 209.

AstraZeneca has publicly acknowledged the importance of identifying a pharmacy's

location using an HIN, and its use of the chargeback system, as tools to implement it policy.

AstraZeneca stated in its initial contract pharmacy policy that it would be implementing its

---

[13] An email exchange between an AstraZeneca's Contract Operations Manager, ███████, and a McKesson Manager, ███████, demonstrates that the HIN was imperative to the new location-based policy.  The exchange is as follows:

███████████████████████████████████████

███████████████████████

████████████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████

███████████████████████

Ex. 46, AZ Emails re Policy (October 30 and 31, 2024) (AZ0042726).

[14] One major wholesaler describes the EDI 844 as data that can be used "to transmit specific data in the form of a debit, credit, or request for credit relating to pre-authorized product transfer actions."  844 Product Transfer Account Adjustment, AmerisourceBergen (Feb. 22, 2021), 844-chargebacks-supplier_o844_4010_specification.pdf.

policy by refusing to process 340B chargebacks at contract pharmacies.  It said: "To implement this new approach, AstraZeneca will stop processing 340B chargebacks for all 340B Contract Pharmacy arrangements effective October 1, 2020." AstraZeneca, 340B Contract Pharmacy Pricing (Aug. 17, 2020),

https://www.340bhealth.org/files/AstraZeneca_Retail_Communication_-_340B_-_Final.pdf?_zs=Ccipc1&_zl=DaI27; SUMF ¶¶ 115-16.  In FAQs to explain its contract pharmacy policy, AstraZeneca stated that it requires HINs "to manage its process with wholesalers":

> Q. Is AstraZeneca requiring covered entities to have a HIN registered for the contract pharmacy that they designate?
>
> A. Yes, a contract pharmacy must have a HIN assigned to it for a covered entity to designate it as its single contract pharmacy. This information is important for AstraZeneca to manage its process with its wholesalers.[15]

Testimonial evidence confirms that AstraZeneca implemented its policy by collecting HINs to identify pharmacy locations and by approving or denying chargebacks. Ex. 12, Henderson Dep., at 26:10–14; 27:4–23 to 28:4; 47:10–17; 50:6–11; SUMF ¶ 159.[16]  AstraZeneca denied chargebacks requested by several wholesalers and explained to the wholesaler that the denials were due to the drug being dispensed at a pharmacy location (identified by HIN) that was not a covered entity's designated pharmacy.  SUMF ¶ 160.[17]

---

[15] Ex. 38, AZ Letter to Distribution Partners (July 3, 2023) (CAH000018); Ex. 58, AZ 340B CP Policy Covered Entity Letter Update (April 2025).

[16] When implementing its policy, AstraZeneca provided instructions by email to Smith on what Smith was required to provide by EDI 844 to implement the contract pharmacy policy.  Ex. 12, Henderson Dep., at 48:5–6.

[17] Ex. 39, AZ Email re Chargeback Denial (May 29, 2024) (AZ0048319) (███████████████████████████████████████ ██████████████); *see also* Ex. 45, AZ Email to CE re HIN (December 21, 2022 ) (AZ0044621) (similar); Ex. 59, Email from ██████████, Contracts Operations Manager, AstraZeneca, to Dakota Drug (July 2, 2024) ((AZ0048248) (similar).

Wholesalers were quick to adapt to AstraZeneca's policy and began blocking certain orders, not because of any pricing change but simply because AstraZeneca labeled contract pharmacy locations as ineligible.  Ex. 12, Henderson Dep., at 51:2–3; 57:12, 17, 21; 58:2–4, 8.  As one representative from drug wholesaler Smith Drug Company, admitted, "we only do what Astra tells us to do" because "AstraZeneca pays the chargebacks and we want to make sure our chargebacks are correct."  Ex. 12, Henderson Dep,. at 26:3–5; 61:4; SUMF ¶¶ 132-33, 145.  As this evidence demonstrates, and as experts who reviewed this discovery concluded, AstraZeneca's contract pharmacy policy—at its core—has nothing to do with pricing and everything to do with restricting the delivery of 340B drugs to certain locations.  Ex. 29, Expert Report of Robert Scholz (June 27, 2025),  at 3, 5; Ex. 14, Handfield Report, at 26–28, ¶¶ 41, 44.

The Eighth Circuit has determined that Act 1103 regulates distribution of 340B drugs and other courts that have analyzed state laws similar to Act 1103 have also determined that those state laws regulate delivery, not pricing.  Moreover, all of the evidence demonstrates that Act 1103 regulates delivery as does AstraZeneca's contract pharmacy policy.  For all of the above reasons, this Court should find that Act 1103 regulates delivery, not pricing.

## B.    Federal Patent Law Does Not Preempt Act 1103

Act 1103 is not preempted by federal patent law because Act 1103 is a distribution statute that does not interfere with AstraZeneca's patent rights.  As an initial matter, federal courts apply a presumption against preemption and, therefore, the Court should begin its analysis with the presumption that federal patent law does not preempt Act 1103.  Moreover, AstraZeneca misinterprets the case that it principally relies on, *Biotechnology Industry Organization v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007) ("*BIO*"), in which a court invalidated a District of Columbia law that explicitly regulated pricing of patented drugs.  In contrast, Act 1103 permissibly regulates distribution of 340B drugs whether or not they are patented.

AstraZeneca raised the same claim to challenge laws similar to Act 1103 in other states, but federal courts have either dismissed the claim or determined that AstraZeneca did not have a likelihood of success on the claim. *AstraZeneca v. Bailey*, 2025 WL 644285, at *3 (dismissing AstraZeneca's claim that the Missouri law was preempted under the federal patent law); *AstraZeneca Pharms. LP v. Brown*, No. 1:24-cv-01868 (D. Md. Sept. 5, 2024) (order denying motion for preliminary injunction on claim based on preemption under federal patent law); *AstraZeneca v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024) (similar). Another manufacturer has raised this patent law claim to challenge state laws similar to Act 1103 and was equally unsuccessful. *Novartis v. Fitch*, 738 F. Supp. 3d at 752 (finding that Novartis was unlikely to succeed on the merits of its claim that a state law similar to Act 1103 did not "clash[] with the objectives of the federal patent laws") (citation omitted).

### 1. The Presumption Against Preemption Applies

Courts routinely apply a presumption against preemption when state laws or regulations concern "matters related to health and safety." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985). Act 1103 fits squarely into this category: it regulates the distribution of prescription drugs, an area long recognized as central to a state's police power to protect the health and safety of its residents. *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 941 (8th Cir. 2011); *see also Wyeth*, 555 U.S. at 565. In *PhRMA II*, the Eighth Circuit recognized this presumption in addressing PhRMA's argument that the 340B statute preempted Act 1103. It stated that its preemption analysis, "'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . [the] Federal Act unless that [is] the clear and manifest purpose of Congress.'" *PhRMA II*, 95 F.4th at 1140 (*citing Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). The Eighth Circuit recognized that "there is a 'presumption that

state or local regulation of matters related to health and safety is not invalidated under the

Supremacy Clause.'" *Id.* (quoting *Hillsborough Cnty.*, 471 U.S. at 715).

AstraZeneca contends that, for various reasons already raised in *PhRMA*, that the

presumption against preemption should not apply to this case. AstraZeneca Br. at 36–39. First,

AstraZeneca argues that Act 1103 regulates transactions under a federal program and is,

therefore, "inherently federal." *Id.* at 36–37. This argument has already been considered and

rejected by the Eighth Circuit. The Eighth Circuit ruled in *PhRMA* that the 340B statute did not

evidence any Congressional intent to supplant State laws that supplement the federal statute.

*PhRMA II*, 95 F.4th at 1143–44. This Court is not at liberty to second-guess the Eighth Circuit's

decision that the presumption against preemption applies to Act 1103.

Courts other than the Eighth Circuit have determined that the presumption against

preemption applies in analyzing whether federal law preempts state laws similar to Act 1103.

Order Denying Preliminary Injunction, *PhRMA v. Fitch*, 2024 WL 3277365, at *8 ("The state

statute therefore triggers the presumption against preemption."); *see also Novartis v. Fitch*, 738

F. Supp. 3d at 748; *AbbVie, Inc. v. Fitch*, 2024 WL 3503965, at *9.

AstraZeneca argues that the Eighth Circuit's determination that "'the practice of

pharmacy is an area traditionally left to state regulation'" was not "justified" because most

Arkansas laws that regulate drugs and pharmacies are applicable to all drugs and not only a

particular category of drugs. AstraZeneca Br. at 37. AstraZeneca fails to recognize, however,

that Arkansas law does regulate specific categories of drugs. As one example, Arkansas requires

drug wholesalers to obtain a license to operate in Arkansas, but exempts various categories of

distribution, including distribution by manufacturers of free samples of drugs. Ark. Code Ann.

§§ 20-64-503, -505. The Arkansas Code also includes provisions that address controlled

substances specifically, which the statute defines by reference to federal law. *Id.* § 5-64-101. Arkansas law clearly regulates specific categories of drugs, and AstraZeneca is clearly wrong that Arkansas state laws regulate the sale and distribution of **all** drugs.

AstraZeneca also argues that there is no presumption against preemption because state laws do not traditionally regulate drug pricing. AstraZeneca Br. at 37. As explained above, AstraZeneca's arguments that Act 1103 is a drug pricing law are unfounded, and the Eighth Circuit has rejected those arguments. *PhRMA II*, 95 F.4th at 1145. In the context of the presumption against preemption, the Eighth Circuit determined that Act 1103 regulated the field of pharmacy, which is a field traditionally left to state law, that Congress was aware of the role of pharmacies and state law in enacting the 340B statute, and that "silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field." *PhRMA II*, 95 F.4th at 1144.

This Court must follow the ruling of the Eighth Circuit and should be persuaded by federal district courts in other jurisdictions that applied the presumption. Accordingly, the Court should apply the presumption against preemption in this case.

### 2.    Federal Patent Law Does Not Preempt Act 1103

Federal patent law in no way preempts Act 1103. District courts considering state laws similar to Act 1103 rejected arguments by AstraZeneca and other manufacturers that these laws are preempted by federal patent law. In *AstraZeneca v. Bailey*, the court dismissed AstraZeneca's patent law preemption claim challenging Missouri's S.B. 751, a state law substantially similar to Act 1103. The court held that S.B. 751 "does not conflict preempt federal patent laws under the Supremacy Clause because it leaves intact the enforcement mechanisms and pricing structure set forth in the 340B statute and does not interfere with manufacturers' rights under the patent system. 2025 WL 644285, at *2–3. A Louisiana federal district court

also dismissed AstraZeneca's patent law preemption claim challenging that state's contract pharmacy law. *PhRMA v. Murrill*, 2024 WL 4361597, at *9. Other manufacturers raising this claim in other states have been similarly unsuccessful. *Novartis v. Fitch*, 738 F. Supp. 3d at 752 (no likelihood of success on patent law preemption argument); *AstraZeneca v. Fitch*, 766 F. Supp. 3d at 665; *Novartis Pharms. Corp. v. Brown*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024) (denying preliminary injunction, in part, on patent preemption claim); *PhRMA v. Brown*, No. 1:24-cv-01631 (D. Md. Sept. 5, 2024) (same); *AbbVie, Inc. v. Brown*, No. 1:24-cv-01816 (D. Md. Sept. 5, 2024) (same); *Novartis v. Bailey*, 2025 WL 489881, at *3 (dismissing Novartis's patent preemption claim). The same analysis applies here: prices are set by the 340B statute, not Act 1103, and Act 1103 does not interfere with federal patent law.

AstraZeneca's heavy reliance on *BIO*, AstraZeneca Compl. ¶¶ 67–69 and AstraZeneca Br. at 19–20, 38, is misplaced and is ultimately fatal to its preemption argument. In *BIO*, the Federal Circuit considered whether a District of Columbia statute prohibiting "any patented drug from being sold in the District for an excessive price" was preempted by federal patent law. *BIO*, 496 F.3d at 1365. The court articulated several reasons—centered on the scope, purpose, and effect of the D.C. statute—for finding that it was "contrary to federal law" and preempted. *Id.* at 1373. None of those scope, purpose, or effect-based concerns are present here. A state law such as Act 1103 regulating patentable products is not preempted if it does not "conflict with the operation of the laws in [such] area passed by Congress." *Kewanee*, 416 U.S. at 479.

First, the *BIO* court emphasized that the law was "in no way general, affecting only patented products" and stood "largely—indeed, exclusively—within the scope of the patent laws." *Id.* at 1373–74. The D.C. statute explicitly called out excessively priced "patented prescription drug[s]," prompting the court to conclude that "its effect is to shift the benefits of a

patented invention from inventors to consumers." *Id.* at 1364, 1374.  In contrast, Act 1103 neither applies solely to patented drugs nor makes any reference to patented prescription drugs. Instead, it applies only to covered outpatient drugs purchased under the 340B statute for delivery to contract pharmacies.  Act 1103 does not affect the duration or scope of AstraZeneca's—or any patent holder's—rights of exclusivity.

Second, unlike the law in *BIO*, where the "fact that the [law was] targeted at the patent right [was] apparent on its face," 496 F.3d at 1374, Act 1103 neither mentions nor affects patented drugs, because neither its purpose nor effect is to regulate patent rights.  As the court in *AstraZeneca v. Bailey* observed, Missouri's contract pharmacy law —which mirrors Act 1103— "does not make any mention of exclusivity periods, patent terms, or even pricing."  2025 WL 644285, at *2.

Echoing the above principles, the Supreme Court has held that protections not aimed *exclusively* at the promotion of invention itself are not preempted under federal patent law.  *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165–66 (1989); *Kewanee*, 416 U.S. 470.  This is true even if the "state law protection [such as Act 1103 is] available for ideas which clearly [fall] within the subject matter of [federal] patent [law]."  *Bonito Boats*, 489 U.S. at 155.  Indeed, in denying a petition for a rehearing en banc in *BIO*, one judge stated a similar proposition: "It is well established that states can generally regulate patented products as part of their general exercise of police powers without preemption, even if this regulation incidentally affects the profits a patentee gains from its patent."  *Biotechnology Indus. Org. v. District of Columbia* 505 F.3d 1343, 1346 n.1 (Fed. Cir. 2007).

Finally, Act 1103 does not have the consequence of "re-balanc[ing] the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to

provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374; AstraZeneca Compl. ¶ 68; AstraZeneca Br. at 25. Act 1103 regulates the distribution of drugs, not their pricing, and does not alter the compensation or market exclusivity granted to patent holders. Rather, it merely ensures that covered entities can receive drugs to which they are entitled under federal law. In doing so, Act 1103 presumes as a starting point that covered entities are complying with the federal 340B statute and thus does not interfere with the federally defined scope of the 340B Program. Any "re-balancing" of the patent law framework was considered and appropriately accepted by Congress when it first passed the 340B statute in 1992. VHCA of 1992 §§ 602–603.

AstraZeneca argues that Arkansas law does not typically focus on manufacturer obligations and, therefore, Act 1103 was not foreseeable. AstraZeneca Br. at 44–45. Arkansas has several statutes, however, that regulate a party's ability to order and receive a manufacturer's drugs and other aspects of the drug delivery system. *See, e.g.*, Ark. Code Ann. § 20-64-505; Ark. Code Ann. § 20-64-501 et seq. (grounds for pharmacies to receive and possess legend and controlled drugs); 17 CAR § 160-2602 (allowing distribution of controlled substances if certain requirements are met); *see also* Ex. 14, Handfield Report, at 24–25, ¶ 38.

In a very recent decision in a case brought by AstraZeneca to challenge the drug price negotiation program created by the Inflation Reduction Act of 2022 ("IRA"), AstraZeneca argued that the negotiation program infringed on its property rights deriving from its patents and regulatory exclusivity periods. *AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116 (3d Cir. 2025). In upholding the district court's decision to dismiss the case, the Third Circuit determined that the *BIO* case was instructive, citing a statement in *BIO* that "'the federal patent laws do not create any affirmative right to make, use, or sell anything.'" *Id.* at 125. Moreover, the Third Circuit stated that "where federal patent laws do not confer a right to sell at all, they do not

confer a right to sell at a particular price," adding that "[n]o other applicable provision of property law confers a right to sell goods at a particular price either." *Id.* If AstraZeneca were correct that Act 1103 regulates pricing (which it does not), it would still lose this preemption argument because federal patent laws do not confer a right to sell goods at a particular price.

AstraZeneca argues that, even if Act 1103 does regulate delivery and not pricing, it would still be preempted, AstraZeneca Br. 34–35, citing two cases that are easily distinguishable. *National Meat Ass'n v. Harris* considered whether the Federal Meat Inspection Act ("FMIA"), which, in contrast to the 340B statute, "contains an express preemption provision . . . addressing state laws," was preempted by a California law. 565 U.S. 452, 458 (2012). In addition, the "FMIA's preemption clause sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements." *Id.* at 459–60. It then cited *Eng. Mfrs. Ass'n v. S. Coast Air Quality Mgmt Dist.*, 541 U.S. 246 (2004). Similar to *National Meat Ass'n*, and as AstraZeneca concedes, the federal law that preempted a California law "prohibited States from 'adopt[ing] or attempt[ing] enforcement' of state standards for motor-vehicle emissions. AstraZeneca Br. at 34. The 340B statute lacks the express preemption clause contained in both of these cases and its text is "silent about delivery" of 340B drugs. *PhRMA II*, 95 F.4th at 1143. The cases cited by AstraZeneca are inapposite.

AstraZeneca unabashedly reports the commercial price that it charges for its patented drug Farxiga to argue that it faces significant financial consequences due to Act 1103. AstraZeneca Br. at 35. Specifically, the administrative record, cited by AstraZeneca, shows that the recent commercial price for a 90-day supply of Farxiga was ███████ *Id.* Data from the HHS is consistent, showing that a 30-day supply of Farxiga was $556.00 in calendar year 2023, making a 90-day supply cost equal to $1,668.00. HHS, CMS, *Medicare Drug Price Negotiation*

*Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 2024),

https://www.cms.gov/files/document/fact-sheet-negotiated-prices-initial-price-applicability-year-2026.pdf [hereinafter *Negotiated Prices Fact Sheet*]. AstraZeneca then complains about the

discount that it has provided to 340B covered entities on Farxiga, calling it "arbitrage revenue."

AstraZeneca Br. at 35.  But the 340B price is set by federal statute and is based on the average

and best prices that AstraZeneca charges in the open market and reports to HHS.  *See* 42 U.S.C.

§ 256b(a)(1); Ex. 6, M. Wallack Depo Tr. Excerpts (August 4, 2025), at 28:1-25. Covered

entities do not have any control over the amount of the 340B discount.  Ex. 6, Wallack

Deposition Transcript, at 28:5–11.

Manufacturers, however, have complete control over the commercial prices that they

charge and some control over the amount of the 340B discount because, as stated above, the

amount of the discount is based on the manufacturer's average and best price sales data from the

prior quarter.  *See* 42 U.S.C. § 256b(a)(1); 42 C.F.R. § 10.10(a).  Moreover, manufacturers must

offer a steeper discount (as an add-on to the primary rebate) if they raise the price of their drugs

faster than the rate of inflation.  42 U.S.C. § 1396r-8(c)(2); *see* Memorandum Order and

Opinion, *Chiesi USA, Inc. v. Robert F. Kennedy, Jr.*, No. 1:24-cv-00260 (D.D.C. Aug. 27, 2025),

ECF No. 37.[18]  This statutory steeper discount, sometimes referred to as the "inflationary

penalty", often results in a discount that is less than $0.01 (i.e., a negative amount), in which case

HRSA requires manufacturers to offer the drug to covered entities at $0.01.  42 C.F.R. §

10.10(b). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[18] As explained by the *Chiesi* court, the formula for the added rebate is:  (1) subtract the drug's inflation-adjusted launch price from its current average price, and (2) then multiply the difference by the number of units dispensed "for which payment was made" during the applicable rebate period. *Chiesi v. Kennedy*, No. 1:24-cv-00260 at 2 (citing 42 U.S.C. §1396r-8(c)(2)(A)).

███████████████████████████████████████

███████████████████████████████████

Significantly, HHS chose Farxiga as one of ten drugs subject to Medicare price negotiations under the IRA, applicable to claims for Medicare beneficiaries beginning on January 1, 2026.[19]  HHS, Ctrs. for Medicare & Medicaid Servs. & Off. of the Assistant Sec'y for Plan. & Evaluation, *Inflation Reduction Act Research Series—Farxiga: Medicare Enrollee Use and Spending* (Nov. 2, 2023), https://aspe.hhs.gov/sites/default/files/documents/3950eb2fe9aaa75c39adac742be3e90f/Farxiga. pdf.  In explaining its choice of Farxiga, HHS noted that, "Between 2018 and 2022, average annual total [Medicare] Part D spending per enrollee taking Farxiga (i.e., the total amount, including Medicare, plan, and enrollee payments, spent on Farxiga per person) increased by 31 percent (from $3,093 to $4,046)."  Also notable is that AstraZeneca agreed to provide Medicare with a 68% discount on the price of the drug.  *Id.*  Undoubtedly, AstraZeneca still makes a profit at that discounted price because the Medicare IRA price negotiation provisions are not designed to result in a loss to manufacturers.  *See Negotiated Prices Fact Sheet*.  AstraZeneca's complaints about the difference between the commercial price and the (statutorily dictated) 340B price is paradoxical, given that: 1) AstraZeneca chooses to charge over ██████ for a 90-day supply of this drug; 2) covered entities have no control over the 340B price to which they are entitled; and 3) 340B discounts are based on sales data submitted by manufacturers.

In sum, Act 1103 preserves AstraZeneca's exclusive right to sell its patented products.  It does not alter patent terms, impose new pricing obligations, or otherwise conflict with the

---

[19] AstraZeneca's attempts to invalidate the drug negotiation provisions of the IRA were unsuccessful.

purposes of federal patent law.  Because AstraZeneca retains all the protections of the federal patent system, there is no preemption.

### C.    Act 1103 Does Not Violate the Contracts Clause

Act 1103 has no effect, much less a substantial impairment, on AstraZeneca's contract with the HHS Secretary, which is simply a form contract that incorporates the terms of the 340B statute.  *See Astra*, 563 U.S. at 118; *see also generally*, Ex. 18, AZ PPA with HHS (AZ000050); SUMF ¶ 49.  Therefore, it in no way violates the Contracts Clause, which prohibits States from passing laws "impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.  As other courts have determined, AstraZeneca's Contracts Clause claim is without merit.  A Missouri district court dismissed a claim brought by PhRMA that the Contracts Clause rendered a Missouri statute similar to Act 1103 unconstitutional.  *PhRMA v. Bailey*, No. 2:24-cv-04144, 2025 WL 644281 (W.D. Mo. Feb. 27, 2025).  Other courts have held that AstraZeneca is unlikely to success on the merits of its claim that the contracts Clause renders unconstitutional other state laws similar to Act 1103.  *Id.* at *6.

A state law violation of the Contracts Clause depends on whether (1) the law operates as a substantial impairment to the preexisting contract, (2) a state has a legitimate and public purpose for the law, and (3) the adjustment of rights of contracting parties is reasonable and appropriate considering the public purpose justification.  *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002).  The Contracts Clause's limitation is "not an absolute one and is not to be read with literal exactness like a mathematical formula."  *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 449 (8th Cir. 1984) (quoting *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 428 (1934)).

Act 1103 does not substantially impair AstraZeneca's PPA with the HHS Secretary.  The Supreme Court has held that the terms of the PPA "simply incorporate statutory obligations and

record manufacturers' agreement to abide by them." *Astra*, 563 U.S. at 118. AstraZeneca concedes this point. AstraZeneca Compl. ¶ 74 ("PPAs are not transactional, bargained-for contracts.") (citation omitted); AstraZeneca Br. at 40. Two federal Circuits have held that the 340B statute is silent on delivery, and the Eighth Circuit has held that Act 1103 addresses delivery, not pricing. *Sanofi Aventis*, *U.S., LLC,* 58 F.4th at 703; *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 459 (D.C. Cir. 2024); *PhRMA II*, 95 F.4th at 1144–45. Because the PPA only serves to incorporate obligations under the 340B statute, and the obligations under the 340B statute and Act 1103 do not intersect, Act 1103 does not and cannot impair AstraZeneca's PPA.

Act 1103 does not impose new obligations on AstraZeneca by requiring delivery of 340B drugs to multiple contract pharmacies. AstraZeneca Br. at 40. As discussed above, AstraZeneca has stated numerous times that, after implementing its policy, "AstraZeneca continued to make its products available at 340B-discounted prices—*in unlimited quantities*—to all covered entities," "covered entities remained able to obtain 340B pricing for AstraZeneca products through either their in-house pharmacy or their designated contract pharmacy *in unlimited quantities*, and 'covered entities' patients were able to obtain unlimited amounts of AstraZeneca products through covered entities and contract pharmacies." AstraZeneca SUMF 115, 118, 120 (emphasis added); *see also* Brief for Appellee AstraZeneca Pharmaceuticals LP at *15, *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023) (No. 22-1676), ECF No. 31, *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023) ("AstraZeneca continues to make its products available at 340B-discounted prices—in unlimited quantities—to all covered entities."). If AstraZeneca is making 340B drugs available to covered entities in unlimited quantities, Act 1103 imposes no new obligation under AstraZeneca's PPA. In arguing its

preemption claim, AstraZeneca states that, "AstraZeneca's products always remain available for purchase and delivery to any location, provided the purchasing entity is willing to pay commercial prices" and that wholesalers "do not handle the physical movement of 340B drugs any differently than they handle drugs purchased at commercial prices."  AstraZeneca Br. at 26–27.  This statement can only be interpreted to mean that there is no difference in the burden to AstraZeneca between delivering 340B drugs and delivering commercially priced drugs.  Because AstraZeneca will make available 340B products to covered entities "in unlimited quantities" and its wholesalers deliver its products to all pharmacies in any case, Act 1103 does not impose any additional burdens on AstraZeneca.[20]

AstraZeneca has not identified any way in which Act 1103 "substantially impairs" its PPA with the HHS Secretary.  Indeed, other courts have rejected this exact argument by AstraZeneca.  A Louisiana federal district court dismissed AstraZeneca's Contracts Clause claim against the Louisiana statute because "AstraZeneca cannot point to any way in which the Act expands or contradicts its PPA because, like the [340B] statute, the PPA is silent as to delivery to or acquisition of Section 340B drugs to contract pharmacies."  *PhRMA v. Murrill*, 2024 WL 4361597, at *12; *See generally*, Ex. 18, AZ PPA with HHS (AZ000050); SUMF ¶ 49.  Similarly, a Missouri district court dismissed PhRMA's claim that a Missouri contract pharmacy law violates the Contracts Clause.  *PhRMA v. Bailey*, 2025 WL 644281, at *6.  Thus, because Act 1103 does not impose any pricing obligations or alter the terms of the PPA, it does not impair AstraZeneca's contractual rights.  *See PhRMA II*, 95 F.4th at 1145 ("Act 1103 does not require manufacturers to provide 340B pricing discounts to contract pharmacies. Act 1103 does not set or enforce discount pricing.").

---

[20] Because there is no impairment to the PPA, AstraZeneca cannot complain about the "magnitude of the impairment."  AstraZeneca Br. at 41.

AstraZeneca also cannot show substantial impairment because it is "operating in a heavily regulated industry," so its "reasonable expectations have not been impaired." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 436, 438 (8th Cir. 2007) (similar to natural gas prices, "[s]tate authority to regulate [distribution] is well established" in this case) (quotations omitted). The Eighth Circuit considers whether the complaining party's industry "has been regulated in the past" when assessing whether a party could reasonably expect its contractual rights to remain unaffected. *Hawkeye*, 486 F.3d at 438 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)). The Supreme Court has held that parties enter contracts with an awareness of, and subject to, the applicable regulatory environment. *See Energy Reserves*, 459 U.S. at 411; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).

Act 1103 does not upset AstraZeneca's reasonable expectations because the drug industry is indisputably "a pervasively regulated business." *PhRMA v. Murrill*, 2024 WL 4361597, at *13 (citation omitted). The history of the 340B Program and litigation surrounding it suggests that regulations requiring delivery and forbidding restrictions against delivery to contract pharmacies were foreseeable. *See id.* at *15. Indeed, AstraZeneca has long been subject to HRSA guidance requiring delivery of 340B drugs to multiple contract pharmacies, which it acknowledges. *See* AstraZeneca Compl. ¶ 25. Given this history of regulation and AstraZeneca's voluntary participation in the 340B Program, any expectation of immunity from distribution-related state laws like Act 1103 is unreasonable. *Spannaus*, 438 U.S. at 264 n.1 (no impairment where a party "purchased into an enterprise already regulated in the particular to which he now objects"). AstraZeneca is wrong that state pharmaceutical laws do not typically regulate drug deliveries— Ark. Code Ann. § 20-64-505 requires annual registration for "every wholesale distributor who

shall engage in the wholesale distribution of prescription drugs," which includes "shipping into this state, or selling or offering to sell in this state."

AstraZeneca concedes that it began participating in the 340B program in 1993, "when it first signed its pharmaceutical pricing agreement to enter the program." AstraZeneca SUMF ¶ 23; SUMF ¶ 49. AstraZeneca did not limit the number of contract pharmacies to which it would deliver 340B drugs until it announced its policy in August 2020, effective October 2020. AstraZeneca, 340B Contract Pharmacy Pricing (Aug. 17, 2020), https://www.340bhealth.org/files/AstraZeneca_Retail_Communication_-_340B_-_Final.pdf?_zs=Ccipc1&_zl=DaI27. Therefore, AstraZeneca's argument that it entered into its PPA with the expectation that its sales of 340B drugs would be limited (AZ brief at 40) is disingenuous given that it, in fact, delivered 340B drugs to an unlimited number of contract pharmacies from 2010 until October 2020. AstraZeneca entered into its PPA with the expectation of contract pharmacy shipments. And when AstraZeneca executed its PPA Addendum, HRSA expected it to honor an unlimited number of contract pharmacy arrangements. Ex. 19, Add. to AZ PPA with HHS, June 29, 2020 (AZ_0000022); SUMF ¶ 49.

Even if substantial impairment existed—which it does not—Arkansas has a legitimate, justifiable, and reasonable purpose for enacting Act 1103. *PhRMA v. Murrill*, 2024 WL 4361597, at *13 (finding that a state law like Act 1103 had a "legitimate purpose" in "promot[ing] greater access to discounted drugs by preventing restrictions on the distribution of those drugs"). Restrictions on contract pharmacies systematically deprive significant volumes of vulnerable patient populations of adequate access to lifesaving healthcare services. DCMC itself has experienced this. Ex. 7, DCMC (D. Mantz) Depo Tr. Excerpts (May 21, 2025), at 30:24–25; 31:1–4, 24–25; 32:1–5; 42:13–20 (explaining how $121,000 in lost 340B revenue, attributable to

AstraZeneca's policy, negatively impacts DCMC patient access); SUMF ¶ 175.  The Supreme Court has made clear that where the state itself is not a contracting party, as is the case here, courts should "properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (quoting *Energy Reserves*, 459 U.S. at 413); *see also Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019).

AstraZeneca's reliance on the Eighth Circuit's decision in *Burgum* is misplaced.  Unlike the North Dakota law at issue in *Burgum*, which retroactively imposed new obligations on existing contracts, Act 1103 does not alter or disrupt preexisting agreements.  *See, e.g.*, 932 F.3d at 729.  Instead, it operates consistent with the 340B Program, preserving AstraZeneca's contractual expectations and maintaining alignment with the long-standing federal program.

The Eighth Circuit has explained that the "inherent police power of the state" to "safeguard the vital interests of its people" is an appropriate justification for a state law.  *Burlington N. R. Co. v. State of Nebraska*, 802 F.2d 994, 1005 (8th Cir. 1986) (quoting *Energy Reserves*, 459 U.S. at 410); *see also Hawkeye*, 486 F.3d at 439 (providing that the police power "extends to all matters affecting the public health or the public morals" (quoting *Stone v. Mississippi*, 101 U.S. 814, 818 (1879))); *Minn. Ass'n of Health Care Facilities, Inc.*, 742 F.2d at 449 ("It has long been recognized that the prohibition of laws impairing the obligation of contracts does not prevent states from acting pursuant to their inherent police power to promote the public welfare.").  Enacting laws that promote health and welfare falls under the states' traditional police power.  *See Rice*, 331 U.S. at 230.  Protecting the distribution of 340B-priced drugs to Arkansas contract pharmacies is squarely within Arkansas' police power to regulate the public health and safety of its citizens.  *See* Ex. 14, Handfield Report, at 24–25 ¶ 38 (recognizing

drug distribution as an area traditionally regulated by the states).  As such, reasonable justifications inform Act 1103, the purpose of which is to remedy a broad and impactful social malady.

Finally, AstraZeneca's argument that Act 1103 impairs its PPA because Act 1103 "imposes an obligation 'outside the 340B Program and hence the PPA'" is misplaced. AstraZeneca Br. at 42 (quoting Dkt. No. 85 at 29).  The Eighth Circuit has held that Act 1103 is not preempted by the 340B statute.  *PhRMA II*, 95 F.4th at 1146.  AstraZeneca does not dispute that Act 1103 is not preempted by the 340B statute.  *See* AstraZeneca Compl. ECF 25.  Because Act 1103 is consistent with the 340B statute and not an obstacle to the 340B Program, Act 1103 cannot impair AstraZeneca's PPA, which is merely a form recitation of the requirements of the 340B statute.  *See Astra*, 563 U.S. at 118.

### D.    AstraZeneca's Takings Claim Is Based on a Mischaracterization of Act 1103

AstraZeneca's taking claim is meritless.  Several courts have rejected the argument that state laws similar to Act 1103 are an unconstitutional taking.  A Missouri district court dismissed AstraZeneca's claims that Missouri's contract pharmacy statute was an unconstitutional taking. *AstraZeneca v. Bailey*, 2025 WL 644285, at *6.  A Louisiana district court dismissed a takings claim brought by another manufacturer against the contract pharmacy law enacted in Louisiana. *AbbVie, Inc. v. Murrill*, No. 6:23-cv-01307, 2024 WL 4361597, at *13–15 (W.D. La. Sept. 30, 2024).  Other courts have held that AstraZeneca and other manufacturers are unlikely to succeed on the merits of their claims against similar state laws are an unconstitutional taking. *AbbVie v. Fitch*, No. 2024 WL 3503965, *aff'd*, No. 24-60375, 2025 WL 2630900 (5th Cir. Sept. 12, 2025); *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *19–20.

AstraZeneca alleges that Act 1103 is an unconstitutional taking because it "forces manufacturers to transfer their prescription drugs to other private (non-governmental) entities-

namely, to contract pharmacies and the covered entities with which they contract." AstraZeneca Compl. ¶ 85; AstraZeneca Br. at 52–53. This claim is based on a mischaracterization of Act 1103, which prohibits 340B-participating drug companies from blocking delivery of 340B drugs to contract pharmacies. As such, the law only applies if a drug company (1) chooses to participate in the 340B Program and (2) seeks to block delivery of 340B drugs to covered entities and their contract pharmacies. AstraZeneca fails to acknowledge these two conditions, which fatally undermine its takings claim.

Moreover, as discussed at length above, AstraZeneca has repeatedly conceded that 340B drugs are available to covered entities in ***unlimited quantities*** under its contract pharmacy policy. AstraZeneca SUMF ¶¶ 116, 150. It has also stated that its delivery obligations remain the same, whether it is directing wholesalers to deliver drugs priced with 340B discounts or commercially priced drugs. AstraZeneca SUMF ¶ 122–24. Given that AstraZeneca is already offering 340B discounts on an infinite number of drugs to Arkansas covered entities, Arkansas takes nothing from AstraZeneca by requiring that it permit those drugs to be shipped to contract pharmacies.

AstraZeneca can avoid the impact of Act 1103—including the alleged harm of being forced to transfer its drugs to private parties—by simply withdrawing from the 340B Program. Act 1103 cannot take AstraZeneca's property if AstraZeneca has the means to shield itself from application of the law. Furthermore, it is the 340B statute, not Act 1103, that requires AstraZeneca to offer and sell 340B drugs to covered entities. Any alleged takings claim should therefore be directed at Congress, not the Arkansas legislature. Once AstraZeneca's mischaracterization of Act 1103 is revealed, both its *per se* and regulatory takings claims fall apart. So does its claim that Act 1103 is a taking under the Arkansas constitution.

1.    **There Is No Taking Because AstraZeneca Voluntarily Participates in the 340B Program**

When a private party voluntarily enters into an arrangement with the federal or a state government, no taking occurs.  *See Arkansas Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (2016) (holding that the plaintiff's "voluntary participation in the Medicare program preclude[d] a takings claim.").  Drug manufacturers like AstraZeneca voluntarily participate in the 340B Program because they want their drugs reimbursed under state Medicaid programs and Medicare Part B.  42 U.S.C. §§ 256b(a)(1), 1396r–8(a)(1); *see also PhRMA II*, 95 F.4th at 1141 ("[A]s a condition of participating in Medicaid, drug manufacturers must 'opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement' with the Secretary of HHS.") (quoting *Astra*, 563 U.S. at 113).  To receive reimbursement, AstraZeneca signed a PPA, under which it expressly agreed to provide 340B pricing discounts to covered entities.  SUMF ¶ 6.  Thus, AstraZeneca's obligations to offer 340B pricing flow directly from its decision to participate in the 340B, Medicaid, and Medicare Part B programs.  *See generally*, Ex. 18 (AstraZeneca's PPA); SUMF ¶ 49.

Takings violations do not stem from a private party's voluntary participation in federal or state programs.  In dismissing AstraZeneca's takings challenge to Missouri S.B. 751, which is substantially similar to Act 1103, the District Court for the Western District of Missouri correctly stated that AstraZeneca "voluntarily chose to participate in a federal program, and as Eighth Circuit precedent has noted, it forecloses the possibility that the federal 340B Program, or S.B. 751, results in an imposed taking of private property which would give right to the constitutional right of just compensation."  *AstraZeneca Pharms. LP v. Bailey*, 2025 WL 644285, at *4.

The Eighth Circuit has held that despite the strong financial incentives to participate in Medicaid, participation is voluntary.  *See Minn. Ass'n of Health Care Facilities*, 742 F.2d at 446

(holding that no taking occurred in a state statute regulating pricing under Medicaid because Medicaid participation is voluntary). AstraZeneca retains the power to withdraw from Medicaid and Medicare Part B at any point, which would relieve their obligation to participate in the 340B Program. *Id.*; *PhRMA v. Murrill*, 2024 WL 4361597, at *15 (stating that 340B "only applies to drug manufacturers who voluntarily participate in the Medicaid and Medicare programs. [A drug company] is not compelled to participate in these programs"). Indeed, courts have specifically "rejected Takings Clause challenges to the 340B Drug Price Program" because the program is voluntary. *Boehringer Ingelheim Pharms., Inc. v. HHS.*, No. 3:23-CV-01103, 2024 WL 3292657, at *13 (D. Conn. July 3, 2024) (citing *Eli Lilly & Co. v. HHS*, No. 1:21-CV-00081, 2021 WL 5039566, at *21 (S.D. Ind. Oct. 29, 2021)). When AstraZeneca enrolled in the 340B Program, it agreed to the very distribution framework it now challenges. Ex. 18, AZ PPA with HHS (AZ000050), ("The covered entity may, at its option, develop an alternative system . . . by which it can prove compliance.")

### a.    Act 1103 is Not a Per Se Taking

AstraZeneca's argument is meritless that Act 1103 is a "*per se* taking" based on its assertion that the statute requires a "forced transfer" of drugs to contract pharmacies, which, according to AstraZeneca, amounts to a "physical appropriation" of property. AstraZeneca Compl. ¶ 87; AstraZeneca Br. at 53. Act 1103 does not require AstraZeneca to sell or donate 340B drugs to contract pharmacies. *PhRMA II*, 95 F4th at 1142 ("When covered entities enter into agreements with contract pharmacies, these pharmacies do not become beneficiaries of the 340B Program."); SUMF ¶¶ 14-18, 38-45, 74-80. Instead, the covered entity purchases the drugs, and the contract pharmacy merely dispenses those drugs to the covered entity's patients on behalf of the covered entity. 2010 Guidance, 75 Fed. Reg. at 10,277. As AstraZeneca

acknowledges, AstraZeneca Br. at 3, the Eighth Circuit has already decided as a matter of law that title to 340B drugs remain with the covered entity. *See PhRMA II*, 95 F.4th at 1142.

Act 1103 neither enables covered entities nor contract pharmacies to seize 340B drugs nor deprives AstraZeneca of the value of its property. *Cf. Lingle v. Chevron*, 544 U.S. 528, 538 (2005) (finding a *per se* taking if owner is subject to a "permanent physical invasion of her property" or a complete deprivation of "*all* economically beneficial us[e]" of her property") (cleaned up); *Iowa Assur. Corp. v. City of Indiana*, 650 F.3d 1094, 1097 (8th Cir. 2011). Act 1103 is not a physical invasion and does not deprive AstraZeneca of all economically beneficial uses because Act 1103 does not set the price of drugs, which AstraZeneca already offers in unlimited quantities at the 340B price. AstraZeneca SUMF ¶¶ 116, 150. Act 1103 simply regulates distribution of AstraZeneca's products that have been discounted by virtue of AstraZeneca's voluntary participation in a federal drug pricing program.

Moreover, AstraZeneca has long participated in the 340B Program with full knowledge that covered entities rely on contract pharmacy replenishment systems to manage 340B drug inventories at both their in-house and contract pharmacies. SUMF ¶¶ 49–51. In fact, AstraZeneca has explicitly recommended use of the contract pharmacy replenishment model. AstraZeneca, Notice to 340B Covered Entities Regarding CALQUENCE Replenishment and CALQUENCE Capsule Formulation Discontinuation, HRSA, https://www.hrsa.gov/sites/default/files/hrsa/opa/calquence-notice-340b.pdf ("AstraZeneca is hereby providing notice that it voluntarily agrees that covered entities utilizing virtual inventory management with a 340B inventory replenishment model may count accumulations of the CALQUENCE capsule NDCs toward replenishment of equal quantities of the corresponding CALQUENCE tablet NDC."); *see also* Ex. 20, Mancill Deposition, at 168:2–9 (Mancill

Deposition). AstraZeneca cannot now claim a taking because a covered entity arranges for 340B

drug delivery to a contract pharmacy as part of this well-established framework.

AstraZeneca's argument that Act 1103 forces an unconstitutional taking even if covered

entities do retain title to 340B-priced drugs is similarly wrong. AstraZeneca Compl. ¶ 86;

AstraZeneca Br. at 32. AstraZeneca's reasoning—that because federal *law does not require*

manufacturers to "transfer their own property" to other private parties, any state law such as Act

1103 violates the takings clause—is fundamentally flawed. AstraZeneca Compl. ¶ 86;

AstraZeneca Br. at 52. AstraZeneca assumes that any state regulation requiring delivery of drugs

necessarily conflicts with federal law—a premise that is both unsupported and incorrect. The

text of the 340B statute is "*silent about delivery*," *Sanofi*, 58 F.4th at 703 (emphasis in original),

and this silence does not preclude state-level regulation of 340B drug delivery. To the contrary,

it reflects Congress's intent to leave such decisions to the states.

### b.    Act 1103 Is Not a Regulatory Taking

Act 1103 does not effect a regulatory taking. The Supreme Court has established three

factors to determine whether a regulatory action is an unconstitutional taking. *Penn Central v.

City of New York*, 438 U.S. 104 (1978). These factors are: 1) the economic impact of the

regulation; 2) the extent to which the regulation interferes with the investment-backed

expectations; and 3) the character of the governmental action. *Id.* at 124. All three factors show

that Act 1103 does not effect a taking.

Regarding the first factor, Act 1103 does not impose any economic burden on

AstraZeneca beyond the impact of the 340B Program itself. This is because 340B prices are set

by the 340B statute, not Act 1103, as explained above. *See PhRMA II*, 95 F.4th at 1145 ("Act

1103 does not require manufacturers to provide 340B pricing discounts to contract pharmacies.

Act 1103 does not set or enforce discount pricing.").  AstraZeneca already offers unlimited drugs

at the 340B discount.  AstraZeneca SUMF ¶¶ 116, 150.

But assuming, *arguendo*, that Act 1103 diminishes the value of AstraZeneca's drugs,

there is no taking because the "mere diminution in the value of property, however serious, is

insufficient to demonstrate a taking."  *Cmty. Hous. Improvement Program v. City of New York*,

59 F.4th 540, 554 (2d Cir. 2023), *cert. denied sub nom. Cmty. Hous. Improvement Program v.*

*City of New York, New York*, 144 S. Ct. 264 (2023) (citing *Concrete Pipe & Prods. of Cal. v.*

*Constr. Laborers Pension Tr.*, 508 U.S. 602, 645 (1993)).  A fundamental principle of Takings

Clause jurisprudence is that "property may be regulated to a certain extent."  *Pennsylvania Coal*

*Co. v. Mahon*, 260 U.S. 393, 415 (1922).  In 2024, AstraZeneca reported $54.1 billion in revenue

and $11.9 billion in operating profits. *See* AstraZeneca, *Annual Report & Form 20-F Information*

2024 (Feb. 6, 2025), https://www.astrazeneca.com/investor-relations/annual-reports/annual-

report-2024.html.  A recent study determined 340B discounts are only a "small share of drug

company revenue."  The American Hospital Association, *The 340B Drug Pricing Program*,

Healthsperian (2024), https://www.aha.org/system/files/media/file/2024/03/The-340B-Drug-

Pricing-Program.pdf.  Act 1103 plainly does not threaten AstraZeneca's economic viability.

*Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 124 (1st Cir. 2009) (where "expenditures

represent only a small fraction of [entity's] overall budget," the economic impact prong is not

satisfied).

Regarding the second factor, Act 1103 does not interfere with AstraZeneca's "investment

backed expectations."  *Penn Central*, 438 U.S. at 124.  Drug distribution is heavily regulated,

and "no party doing business in a regulated environment" can expect the regulatory environment

"to remain static." *Cmty. Hous. Improvement Program*, 59 F.4th at 555 (quotation omitted); *see also Franklin Mem'l Hosp.*, 575 F.3d at 129.

Consistent with this principle, the Ninth Circuit recently held that prospective compliance with state law does not disturb the investment-backed expectations of drug companies because "reasonable expectations are necessarily tempered in areas 'that ha[ve] long been the source of public concern and the subject of government regulation,'" and "[t]he pharmaceutical industry is unquestionably an industry with a long history of government regulation." *Stolfi v. PhRMA*, No. 24-1570, 2025 WL 2448851, at *24 (9th Cir. Aug. 26, 2025) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984)). Manufacturers that choose to operate in this heavily regulated space "can hardly argue that [their] reasonable investment-backed expectations are disturbed when [the State] acts" pursuant to law. *Id.* at *26 (quoting *Monsanto*, 467 U.S. at 1006–07). Indeed, as *Stolfi* emphasized, "[a]ccess to highly regulated markets has not historically been conceived as a constitutional right." *Id.* at *27.

On February 1, 1995, AstraZeneca voluntarily signed a PPA which expressly acknowledged that covered entities may use purchasing agents without forfeiting access to 340B discounts. *See* Ex. 18, AZ PPA with HHS (AZ000050), Attachment B; SUMF ¶ 49. Moreover, contract pharmacy arrangements existed before the enactment of Section 340B, and HRSA has formally recognized covered entities' right to enter into contract pharmacy arrangements since 1996. *See generally*, 1996 Guidance. Fifteen years ago, HRSA formally recognized the right of covered entities to contract with an unlimited number of pharmacies, 2010 Guidance, 75 Fed. Reg. at 10,273, and AstraZeneca willingly signed an Addendum to its PPA after that. Ex. 18, AZ PPA with HHS (AZ000050); SUMF ¶ 49. Accordingly, AstraZeneca's investment-backed expectations have included the longstanding and well-established use of contract pharmacy

arrangements under the 340B Program.  *See, e.g., Ruckelshaus*, 467 U.S. at 1006–08 (rejecting

takings claim brought by plaintiff who was aware of the conditions of participation in a

voluntary program); *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *17–20, *aff'd*, No. 24-60375,

2025 WL 2630900 (5th Cir. Sept. 12, 2025).

Lastly, under the third factor, the "character" of Act 1103 demonstrates that it is not an

unlawful taking.  Act 1103 was not "enacted solely for the benefit of private parties" and instead

furthers "important public interests."  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S.

470, 485–86 (1987).  When a statute such as Act 1103 primarily concerns "profound" economic

loss, as AstraZeneca argues, AstraZeneca Compl. ¶ 88, the Supreme Court interprets the concept

of important public interests is broadly, incorporating a "longstanding policy of deference to

legislative judgments."  *Kelo v. City of New London*, 545 U.S. 469, at 469, 480 (2005).

Arkansas enacted Act 1103 to protect Arkansas' safety net health care providers and the

patients they serve.  Ensuring this protection is an "important public interest" that should not be

second guessed.  *See Cmty. Hous. Improvement Program*, 59 F.4th at 555 (quotation omitted).

Protecting the distribution of 340B-priced drugs to Arkansas contract pharmacies is squarely

within the scope of Arkansas' police power to regulate the public health and safety of its citizens.

*See Rice*, 331 U.S. at 230; *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *20.  As the Eighth

Circuit explained, pharmacies have "traditionally been regulated at the state level, and we must

assume that absent a strong showing that Congress intended preemption, state statutes that

impact health and welfare are not preempted."  *PhRMA II*, 95 F.4th at 1144.  The Eighth Circuit

found no such strong showing, and the court's reasoning applies equally to AstraZeneca's

takings claim.  Thus, Act 1103 does nothing more than "adjust the benefits and burdens of

economic life to promote the common good", *Franklin Mem'l Hosp.*, 575 F.3d at 128–29, and

furthers a valid "public purpose." *See Midkiff*, 467 U.S. at 233–34; Ex. 7, Mantz Dep., at 42:13–20.

### 2.    Act 1103 is Not a Taking Under the Arkansas Constitution

The Arkansas Supreme Court has not provided a "definitive statement" of what constitutes a taking. *Watkins v. Lawrence Cnty.*, No. 3:17-CV-00272, 2020 WL 13389385, at *7 (E.D. Ark. May 19, 2020). Like the U.S. Supreme Court, it has held that the Arkansas Takings Clause yields to the reasonable exercise of the police power. *Richardson v. City of Little Rock Planning Comm'n*, 295 Ark. 189, 191 (1988) ("[T]he existence of the Arkansas Takings Clause does not mean... an individual is constitutionally guaranteed the right to do with such property as he or she wishes in all circumstances."); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992) (property owners should expect that their property use will "be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers").

Because the Takings Clauses of the Fifth Amendment and the Arkansas Constitution "use substantially similar language," this Court recently held that there was "no reason to treat the claims under the two clauses differently." *Hurd v. Flywheel Energy Prod., LLC*, No. 4:21-cv-01207, 2024 WL 4571445, at *17 (E.D. Ark. Oct. 24, 2024). Thus, for the same reasons that Act 1103 does not violate the Takings Clause of the Fifth Amendment as discussed above, Act 1103 likewise does not effectuate a taking under the Arkansas Constitution.

### CONCLUSION

For the foregoing reasons, the Court should deny AstraZeneca's motion for summary judgement and grant the motion for summary judgment of the Commissioner and DCMC.

Dated: September 17, 2025

Frederick H. Davis, Ark. Bar No. 2012271
Jess Askew, III, Ark. Bar No. 86005
Ashley W. Hudson, Ark. Bar No. 2007136
KUTAK ROCK, LLP
124 West Capitol Avenue, Suite 2000
Little Rock, AR 72201
T: (501) 975-3000
F: (501) 975-3001
jess.askew@kutakrock.com
ashley.hudson@kutakrock.com
frederick.davis@kutakrock.com
*Counsel for Intervenor-*
*Defendant Dallas County Medical Center*

Sara Farris, ABA #98115
General Counsel
Arkansas Insurance Department
One Commerce Way
Little Rock, Arkansas 72202
(501) 371-2829
sara.farris@arkansas.gov

Respectfully submitted,

*/s/Ronald S. Connelly*

Ronald S. Connelly, D.C. Bar No. 488298*
Fernando Montoya, D.C. Bar No. 90007361*
Hannah Hauer, D.C. Bar No. 90008945*
POWERS PYLES SUTTER & VERVILLE, PC
1250 Connecticut Ave NW, Eighth Floor
Washington DC 20036
T: (202) 466-6550
Ron.Connelly@PowersLaw.com
*Counsel for Intervenor-Defendant Dallas County*
*Medical Center*
*Admitted pro hac vice