**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiff*,

v.

JIMMY HARRIS, in his official capacity as
Commissioner of the Arkansas Insurance
Department,

*Defendant*,

DALLAS COUNTY MEDICAL CENTER

*Intervenor-Defendant*.

Case No. 4:24-cv-268-KGB
JUDGE: Kristine G. Baker
MAGISTRATE JUDGE: Joe J. Volpe

**ASTRAZENECA PHARMACEUTICALS LP'S REPLY IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT AND RESPONSE TO ARKANSAS INSURANCE
DEPARTMENT AND DALLAS COUNTY MEDICAL CENTER'S MOTION FOR
<u>SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT .................................................................................................................... 4

I.     The Undisputed Record Demonstrates that Act 1103 Is Unconstitutional ........................4

     A.     Act 1103 Regulates Pricing ................................................................................4

          1.     The Act requires AstraZeneca to offer drugs at 340B-discounted prices .............. 4

          2.     Defendants' remaining arguments are meritless ................................................ 15

     B.     Act 1103 Is Preempted by Federal Patent Law ...............................................19

          1.     Arkansas cannot regulate the price of patented drugs ......................................... 20

          2.     Act 1103 would be preempted even if it only regulated delivery ......................... 25

          3.     No presumption against preemption applies ........................................................ 26

     C.     Act 1103 Violates the Contracts Clause ..........................................................28

          1.     Act 1103 substantially impairs AstraZeneca's PPA ........................................... 29

          2.     The Act is not reasonably tailored to further a significant public purpose ........... 33

     D.     Act 1103 Works an Unconstitutional Taking ...................................................36

II.     The *PhRMA* Litigation Does Not Preclude Reaching the Merits Here ...........................38

     A.     Defendants May Not Raise Preclusion as a Defense ...........................................40

     B.     Claim Preclusion Does Not Apply ....................................................................41

     C.     Issue Preclusion Does Not Apply .....................................................................48

CONCLUSION ............................................................................................................... 51

## INTRODUCTION

Defendants' responsive brief, Dkt. No. 139 (Defs. Br.), continues to ignore and obscure the record in this case. There is simply no evidence to support their arguments on title and agency, or regarding the scope and effect of Act 1103. Instead of evidence, Defendants continue to rely on prior statements from this Court, the Eighth Circuit, and other courts throughout the country, all of which were made based on a facial assessment of the law without a record. This case is different from each of those cases, as this Court has already observed in denying Defendants' Rule 12(c) motion. Order at 10, 12, 13, 15 (Oct. 2, 2025) (MJOP Order), Dkt. No. 142.

Months of discovery in this case has shown that (1) covered entities *do not* maintain title to 340B-priced drugs, AZ SUMF ¶¶ 94-96; and (2) contract pharmacies are *not* agents of covered entities. AZ SUMF ¶¶ 97-98. Every single pharmacy services agreement produced in this case, which are contracts between covered entities and their pharmacies, establish those undisputed facts. They are further supported by deposition testimony from Defendants' own experts and by other documentary evidence obtained through discovery. Defendants fail to identify any evidence in the record to establish a meaningful dispute.

Discovery has also shown that Act 1103 regulates pricing. The Commissioner, who is a party to this litigation, agreed with this interpretation of the law, concluding that AstraZeneca violated Act 1103 by failing to "offer[]" its products at "the 340B price" for unlimited contract pharmacy sales. AZ SUMF ¶ 161. The Commissioner further found that no "covered entity has ever "fail[ed] to receive an order of AstraZeneca drugs that it actually did place." AZ SUMF ¶ 161. Defendants have no rebuttal to these points. Rather, they admit (at 50) that the Act requires AstraZeneca and its wholesalers to provide "chargebacks" (*i.e.*, pricing refunds) to covered entities, and that helping covered entities generate this "340B revenue" is the Act's main function (at 65). Simply put, when a law's primary function is to generate revenue through pricing discounts, the law regulates pricing.

Defendants' remaining arguments fail to raise genuine factual disputes. First, the evidence shows that Act 1103 violates the federal patent law as applied to AstraZeneca's patented products because it limits "the pecuniary rewards stemming from the patent right." *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007) (*BIO*). Defendants' response is based on their erroneous argument that the Act merely regulates delivery, which is not supported by any evidence. But even if the Act could somehow be characterized as a delivery regulation, rather than a pricing regulation, that would not matter: The law indisputably has a significant effect on "the pecuniary rewards" that AstraZeneca would otherwise earn from selling its patented products. And while Defendants attempt to invoke a presumption against preemption, such a presumption does not apply to a law like Act 1103 that serves *only* to regulate conduct among participants in a federal program, using key terms defined by reference to federal law.

Second, the evidence shows that Act 1103 violates the Contracts Clause by imposing new, costly obligations on AstraZeneca *only* because it has signed a Pharmaceutical Pricing Agreement (PPA) with the Secretary of HHS. Defendants argue that the Act does not imposes any obligations on AstraZeneca, but the undisputed record points to the law's significant—and quantifiable—costs. The record shows that AstraZeneca is losing approximately ███████ per month because of the new pricing obligations imposed by the Act. AZ SUMF ¶ 169. Defendants also argue that the Act is justified because it helps patients, but nothing in the law even *mentions* patients, much less requires covered entities to give them the benefit of 340B discounts. In fact, evidence shows that most covered entities *do not* pass on discounts; and, under binding case law, any such "incidental" benefit to patients would be insufficient anyway. *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019).

Third, the evidence shows that Act 1103 violates the Takings Clause because it forces AstraZeneca to relinquish title to and control of its products, without paying just (or any) compensation. The undisputed facts show that the Act requires AstraZeneca to transfer title to its 340B-priced drugs to covered entities, and that Arkansas covered entities transfer title to contract pharmacies—entities that are not the covered entities' agents and to whom the federal law does not require AstraZeneca to sell its 340B-priced drugs. AZ SUMF ¶ 94-98. Those facts are dispositive, but Defendants try to evade that conclusion by arguing that AstraZeneca's voluntary participation in the 340B program precludes its taking claim. Yet AstraZeneca voluntarily participates in Section 340B, *not* Act 1103, and Arkansas confers no "benefit" on AstraZeneca in return for compliance. *Horne v. Dep't of Agric.*, 576 U.S. 350, 366 (2015). Defendants also argue that federal law already requires AstraZeneca to make these sales, but AstraZeneca is challenging the Act's requirement of "*unlimited*" contract pharmacy sales, which "Section 340B does *not* require." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023) (emphases added).

Finally, Defendants invoke a preclusion defense that this Court has now rejected. *See* MJOP Order. "Facts about the enforcement of Act 1103 as to AstraZeneca were not before the Court in the *PhRMA* Case; those facts were not developed or litigated in that case." *Id.* at 12. Now that the Court has a full evidentiary record in this as-applied challenge, the Court should grant AstraZeneca's motion for summary judgment and deny Defendants' cross-motion.

## ARGUMENT

I.    **THE UNDISPUTED RECORD DEMONSTRATES THAT ACT 1103 IS UNCONSTITUTIONAL**

   **A. Act 1103 Regulates Pricing**

There is no genuine dispute that Act 1103 regulates the pricing, rather than the delivery, of AstraZeneca's drugs. In attempting to avoid that inescapable conclusion, Defendants tie themselves into knots and seek to rely on preliminary facial determinations by prior courts. Defendants try to deny that the Act regulates pricing, even though they admit that it requires wholesalers to provide chargebacks (*i.e.*, pricing refunds) and that the Act facilitates significant revenue for covered entities by allowing them to engage in arbitrage (*i.e.*, to exploit pricing differentials). Inexcusably, Defendants deny what the contracts between covered entities and pharmacies literally say and what the Commissioner himself has *already decided* about how the Act operates. Ultimately, Defendants seek to deny that Act 1103 has any material, concrete impact at all. There is simply no basis for these claims.

   **1.    The Act requires AstraZeneca to offer drugs at 340B-discounted prices**

Defendants devote much of their brief to attempting to obscure the actual operation and effect of Act 1103, in an effort to contort the law into a delivery-focused statute. But in every relevant respect—whether covered entities maintain title and establish agency relationships, how the Act is enforced, the mechanics of how drugs are ordered and delivered, how and when 340B discounts are offered, and the Act's financial effects on AstraZeneca and covered entities—the undisputed evidence points to a single conclusion: Act 1103 requires AstraZeneca to offer its drugs for purchase at the 340B price, instead of the commercial price, in circumstances where federal law *would not* require them to do so.

   ***Title***. Record evidence makes crystal clear that covered entities do not maintain title to 340B drugs. Pharmacy services agreements—the contracts between covered entities and

pharmacies that establish the relationship on which all contract pharmacy sales are based—
*explicitly* state that title to drugs purchased at the 340B price transfers to contract pharmacies upon delivery. That is crucial: Since pharmacies take title to 340B-discounted drugs, that means the actual movement (delivery) of the drugs is no different than the movement of other drugs; the only difference is the price at which they were originally purchased. AZ Br. 31-32.



Defendants respond by trying to dispute the plain meaning of these contracts, asserting that "a covered entity maintains title to the 340B Drug from shipment by the wholesaler through dispensing to the covered entity's patient." Defendants' Response to AZ SUMF (Defs. SUMF

Resp.) ¶ 92. But there can be no genuine dispute about what the contracts say on their face: Pharmacies take title to drugs purchased at the 340B price upon delivery to the pharmacy, which occurs well before the drug is dispensed to a patient. AZ Br. 32; *see* AZ SUMF ¶¶ 93-96. In fact, Defendants' own expert agreed—stating that ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. And Defendants themselves concede that contract pharmacies put drugs purchased at 340B prices into their ████████████████████████████████████████████████████████████████████ ███████████████████████████████. The pharmacy can thus dispense drugs from that ███████ inventory to *any* patient, regardless of the patient's 340B eligibility (or ineligibility). That fact yet again underscores that there is no difference between the *delivery* of 340B-discounted and non-340B drugs—only a pricing difference.

Defendants also argue (at 45) that "AstraZeneca is wrong" about whether covered entities maintain title "because covered entities are required under federal law to maintain title and would be guilty of diversion and subject to penalties under the 340B statute." In support of that assertion, they cite to "Essential Covered Entity Compliance Elements" established by HRSA, under which covered entities must "maintain title to the drug." 75 Fed. Reg. 10,272, 10,277 (Mar. 5, 2010). But that argument—that since HRSA *requires* covered entities to maintain title, it must be that they actually *do so*—is an obvious non-sequitur; it is like arguing that no one ever drives 80 miles per hour because the speed limit is only 65. What matters for purposes of this case is what the evidence says. To be clear, AstraZeneca is *not* seeking in this case to punish any covered entity for its violation of agency guidance. But the fact that covered entities in fact do not maintain title to 340B drugs, which instead pass to contract pharmacies and are incorporated into their general

inventory—where the drugs are dispensed to any patient of the pharmacy just like all other drugs—confirms that 340B drugs and non-340B drugs differ only in terms of the price at which they are offered.[1]

***Agency***. Defendants similarly raise no genuine dispute about whether contract pharmacies act as agents of covered entities: They do not. Numerous contract pharmacy agreements in the record state plainly that contract pharmacies are independent contractors, *not* covered entities' agents, with respect to acquisition and sale of 340B drugs. *See* AZ SUMF ¶¶ 97-98. As with the issue of title, the fact that contract pharmacies are independent contractors shows that when they acquire drugs that have been purchased at 340B-discounted prices, they treat the drugs as their *own* inventory—distributing them like any other drugs. *See* AZ Br. 32.

The record on this issue is undisputed. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[1] To the extent Act 1103 requires AstraZeneca to offer 340B pricing for its drugs even in circumstances where covered entities transfer title to the drugs to contract pharmacies, the law is also preempted because it requires diversion in violation of the 340B statute. *See* 42 U.S.C. § 256b(a)(5)(B).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ No contract in the record says otherwise.

In response, Defendants assert counter-factually that "[c]ontract pharmacies are the dispensing agents of covered entities," which they support via a citation to a 30-paragraph section of their statement of facts that does not establish that proposition. Defs. SUMF Resp. ¶ 96 (citing D.SUMF ¶¶ 19-48); Defs. Br. 40. Again, Defendants cannot conjure a *genuine* dispute of fact without presenting evidence that contradicts the actual evidence in the record. "To create a genuine dispute of material fact, '[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.'" *Davenport v. City of Little Rock*, 142 F.4th 1036, 1041 (8th Cir. 2025) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)). As with the question of title, there is no genuine dispute of fact about agency.

**Enforcement.** Act 1103 requires that AstraZeneca must not "deny[] access" to "340B drug pricing." Ark. Code Ann. § 23-92-604(c). Defendants do not dispute this point, and the way the Commissioner has enforced Act 1103 against AstraZeneca indicates the law regulates pricing.

Defendants do not dispute that the Commissioner found that AstraZeneca's failure to offer 340B pricing for unlimited contract pharmacy sales, by itself, violated Act 1103. Indeed, the Commissioner accepted that AstraZeneca's contract pharmacy policy does not "indicate any change in AstraZeneca's role in the movement or delivery of 340B drugs." AZ SUMF ¶ 161. Yet he nevertheless found AstraZeneca's policy to be in violation of the Act, because under the policy "the 340B price is not offered, and an order for 340B-priced drugs cannot be placed." AZ SUMF

8

¶ 161. As the Commissioner has interpreted Act 1103 and applied it to AstraZeneca, therefore, the Act makes it unlawful to refuse to "offer[]" products at "the 340B price." AZ SUMF ¶ 161. That is the very definition of a pricing regulation.

In response, Defendants assert that the Commissioner's findings "contain improper legal conclusions" and "are inadmissible hearsay." Defs. SUMF Resp. ¶ 161. That response is puzzling. These are the Commissioner's *own* conclusions. They indisputably reflect how the Commissioner understands and has applied the law—in fact, how he has applied the law *against AstraZeneca's contract pharmacy policy* in particular. So whether the conclusions are "legal" in nature is beside the point. What matters is that the Commissioner himself understands the law he administers as barring a policy, like AstraZeneca's, under which "the 340B price is not offered." AZ SUMF ¶ 161. Since the Commissioner is a party here, moreover, his official findings are "An Opposing Party's Statement[s]" that were "made by the party in an individual or representative capacity," and thus are "not hearsay." Fed. R. Evid. 801(d)(2)(A); *see, e.g.*, *United States v. Brown*, 122 F.4th 290, 296 (8th Cir. 2024). And in any event, his findings were based on substantial evidence, including testimony that, under AstraZeneca's policy, the covered entity "just would not be able to place the order at the 340B price" for sales at non-designated contract pharmacies, even though it *would* "be able to place an order at a non-340B price." Ex. 3, AID PI Tr. 205:20-24; *see* Ex. 41 at 11 (Commissioner's findings relying on this testimony).

***Product ordering and delivery***. Under AstraZeneca's policy, its products *always* remain available for purchase and delivery to any location, provided the purchaser is willing to pay commercial prices. AZ Br. 26 (citing AZ SUMF ¶¶ 118-23, 161). In response, Defendants deem it "irrelevant" (at 43) that covered entities and contract pharmacies "can buy AstraZeneca's drugs at commercial prices," because "covered entities . . . do not purchase non-340B drugs." That

statement is incorrect on its own terms: Since Section 340B applies only to "covered *outpatient* drugs," 42 U.S.C. § 256b(a)(1)—*i.e.*, to drugs for patients treated on an outpatient basis—covered entities *do* routinely purchase commercially priced drugs for administration to their in-patients.

But even apart from that mistake, Defendants are wrong that the universal availability of AstraZeneca's drugs at commercial prices "irrelevant." It shows that AstraZeneca's policy does not restrict access to or delivery of AstraZeneca's products in Arkansas; it is only when a purchaser wants to obtain AstraZeneca's products *at the 340B price* that the policy matters. Just as important, Defendants have no answer to the fact that no covered entity has ever "fail[ed] to receive an order of AstraZeneca drugs that it actually did place." AZ SUMF ¶ 161. Yet again, evidence shows that AstraZeneca's policy does not restrict delivery, only offering price.

Under AstraZeneca's policy, moreover, AstraZeneca offers 340B pricing to a covered entity's in-house pharmacy but *not* to a non-designated pharmacy at the exact same address. *See* AZ Br. 26-27. Defendants respond (at 44) that this example is "fictional" because even if "[t]wo pharmacies might be at the same street address, . . . they would be required to have a different suite number." Defendants' response only highlights how hyper-semantic their argument is. Neither Act 1103 nor AstraZeneca's policy has anything to do with "suite numbers," which have significance only because they designate the *identity* of the pharmacy—and thus whether AstraZeneca is required to offer 340B pricing on sales of its products at that pharmacy.

Indeed, although their argument is premised on the notion that AstraZeneca's contract pharmacy policy restricts delivery, Defendants do not point to any evidence in the record showing that a pharmacy's delivery address is material in the application of AstraZeneca's policy—because, in fact, the delivery address is immaterial. AstraZeneca's policy is designed to limit covered entities to a "single" pharmacy, regardless of *where* that pharmacy is located. AZ SUMF ¶ 116. A

covered entity could designate a pharmacy in Little Rock, then change its mind and designate a different pharmacy in Fayetteville, and the change in address would be entirely immaterial under AstraZeneca's policy. What matters to AstraZeneca is that there is only *one* of them, rather than an unlimited number. And by the same token, what matters under Act 1103—and the reason that the Commissioner found AstraZeneca's policy in violation of the Act—is that AstraZeneca no longer offers 340B-discounted pricing for sales at unlimited contract pharmacies.

For similar reasons, Defendants' arguments based on Health Identification Numbers (HINs) are misguided. Defendants note (at 19) that a HIN "identifies the location of a contract pharmacy," and they argue (at 50) that AstraZeneca's policy therefore must be location-based since "AstraZeneca implemented its policy by collecting HINs to identify pharmacy locations and by approving or denying chargebacks." That is quite the stretch. AstraZeneca uses HINs to keep track of the *identity* of contract pharmacies, because it is a unique identifier. Defs. Ex. 20, Mancill Dep. 202:5-9, 205:15-17; Ex. 55, Scholz Dep. 42:8-9. But the fact that a HIN lists a pharmacy's physical address as one of several pieces of identifying information (such as the pharmacy's name and the name of the covered entity with which it contracts) does not mean that that the HIN's *purpose* has anything to do with delivery. *See* Ex. 39, Handfield Dep. 153:3-12; Defs. Ex. 12, Henderson Dep. 14:4-12; *see also* Ex. 55, Scholz Dep. 42:12-13 (Q: "[W]hat information does [a HIN] include?" A: "It includes all kinds of stuff").

In the end, Defendants inadvertently give up the game by acknowledging (at 50) that AstraZeneca uses HINs for purposes of "approving or denying chargebacks." Exactly right: The identity of the pharmacy matters because it helps AstraZeneca decide whether to pay a chargeback (*i.e.*, to provide a discount) for the sale of its products at that pharmacy.

Defendants also say virtually nothing in their brief about the role of third-party administrators (TPAs) in placing 340B-priced orders from wholesalers on covered entities' behalf, often without the entities' preapproval or even knowledge. In their response to AstraZeneca's Statement of Undisputed Material Facts, however, Defendants acknowledge that the replenishment model involves the participation of TPAs, which comb through pharmacy sales records to identify prior dispenses of a drug that have been made to 340B-eligible patients. *See* Defs. SUMF Resp. ¶¶ 72, 73, 75, 78, 79, 80, 81, 84, 85. The function of the TPA is accordingly to facilitate a pricing discount on the basis of a sale that has *already* occurred. And notably, many of these TPAs, which play a central role in managing 340B purchasing and revenue-generation for covered entities, are owned by major pharmacies. *See* AZ SUMF ¶¶ 69-72, 79-81.

Defendants' response (at 46) is that it is reasonable for the CEO of Community Clinic not to know when 340B drugs are ordered by its TPA, just as he does not know when Community Clinic orders office supplies. But the point is that *no one* at Community Clinic knows when 340B orders are placed, because Community Clinic itself is not involved in the ordering process *at all*:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ That fact further illustrates that, "from the perspective of a covered entity, there is no meaningful difference between a 340B sale and a non-340B sale at the contract pharmacy other than the price." AZ Br. 27.

The function of TPAs thus supports the conclusion that 340B and non-340B drugs are distributed in the same manner: The fact that TPAs identify 340B-eligible patients by looking through prior sales records underscores that "the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy." *PhRMA v. Morrisey*, 760 F. Supp. 3d

439, 455 (S.D.W. Va. 2024). That means "the question is not about delivery of the drug," but "only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one." *Id.*

Defendants attempt (at 39) to distinguish *Morrisey* on the ground that it addressed a provision of West Virginia's contract pharmacy law with "no analogue in Act 1103." But that is mistaken. The relevant West Virginia provision, like Act 1103, forbids a drug manufacturer from "either directly or indirectly, deny[ing], restrict[ing], or prohibit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a location authorized by a 340B entity to receive such a 340B drug." W. Va. Code § 60A-8-6a(b)(1). Defendants also fault *Morrisey*'s conclusion that the law there "governed pricing" because "'wholesalers and retailers already deliver . . . drug products to contract pharmacies throughout West Virginia.'" Defs. Br. 39 (quoting 760 F. Supp. 3d at 456). But *Morrisey* was correct about that, and the same is true here: As the Commissioner himself found, no pharmacy has ever "fail[ed] to receive an order of AstraZeneca drugs that it actually did place," and AstraZeneca's products are available for delivery to *any* pharmacy throughout the State, so long as the order is "placed at a commercial, non-340B price." *See* AZ SUMF ¶ 161 (citing Ex. 41). Under those circumstances, *Morrisey* explained, "a manufacturer risks violating [the law] not by withholding drugs from contract pharmacies, but by refusing the 340B discount" for contract pharmacy sales. 760 F. Supp. 3d at 456 (cleaned up).

***How and when 340B discounts are offered***. Defendants concede (at 47) that under the increasingly ascendant credit replenishment model, 340B treatment "is applied retroactively to a drug that has already been shipped to the pharmacy." That concession reinforces why Act 1103 governs the price of 340B drugs: A 340B discount "applied retroactively" for a drug that "has already been shipped" is simply a refund to effectuate the 340B price. Indeed, under the credit

replenishment model, there is *never* an order placed for, nor any delivery of, a new 340B drug—just an after-the-fact accounting reconciliation to make it seem, as a financial matter, as if an already-dispensed drug had been ordered at the 340B price in the first place. AZ Br. 29-30.

Defendants respond (at 47) that the credit replenishment model "has nothing to do with" AstraZeneca's claims because credit replenishment is not meaningfully different than the "typical replenishment arrangement" (*i.e.*, product replenishment). But that response gets things backwards. Act 1103 punishes AstraZeneca equally for refusing to extend discounts *either* under the product replenishment model *or* under the credit replenishment model. So the fact that both models have the same effect and generate the same result—a discount for a drug that has already been dispensed—further underscores that the Act regulates pricing. In either case, the "impact" on AstraZeneca, Defs. Br. 47, has nothing to do with delivery and everything to do with price.[2]

*Financial impacts*. Defendants cannot explain why, if AstraZeneca's contract pharmacy policy merely restricts delivery, application of the policy would prevent Community Clinic from generating ▇▇▇▇▇ per year in revenue. AZ SUMF ¶ 168. Nor can Defendants explain why, if Act 1103 merely requires delivery, AstraZeneca's compliance with the Act (*i.e.*, suspending its policy) has cost approximately ▇▇▇▇▇ per month. AZ SUMF ¶ 169. Those sizeable dollar amounts obviously have nothing to do with the cost of postage. Instead, they reflect that AstraZeneca's policy restricts—and Act 1103 restores—a covered entity's access to *discount*

---

[2] Defendants concede that Act 1103 "does not address access by patients, who also typically experience no difference between 340B and non-340B sales at contract pharmacies." AZ Br. 28. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Instead, Defendants state (at 46) that "340B is not a patient-discount statute" and "does not address access by patients," but rather facilitates "provider-discount[s]." That is correct, and Act 1103's function is the same: By expanding the category of sales for which 340B discounts must be offered to include unlimited contract pharmacy sales, the Act facilitates *even more* "provider-discount[s]."

*pricing* for unlimited contract pharmacy sales: Under the Act, AstraZeneca products ███████

████████████████████████████████████████████████████████████████

███████████████, where they can be resold to insured patients at full price to generate what

covered entities call "340B revenue" or "340B savings." AZ SUMF ¶¶ 35, 105. Restoring access

to that money is the point of the Act—making unmistakably clear and undisputed yet again that

the Act regulates pricing, not delivery.

### 2. Defendants' remaining arguments are meritless

Defendants cannot—and do not—provide evidence disputing AstraZeneca's account of the

relevant facts: how covered entities and contract pharmacies use 340B discounts to generate

arbitrage revenue; how AstraZeneca's policy limits the circumstances in which discounts are

offered; and how Act 1103 forces AstraZeneca to restore access to those discounts by offering

them for unlimited contract pharmacy sales. So instead, Defendants make a series of hyper-

semantic arguments that try to recharacterize the pricing dispute at the heart of this case as if it

were mere haggling over delivery addresses. Their efforts are unpersuasive and, in any event, fail

on their own terms.

***Prior AstraZeneca Litigation***. As an initial matter, Defendants point (at 47-48) to

statements from AstraZeneca's litigation against HRSA in *Sanofi*, where AstraZeneca referred to

the "delivery" of 340B drugs. But those references to "delivery conditions" addressed the

permissible conditions on an *offer*: The Third Circuit construed the statutory requirement that "[i]f

drug makers make drugs available to anyone at any price, they must 'offer' those drugs to 'covered

entities' at a discount." *Sanofi*, 58 F.4th at 703 (quoting 42 U.S.C. § 256b(a)(1)). AstraZeneca's

position there, which the Third Circuit adopted, is that "Section 340B requires only that

manufacturers 'offer' drugs at discounted prices to covered entities; it does not require

manufacturers to transfer statutorily discounted drugs to an unlimited number of contract

pharmacies." Brief for Appellee AstraZeneca Pharmaceuticals LP at 31, *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023) (No. 22-1676), 2022 WL 2967556, Doc. 31.

AstraZeneca's position—that it need not offer its products at a discount for unlimited contract pharmacy sales—has not changed. What has changed is the law: Prior to Act 1103, AstraZeneca was required to comply only with Section 340B itself, which *does not* require manufacturers to offer "discounted drugs" for sales at "an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 706. Now, however, Arkansas law forces AstraZeneca to provide discounts for unlimited contract pharmacy sales as well.[3]

***Meaning of "340B drug."*** Much of Defendants' argument rests on a convoluted attempt to redefine what a 340B drug is. According to Defendants:

> [W]hen the 340B Drug purchased by the covered entity is delivered to the arrives at the [sic] contract pharmacy location where it is treated as s a [sic] replacement for, or a "replenishment of," the drug previously dispensed to the covered entity's patient becomes the 340B Drug, and at the same time, the drug delivered to the contract pharmacy becomes replacement, neutral inventory of the contract pharmacy.

---

[3] In a similar semantic argument, Defendants claim (at 48) that AstraZeneca has articulated its contract pharmacy policy in a manner that "demonstrates that it is about delivery to a location and not pricing." But the opposite is true. In its August 2020 policy announcement, for instance, AstraZeneca explained: "To implement this new approach, AstraZeneca will *stop processing 340B chargebacks* for all 340B Contract Pharmacy arrangements effective October 1, 2020." Defs. Br. 50 (quoting AstraZeneca, 340B Contract Pharmacy Pricing (Aug. 17, 2020)) (emphasis added). Chargebacks are the mechanism by which wholesalers recoup the difference between the *price* at which they acquire AstraZeneca drugs and the 340B price that a covered entity pays for that inventory. *See, e.g.*, Defs. Ex. 20, Mancill Dep. 104:10-105:8; Defs. Ex. 12, Henderson Dep. 35:25-36:17.

Even if Defendants were correct, moreover, what matters most is not how the policy is described but what it actually *does*. Defendants themselves say (at 50) that AstraZeneca "implemented its policy . . . by approving or denying chargebacks," and (at 51) that "[w]holesalers were quick to adapt to AstraZeneca's policy and began blocking certain orders." Again, these are admissions that AstraZeneca's policy addresses the circumstances under which discounted pricing ("chargebacks") is offered or not offered ("block[ed]").

D.SUMF ¶ 40. Defendants then assert that, under the replenishment system, "when the 340B drug reaches the pharmacy, it becomes neutral inventory to repay the pharmacy, at which point it is no longer a 340B drug." D.SUMF ¶ 45. But then, Defendants say, when "drugs [are] dispensed by the contract pharmacy to the covered entity's 340B-qualified patient," those drugs "become the covered entity's 340B drugs." D.SUMF ¶ 40. However, "if a 340B Drug never arrives at the dispensing contract pharmacy location, the drug dispensed by the contract pharmacy to the covered entities' patient never becomes a 340B Drug." D.SUMF ¶ 41.

Defendants thus argue that drugs come in and out of existence as 340B drugs: A drug purchased at the 340B price is a "340B drug" only until it is received by a pharmacy, at which point it is no longer a 340B drug; but then, when the pharmacy dispenses it to a covered entity's eligible patient, it becomes a 340B drug again. This tortured understanding of 340B drugs appears to underlie much of their position, such as their claim (at 6) that "340B drugs are not transferred to contract pharmacies but dispensed to covered entity patients" and their claim (at 16) that "[c]overed entities do not sell or transfer 340B drugs to contract pharmacies."

Defendants' convoluted concept of "340B drug," while tailor-made to suit their preemption argument, has no support either in the 340B statute or Act 1103. Instead, a "340B drug" is simply a drug offered at "340B drug *pricing*." Ark. Code Ann. § 23-92-604(c) (emphasis added). The term in the statute merely describes the price at which drugs are offered. This interpretation of the term was adopted by the Commissioner in stating that the Act requires access to "340B-*priced* drugs." 003.22.123 Ark. Code R. § II(7) (emphasis added). Defendants thus cannot wish away the pricing requirement at the center of the law. *See Morrisey*, 760 F. Supp. 3d at 455 ("Price is what distinguishes between an 'ordinary drug' and a 340B Program drug—a fact that seems to be reflected in the statute itself.").

17

Defendants' concept of a "340B drug" is also undermined by their own admissions. Defendants concede (at 15) that, under the 340B statute, "[c]overed entities are responsible for . . . ensuring that the contract pharmacy does not dispense 340B drugs to individuals who are not patients of the covered entity," nor "to Medicaid beneficiaries." Those admissions contradict Defendants' attempt to redefine "340B drug": If such drugs only *became* "340B drugs" upon dispensing "by the contract pharmacy to the covered entity's 340B-qualified patient," as Defendants claim, then it would not be possible for a contract pharmacy to dispense "340B drugs" to *ineligible* patients or to Medicaid beneficiaries. D.SUMF ¶ 40. Indeed, if Defendants' definition were correct, the federal prohibitions on diversion and duplicate discounting would be meaningless under a replenishment model, because contract pharmacies could *never* dispense "340B drugs" to ineligible patients. That obviously cannot be correct.

*Pricing Is Set under the Federal Statute*. Defendants claim (at 36, 40) that Act 1103 does not regulate pricing because the 340B price is set by the federal statute. But the fact that Section 340B sets the ceiling price is undisputed. The point is that Act 1103 determines whether that price has to be offered *in particular transactions*. An example illustrates the difference. Imagine that a state law required hospitals to provide Medicare pricing for the treatment of all patients aged 55 and older—despite the fact that Medicare under federal law starts at 65. That law would obviously regulate pricing, even though it is federal law that sets Medicare prices, because the law extends Medicare pricing to a broader range of transactions. So too with Act 1103: The Act here similarly forces manufacturers to offer 340B prices for a broader category of sales (unlimited contract pharmacy sales) than those for which manufacturers would otherwise be required to offer them under federal law.

***Delivery only after Purchase.*** Defendants argue (at 40) that Act 1103 merely says that "if a covered entity purchases a drug at the 340B price, . . . the manufacturer may not block delivery of that drug to a contract pharmacy." That claim, which Defendants call the "crux" of their case (at 40), simply cannot be reconciled with the Commissioner's own interpretation and application of the law. The Commissioner found no evidence that any pharmacy has ever "fail[ed] to receive an order of AstraZeneca drugs that it actually did place." AZ SUMF ¶ 161. Instead, he based his finding of a "violation" on the fact that, "where a contract pharmacy is *not* designated under AstraZeneca's policy, a sale at the 340B price is not offered, and an order for 340B-priced drugs cannot be placed for delivery to the contract pharmacy." AZ SUMF ¶ 161. Thus, what is "blocked" under AstraZeneca's policy is the "offer[]" of "a sale at the 340B price," not delivery.

Defendants inadvertently concede as much. In response to AstraZeneca's argument that 340B and non-340B drugs are handled the same way, Defendants note (at 45) that "in the case of a non-designated pharmacy, the 340B drug is not handled at all." Exactly right: Under AstraZeneca's policy, a covered entity or TPA simply cannot place an order at the 340B price for shipment to a non-designated contract pharmacy. The policy thus restricts the *offer* of 340B prices, not the delivery of drugs that have already been purchased.[4]

**B.  Act 1103 Is Preempted by Federal Patent Law**

In its Rule 12(c) ruling, this Court recognized that "taking AstraZeneca's allegations as true," AstraZeneca has established a "right to relief" on its patent preemption claim. MJOP Order at 12. Now that discovery has concluded, the undisputed evidentiary record shows that

---

[4] Defendants claim (at 42) that "drug companies play no role in the replenishment process." That is absurd. Manufacturers like AstraZeneca produce the drugs that are acquired through the replenishment process, and Act 1103 forces them to offer their drugs for replenishment sales at unlimited contract pharmacies. That obligation is currently costing AstraZeneca approximately ██████ per month. AZ SUMF ¶ 169.

AstraZeneca's allegations *are* true. The record includes substantial evidence that Act 1103 regulates pricing—including through proof "that covered entities do not actually retain title to the 340B drugs and that contract pharmacies are actually independent contractors, instead of agents of the covered entities." *Id.* And undisputed "[f]acts about enforcement of Act 1103," *id.*, also show that AstraZeneca was found to "violate[]" the Act because it refused to offer "340B pricing," AZ SUMF ¶ 162. While Defendants try (unsuccessfully) to resist these facts, they do not meaningfully dispute that *if* Act 1103 regulates the pricing of patented drug sales, then it is preempted by the federal patent law.

But Act 1103 would be preempted even if (contrary to fact) it only regulated delivery. As the Federal Circuit held in *BIO*, States may not "re-balance the statutory framework of rewards and incentives" created by federal patent law by "diminishing the reward to patentees [*i.e.*, to patent-holders] in order to provide greater benefit to" in-state purchasers. 496 F.3d at 1374. Even if the costly obligations created by the Act could somehow be construed as delivery obligations, they indisputably "diminish[] the reward" to patent-holders like AstraZeneca "in order to provide greater benefit" to Arkansas covered entities. *Id.* The Act accordingly "is preempted by federal patent law." *Id.*

### 1. Arkansas cannot regulate the price of patented drugs

Defendants offer several arguments in an attempt to show that Act 1103 is consistent with the federal patent law, none of which is persuasive.

***First***, Defendants argue (at 56) that "the Supreme Court has held that protections not aimed *exclusively* at the promotion of invention itself are not preempted under federal patent law." But Act 1103 does not provide "protections" for patented products—just the opposite: It *destroys* patent protection, by requiring manufacturers to offer their patented products at pennies on the dollar, rather than at prices set through "the dictates of the marketplace." *BIO*, 496 F.3d at 1372

(citation omitted). Defendants identify no authority for allowing States to restrict the benefits of patent protection in that manner, and *BIO* expressly holds that they cannot.

Indeed, the two cases cited by Defendants (at 56) strongly undermine, rather than support, their argument. In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989), the Supreme Court struck down a Florida law that provided patent-like "protection" for certain "unpatented" products (boat hulls). *Id.* at 144. In so ruling, the Court acknowledged that "States may place limited regulations on the use of unpatented designs," so long as "state protection [i]s not aimed exclusively at the promotion of invention itself, and the state restrictions on the use of unpatented ideas [a]re limited to those necessary to promote goals outside the contemplation of the federal patent scheme." *Id.* at 165-66. But the Florida law at issue altered the "careful balance between public right and private monopoly," because it "offer[ed] patent-like protection for ideas deemed unprotected under the present federal [patent] scheme." *Id.* at 167-68. The state law accordingly was "preempted by the Supremacy Clause." *Id.* at 168.

*Bonito Boats* thus definitively shows that a state law *can be* "preempted" by the federal patent law even when it *only* targets "unpatented" products. *Id.* at 167-68. Here, by contrast, Act 1103 is *not* limited to unpatented products, but applies to patented products as well. And because the Act regulates "access" to "pricing," Ark. Code Ann. § 23-92-604(c); *see* 003.22.123 Ark. Code R. § II(7), it also does not fit into the limited exception that *Bonito Boats* identified for state laws that are "necessary to promote goals *outside* the contemplation of the federal patent scheme." *Id.* at 166 (emphasis added). A patent-holder's ability to "charg[e] prices" according to the dictates of the market is central to "the goals established by Congress in the patent laws." *BIO*, 496 F.3d at 1374.

The Supreme Court's decision in *Kewanee Oil Corp. v. Bicron Corp.*, 416 U.S. 470 (1974), is similarly unhelpful to Defendants. The question there was "whether state trade secret protection is pre-empted by operation of the federal patent law." *Id.* at 472. The Court said no, but only because the "trade secret law [being challenged] operated to protect non-economic interests *outside* the sphere of congressional concern in the patent laws." *Bonito Boats*, 489 U.S. at 155 (describing *Kewanee Oil*) (emphasis added). That principle has no application to Act 1103, since the Federal Circuit "has repeatedly recognized" that a patent-holder's ability to receive the "pecuniary rewards stemming from the patent right" is an "important" function of patent law. *BIO*, 496 F.3d at 1372.

For similar reasons, Defendants are wrong (at 56) that Act 1103 escapes preemption because it "neither applies solely to patented drugs nor makes any reference to patented prescription drugs." The Florida law at issue in *Bonito Boats* applied only to "*un*patented" products, for instance, and yet the Supreme Court *still* held that it "conflicted with the balance struck by Congress in the federal patent statute." 489 U.S. at 144 (emphasis added). The relevant question for patent-preemption purposes is more general: whether the challenged state law is designed to "protect non-economic interests outside the sphere of congressional concern in the patent laws." *Id.* at 155. Since Act 1103 protects *economic* interests *within* the sphere of congressional concern—namely, helping covered entities generate revenue through pricing arbitrage—it is preempted as applied to AstraZeneca's patented products.

Indeed, the Supreme Court has repeatedly invalidated, as preempted by federal patent law, state laws that regulate both patented and unpatented goods. *See, e.g.*, *Sears, Roebuck & Co., v. Stiffel Co.*, 376 U.S. 225, 231-32 (1964) (finding state unfair competition law, which applied both to patented and unpatented goods, to be preempted by federal patent law); *Compco Corp. v. Day-*

*Brite Lighting, Inc.*, 376 U.S. 234, 237 (1964) (similar). Nor does Defendants' argument—that states may regulate the price of patented good, so long as they *also* regulate the price of non-patented goods as well—make sense. Accepting that argument would encourage States to enact *broader* restrictions in the hopes of evading patent preemption. No authority supports it.

**Second**, Defendants point (at 57-58) to a recent holding of the Third Circuit that the federal patent laws "do not confer a right to sell at a particular price." *AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116, 125 (3d Cir. 2025). But the decision there held that a manufacturer lacks a right to sell at a particular price *to the government*: It held that "[t]here is no protected property interest in selling goods to Medicare beneficiaries . . . at a price higher than what the government is willing to pay when it reimburses those costs." *Id.* at 125-26. Indeed, the decision made clear that its holding was limited to circumstances where the government "sets prices for drugs *that CMS* [*i.e.*, the government] *pays for*," and "not private market transactions." *Id.* at 126 (emphasis in original). The decision did not purport to contradict or limit *BIO*'s holding that, in circumstances where federal law does *not* require below-market pricing, manufacturers may set prices for their patented products according to "the dictates of the marketplace." *BIO*, 496 F.3d at 1372 (citation omitted). Indeed, the Third Circuit cited *BIO* with approval. *AstraZeneca*, 137 F.4th at 125.

**Third**, Defendants argue that "Act 1103 does not have the consequences of 're-balancing the statutory framework of rewards and incentives'" because it "regulates the distribution of drugs, not their pricing, and does not alter the compensation or market exclusivity granted to patent holders." Defs. Br. 56-57 (quoting *BIO*, 496 F.3d at 1374) (cleaned up). That argument conflicts with the record in multiple respects. It contradicts the extensive record that the Act *does* regulate pricing. S*ee* Section I.A, *supra*. And it contradicts evidence that the Act has significant effects on "compensation" to covered entities and AstraZeneca. For example, based on the additional

discounts that AstraZeneca must offer under Act 1103, the Act generates ███████ in "revenue" per year just to a single, relatively small, covered entity (Community Clinic). AZ SUMF ¶ 168. And the Act has *cost* AstraZeneca approximately ███████ per month. *See* AZ SUMF ¶ 169.

*Fourth*, Defendants argue (at 59) that Act 1103 has no effect on the financial rewards for patented products because it leaves manufacturers with "complete control over the commercial prices that they charge" and does not give covered entities "any control over the amount of the 340B discount." That argument essentially boils down to the claim that the Act has no financial effect at all, and is as wrong as it sounds. The whole point of the Act is that AstraZeneca can no longer charge commercial prices for sales at non-designated contract pharmacies; it must now offer "340B pricing" for those sales, or else it will be found to have "violate[d] Act 1103"—as, in fact, the Commissioner has already determined. AZ SUMF ¶¶ 162-63. And again, the economic effects of that requirement, both for covered entities and for manufacturers, are unmistakable.

*Fifth*, Defendants note (at 59) that manufacturers have "some control over the amount of the 340B discount," which is set through a complicated statutory formula that is tied to commercial sales data. *See* 42 U.S.C. § 256b(a)(1); 42 § C.F.R. 10.10(a). But what manufacturers *lack* control over—the control that Act 1103 takes away from them—is the ability to determine *which transactions* they will offer 340B pricing for. Prior to the Act, they were allowed to offer 340B pricing for sales only at "one contract pharmacy." *Sanofi*, 58 F.4th at 706. Now, in light of the Act, they must offer 340B pricing for sales at unlimited contract pharmacies.

*Finally*, Defendants rely (at 54-55) on district court decisions that have found similar state laws not to be preempted by federal patent law. But none of those decisions involved a law that had actually been applied to a manufacturer, and none was decided with a discovery record. *See AstraZeneca Pharms. LP v. Bailey*, No. 2:24-cv-04143, 2025 WL 644285 (W.D. Mo. Feb. 27,

2025) (motion to dismiss); *PhRMA v. Murrill*, No. 6:23-cv-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (motion for summary judgment without discovery); *AstraZeneca Pharms. LP v. Brown*, No. 1:24-cv-01868 (D. Md. Sept. 5, 2024) (preliminary injunction without discovery record); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024) (similar).

"[T]his case, unlike th[ose] prior case[s], is before this Court on a fully developed factual record post-enforcement of Act 1103." MJOP Order at 12. Here, the undisputed discovery record shows that the Act regulates pricing. *See* Section I.A, *supra*. And the undisputed "[f]acts about the enforcement of Act 1103," MJOP Order at 12, also show that AstraZeneca was found to "violate[]" the Act because it refused to offer "340B pricing," AZ SUMF ¶ 162. Under those circumstances, AstraZeneca has proven that its "allegations [are] true," thereby establishing its "right to relief" on its patent preemption claim. MJOP Order at 12.

### 2. Act 1103 would be preempted even if it only regulated delivery

Even if, contrary to the undisputed record evidence, Act 1103 only regulated drug delivery, rather than pricing, it would *still* be preempted. As *BIO* explained, the federal patent laws reflect Congress's considered judgment regarding the "pecuniary rewards stemming from the patent right." 496 F.3d at 1372. States accordingly may not enact laws—however characterized—that "in effect diminish[] the reward to patentees [*i.e.*, to patent-holders] in order to provide greater benefit to [state] drug consumers." *Id.* at 1374. Here, the undisputed evidence shows that Act 1103 does just that, producing "losses" to AstraZeneca of approximately ███ per month, AZ SUMF ¶ 169, while generating significant "revenue" for covered entities like Community Clinic, AZ SUMF ¶ 168 ████████████████████████████

Defendants' only response (at 58) is to attempt to distinguish two cases that were cited by AstraZeneca for the proposition that what matters for preemption purposes is how a state law actually "functions," not how the law is characterized. *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452,

464 (2012); *accord Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) (rejecting California's "meaningless" semantic argument). True, both of those cases involved express preemption clauses. But the proposition that "[p]re-emption is not a matter of semantics," and that what really matters is "the statute's intended operation and effect," applies to *all* preemption cases. *Wos v. EMA ex rel. Johnson*, 568 U.S. 627, 636 (2013). Courts accordingly apply the principle even in cases where express preemption is not at issue. *See, e.g.*, *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994) ("Pre-emption analysis . . . turns on the actual content of [state law] and its real effect on federal rights."); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 636-37 (2012); *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 69 (2008); *Franklin Cal. Tax-Free Trust v. Puerto Rico*, 805 F.3d 322, 341 (1st Cir. 2015).

Here, there is no genuine dispute that Act 1103 actually functions to limit "the pecuniary rewards stemming from the patent right," *BIO*, 496 F.3d at 1372. So regardless of whether the Act is characterized as a pricing mandate ("You must offer to sell me a car for $1") or as a delivery mandate ("You may not deny me access to or delivery of a $1-priced car"), the result is the same: "it is preempted by federal patent law." *Id.* at 1374.

### 3. No presumption against preemption applies

No presumption against preemption applies when a State seeks to regulate a relationship that is "inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). Here, Defendants do not contest that the relationship between manufacturers and 340B covered entities originates from, is governed by, and terminates according to Section 340B. Nor, indeed, do Defendants dispute that the Act would not even *exist* absent the federal 340B program, as the Act defines all its key terms by reference to the federal 340B statute. Nor is Act 1103 a traditional exercise of state police power; there is no "historic presence of state law" in regulating

drug pricing, let alone regulating the implementation of a *federal* drug pricing program. *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009); *see BIO*, 496 F.3d at 1374 (D.C. drug-pricing law regulated "the [federal] patent right" and thus fell within an area of traditional *federal* regulation).

Defendants respond (at 53) that Act 1103's regulation of drugs solely within the 340B program is not unusual, because other "Arkansas law[s] . . . regulate specific categories of drugs." For instance, they point to laws that exempt "drug samples" from distribution requirements, Ark. Code Ann. § 20-64-503(11)(G), or that apply only to controlled substances, *id.* § 5-64-101. But none of those laws seeks to regulate an inherently federal relationship or inherently federal transactions. And each of those laws would continue to have effect in absence of federal law.[5] Act 1103 is fundamentally different: It *solely* regulates participants in, and sales under, the 340B program; if Congress repealed Section 340B, Act 1103 would become a nullity.

Defendants also contend (at 53) that AstraZeneca's argument about the presumption against preemption was "considered and rejected by the Eighth Circuit." But the *PhRMA* decision did not consider whether Act 1103 regulates a relationship created by federal law. *See PhRMA v. McClain*, 95 F.4th 1136, 1144-45 (8th Cir. 2024). And even if it had, that decision was a facial challenge based on the premise that the "law as written did not require manufacturers to provide 340B pricing discounts to contract pharmacies nor does the law set or enforce discount pricing." MJOP Order at 12. As a result, "[f]acts about the enforcement of Act 1103 as to AstraZeneca were not before the Court in the *PhRMA* Case; those facts were not developed or litigated in that case." *Id.* Now that there is an evidentiary record of how the Act is enforced and of its actual effects on

---

[5] Defendants say (at 54) that Arkansas' Uniform Controlled Substances Act "defines" controlled substances "by reference to federal law." But it is the Arkansas Secretary of Health who decides which substances do and do not qualify as controlled substances. *See* Ark. Code. Ann. § 5-64-201.

manufacturers, this case is fundamentally "different from what the Eighth Circuit based its ruling in the *PhRMA* Case on when reviewing the facial challenge to Act 1103." *Id.*

Finally, and in any event, even if the presumption against preemption *did* apply, it would be overcome here. "Under the Supremacy Clause of the Federal Constitution, '[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). As a result, even in cases where "the presumption against preemption" does apply, courts nevertheless strike down any "state law [that] is 'an obstacle to the accomplishment of congressional objectives.'" *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 794-95 (8th Cir. 2010). For the reasons stated above, Act 1103 creates an obstacle to the objectives of the federal patent law.

### C. Act 1103 Violates the Contracts Clause

Act 1103 substantially impairs AstraZeneca's Pharmaceutical Pricing Agreement (PPA) by imposing costly new obligations on AstraZeneca because (and *only* because) it signed a contract with the Secretary of HHS agreeing to participate in the 340B program. The Act is not drawn in a reasonably necessary way to advance the State's asserted interest in promoting patient access to prescription drugs, including because the law does not mention patients at all or require covered entities to share price discounts with them—and, in fact, most covered entities do not.

Defendants counter with the bizarre claim (at 62) that "Act 1103 does not impose new obligations on AstraZeneca," in effect arguing that the Act accomplishes nothing at all. But the record shows beyond dispute that the Act imposes obligations on AstraZeneca that cost it ███ of dollars every year. And the only purpose served by the law is to redistribute revenue away from

one group (manufacturers) and towards another group (covered entities and their contract pharmacies). That is the very definition of a Contracts Clause violation.

Defendants seek (at 61, 63-64) to rely on district court decisions rejecting Contracts Clause claims against other state statutes. But those pre-enforcement facial challenges were resolved without evidentiary records. Here, AstraZeneca's claim "is not based solely on the text of [Act 1103]," but instead is "based on how the law [has been] applied to AstraZeneca's Pharmaceutical Pricing Agreements" in particular. MJOP Order at 13. Defendants also fail to recognize that a Missouri judge ruled *in favor of* AstraZeneca, concluding that AstraZeneca had "sufficiently alleged the existence of a contract, that would be substantially impaired by" the state law, and giving AstraZeneca a chance to offer evidence that the law "expands its obligations under the PPA to unlimited contract pharmacies." *Bailey*, 2025 WL 644285, at *4. AstraZeneca has now made precisely such a showing in this case.

### 1. Act 1103 substantially impairs AstraZeneca's PPA

As this Court explained, "the first prong" of the Contracts Clause analysis "involves a three-part inquiry: '(1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial.'" MJOP Order at 14 (quoting *Gen. Motors Corp v. Romein*, 503 U.S. 181, 186 (1992)). The first element is not disputed here: AstraZeneca signed a PPA with the Secretary. AZ SUMF ¶ 23. Nor is the third element disputed. Evidence shows that compliance with Act 1103 is costing AstraZeneca approximately ███████ dollars per month. AZ SUMF ¶ 169. Defendants accordingly make no argument about the "magnitude" of the impairment. *See* Defs. Br. 63 n.20 (declining to address the issue).

That leaves the question whether Act 1103 "impairs" AstraZeneca's contract with the Secretary of HHS. *Gen. Motors*, 503 U.S. at 186. The undisputed record in this case makes crystal

clear that the Act does so, by imposing costly new obligations on AstraZeneca solely because it has signed a PPA agreeing to participate in the 340B program. Defendants make a series of arguments trying to resist that conclusion, but all of them boil down to the assertion—contradicted by the undisputed record—that Act 1103 has no effect at all.

**a.** As this Court has explained, AstraZeneca's impairment argument "does not rest entirely on the pricing issue," but is based on the substantial, costly burdens of complying with Act 1103. MJOP Order at 13. In response, Defendants principally argue (at 61) that "Act 1103 has no effect" on AstraZeneca's PPA at all. Yet there is no dispute that the Act *only* applies to a manufacturer who has "enter[ed] into an agreement" with "[t]he Secretary" of HHS to participate in the 340B program. 42 U.S.C. § 256b(a)(1). A state law, like the Act, that imposes significant new obligations if—but *only* if—a particular type of agreement is signed qualifies as a law that impairs such an agreement. As the Supreme Court has explained, a law that "superimpose[s] retroactive obligations upon" a contracting party "beyond the terms of its [existing] contracts" thereby "impair[s] the obligation of the [existing] contracts." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249-50 (1978).

Defendants' argument appears to be (at 62) that no contractual impairment can occur if the obligations imposed by state law and those assumed under the contract "do not intersect." But the Supreme Court has "expressly repudiated" that view. *Id.* at 244 n.16. In *Allied Structural Steel*, the dissent argued that "*creating* an obligation where none had existed previously is not an *impairment* of contract," such that "legislation increasing the obligation of an existing contract is not an impairment." *Id.* at 258-59 (Brennan, J., dissenting) (emphasis in original). But the majority of the Court disagreed, rejecting "[t]he narrow view that the Clause" does not apply to "state laws that . . . increase" the "duties of a contractual obligor." *Id.* at 244 n.16. After all, there

is no practical difference between modifying a preexisting contractual obligation or imposing a new one altogether—either way, the law affects "rights and obligations" that otherwise would have been "binding" on the contracting parties. *Id.* at 245. Here, the Act directly "increase[s]" the "duties of a" PPA-signer like AstraZeneca. *Id.* at 244 n.16.

In any event, even accepting Defendants' attempt to reframe Act 1103, the law *does* modify the terms of AstraZeneca's contract. There is no dispute that, under the terms of its PPA, AstraZeneca is permitted to impose "reasonable conditions" on its "offer" to covered entities, including a limitation on discounts for contract pharmacy sales. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 461 (D.C. Cir. 2024); *accord Sanofi*, 58 F.4th at 703 (manufacturers may impose such "conditions"). But now, because of the Act, AstraZeneca no longer has the right to condition its offer on a one-contract-pharmacy limitation. Defs. SUMF Resp. ¶¶ 162-63.

**b.** Defendants argue (at 61-63) that Act 1103 "has no effect" on AstraZeneca's PPA because, even before the Act, AstraZeneca made its products available to covered entities in "unlimited quantities." Defendants thus conclude (at 63) that "there is no difference in the burden to AstraZeneca between delivering 340B drugs and delivering commercially priced drugs."

This argument has several flaws. For one thing, AstraZeneca's injuries from Act 1103 have never stemmed from the burden of "*delivering* 340B drugs." Defs. Br. 63. Rather, they stem from the new obligation that the Act imposes to ensure that "the 340B price is . . . offered" for unlimited contract pharmacy sales. AZ SUMF ¶ 161. For another thing, the fact that AstraZeneca is willing to offer its products at 340B prices in "unlimited quantities" for sale at a *single* contract pharmacy is obviously different from having to offer them in unlimited quantities for sale at *unlimited* contract pharmacies. Indeed, that difference is the very reason the Arkansas Legislature enacted

Act 1103 in the first place. The *magnitude* of that difference, moreover, is indisputably significant: It costs AstraZeneca approximately ████████ per month. AZ SUMF ¶ 169.

    **c.** Defendants argue (at 64-65) that Act 1103 had no effect on AstraZeneca's "reasonable expectations." But prior to the Act, no State had *ever* attempted to regulate 340B sales; Arkansas's law was the first. While Defendants argue (at 64) that drug manufacturers operate in a "heavily regulated industry," the Eighth Circuit has repeatedly found Contracts Clause violations in pervasively regulated industries when state regulation is extended to a new "context," *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 730 (8th Cir. 2022), or "goes a significant step beyond" existing regulations, *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019). That is obviously true of Act 1103: Before its enactment, there was *no* state regulation of 340B sales, and the Act "goes a significant step beyond" what AstraZeneca was obligated to do under Section 340B itself.

    To show that AstraZeneca should have anticipated the new obligations imposed on it by Act 1103, Defendants point (at 64-65) to a run-of-the-mill permitting statute that requires wholesalers doing business in Arkansas to register for a permit and pay a $100 annual renewal fee. Ark. Code Ann. § 20-64-505. That generally applicable, garden-variety permitting law—which, incidentally, is applicable only to wholesalers—gave AstraZeneca no warning that the State might impose multi-million-dollar obligations based on its agreement with the HHS Secretary to participate in the 340B program. Indeed, if the landlords in *Heights Apartments* could not have expected the Governor to issue an eviction moratorium during the COVID-19 pandemic under his pre-existing authority to take emergency action relating to the "sheltering of persons," 30 F.4th at 730, and if the manufacturers in *Burgum* could not have expected the State to impose new trade-

practice regulations on top of trade-practice regulations that already existed, 932 F.3d at 730, then AstraZeneca certainly could not have anticipated Act 1103.

Defendants also make an argument (at 64) based on "[t]he history of the 340B Program," but the argument is divorced from reality. For the first four years of the program, *no* contract pharmacy arrangements were recognized. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996). Then, for the next fourteen years, HRSA limited contract pharmacy arrangements to "one site," *id.*—just as AstraZeneca's policy does. *See Novartis Pharms.*, 102 F.4th at 461. It was not until 2010 that HRSA "swerved" and issued nonbinding guidance, *id.* at 457, that for the first time endorsed the use of multiple contract pharmacies, 75 Fed. Reg. at 10,272-73.

Even then, of course, manufacturers (including AstraZeneca) challenged HRSA's guidance—and *won*—thereby restoring the expectations that had prevailed for the previous thirty years. *Sanofi*, 58 F.4th at 707. HRSA's unlawful guidance misinterpreting Section 340B obviously could not have altered AstraZeneca's reasonable expectations. Nor do Defendants identify any authority for the remarkable proposition that a legally *invalid* regulation can alter a contracting party's reasonable expectations for purposes of the Contracts Clause.

### 2. The Act is not reasonably tailored to further a significant public purpose

A State that impairs pre-existing contractual rights, as Arkansas has done to AstraZeneca's PPA, must justify that impairment by demonstrating that its law is "reasonably tailored to further a 'significant and legitimate public purpose.'" *Heights Apartments*, 30 F.4th at 730 (quoting *Burgum*, 932 F.3d at 730). Defendants utterly fail to make such a showing here.

**a.** Defendants invoke (at 66) the familiar refrain that the Court should "defer to" the State's "legislative judgment." But they ignore that the Eighth Circuit has found deference appropriate only for "well-supported" legislative "findings or purposes within the[] duly enacted laws." *Burgum*, 932 F.3d at 733; *see id.* at 732 (findings must be "supported by an adequate factual

basis"); *cf. Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 474 (1987) (discussing legislature's "detailed findings"). Where, as here, no such findings exist, the court must conduct a "discerning inquiry into the Act's structure and design" to ensure that it "furthers a significant public interest" and is "not special-interest legislation." *Burgum*, 932 F.3d at 731, 733.

**b.** Because they cannot point to legislative findings, Defendants rely (at 65) on their own assessment of legislative purpose—namely, that Act 1103 promotes "access" by "vulnerable patient populations" to needed drugs. But Defendants themselves argue that Section 340B is "*not a patient-discount statute*," but rather "a provider-discount statute," Defs. Br. 46 (emphasis added); *see id.* at 12 (similar). Act 1103 does not purport to have a patient-discount purpose; it merely extends, to unlimited contract pharmacy sales, the *provider*-discounts that are available under Section 340B.

In fact, Act 1103 is entirely *silent* about patients, focusing instead on pharmacies and covered entities. Ark. Code Ann. § 23-92-604(c). The same is true of Rule 123. 003.22.123 Ark. Code R. § IV(c). In analogous circumstances, the Eighth Circuit has rejected a State's justification for its law as insufficient because "[t]he Act nowhere mentions benefits for farmers or rural communities," the two groups that the law was supposed to help. *Burgum*, 932 F.3d at 733. Here, Act 1103 similarly "d[oes] not even utter" the name of the group (patients) that it is purportedly designed to benefit. *Id.* Under those circumstances, courts refuse to "[a]ccept[] the State's assertion of a sufficient public purpose without a stronger showing." *Id.* at 734.

The factual record also conflicts with Defendants' assertions of statutory purpose. Defendants admit that the Act does not require anyone—covered entities or pharmacies—to pass discounts on to patients. Indeed, Defendants *agree* that ███████████████████ ████████████████████████████████████████████████████

███. And even the rare, covered entity that *does* pass discounts on to patients does so only ███

██████████████████—not because of any obligation under the Act. Defs. SUMF Resp. ¶ 149. The evidence further shows that, under AstraZeneca's policy, "patients were able to obtain unlimited amounts of AstraZeneca products through covered entities and contract pharmacies." Defs. SUMF Resp. ¶ 120.[6]

    **c.** Defendants attempt to justify Act 1103 (at 65) on the ground that it helps covered entities generate "340B revenue." That justification, of course, confirms that the Act regulates pricing, not delivery. But it is also *per se* insufficient under the Contracts Clause. As the Eighth Circuit has explained, the Clause forbids States from impairing contracts in order to "provid[e] a benefit to special interests." *Burgum*, 932 F.3d at 734 (citation omitted). As a result, a state law that "primarily benefits a particular economic actor" does not "further a significant and legitimate public purpose," even when the law "indirectly might benefit" needy citizens. *Id.* at 733.

    Here, Act 1103 *directly* benefits covered entities (and their contract pharmacy partners), by enabling them to generate more revenue. Those are "the only real beneficiaries under the Act." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002). Even if *some* covered entities might choose to use the additional revenue to help their patients, that is not enough: "[T]he Contract Clause demands more than incidental public benefits." *Burgum*, 932 F.3d at 733. Defendants have no response.

    **d.** Ultimately, defendants fall back on the argument (at 66) that Act 1103 promotes general "health and welfare." But "mere assertion of a conceivable public purpose is insufficient to justify

---

[6] Defendants dispute that, under AstraZeneca's policy, patients could obtain "AstraZeneca 340B Drugs" in unlimited amounts, Defs. SUMF Resp. ¶ 120, but that denial is based on their semantic argument about the definition of "340B drugs." More relevant, Defendants have not meaningfully disputed that Arkansas patients were "able to obtain unlimited amounts of AstraZeneca *products*." Defs. SUMF Resp. ¶ 120 (emphasis added).

a substantial impairment of contractual rights." *Burgum*, 932 F.3d at 731. After all, *every* law can be described, at a high level of generality, as serving *some* socially useful purpose. *See, e.g.*, *Heights Apartments*, 30 F.4th at 730 (rejecting claim of "health and safety"); *Burgum*, 932 F.3d at 733 (rejecting claim "law would benefit farmers and rural communities"); *Janklow*, 300 F.3d at 860 (rejecting claim law "serv[ed] the farmer and rural communities"). But "[a] state must do more than mouth the vocabulary of the public weal in order to reach safe harbor." *Burgum*, 932 F.3d at 733 (citation omitted).

### D.  Act 1103 Works an Unconstitutional Taking

Act 1103 takes AstraZeneca's property for private use and without payment of just (or any) compensation, in violation of the Takings Clause. It forces manufacturers like AstraZeneca to relinquish title to and possession of their products at well-below-market prices, and to transfer those products to other private (non-governmental) entities—namely to covered entities and the pharmacies with which they contract. *See* AZ SUMF ¶¶ 35, 150. This forced surrender of "possession and control" over AstraZeneca's property constitutes a physical taking, *Horne*, 576 U.S. at 362 (citation omitted), which occurs where (as here) the government provides for "private property" to be "physically acquire[d]" by "a third party," *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021). Defendants do not meaningfully dispute any of these points. Instead, they make a series of arguments, none of which is persuasive.

*First*, Defendants assert that "Act 1103 is not a physical invasion" because it "does not require AstraZeneca to sell or donate 340B drugs *to contract pharmacies*." Defs.' Br. 70-71 (emphasis added). But that is not AstraZeneca's argument. The Act works a physical taking because it compels AstraZeneca to offer its products—and thus to give up possession and control over them—*to covered entities*, under circumstances where AstraZeneca would not voluntarily do so. For similar reasons, Defendants miss the mark in arguing that no physical taking occurs because

36

"the Eighth Circuit has already decided as a matter of law that title to 340B drugs remain[s] with the covered entity." Defs. Br. 71 (citing *PhRMA*, 95 F.4th at 1144). Even if true, that just confirms AstraZeneca has to give up title to covered entities. In any event, the undisputed record shows that title to 340B drugs *does not* remain with the covered entity. AZ SUMF ¶¶ 93-96; *see* pp. 4-7, *supra*. Defendants also assert (at 71) that Act 1103 does not work a physical taking because it does not "deprive[] AstraZeneca of the value of its property." That is absurd. The record shows that AstraZeneca must relinquish its property for pennies on the dollar—or even less. AZ SUMF ¶ 35.

*Second*, Defendants argue (at 69) that Act 1103 does not effect a taking because AstraZeneca "voluntarily participate[s] in the 340B Program." But as AstraZeneca explained at length, *see* AZ Br. 58-60—and as this Court has observed—the real question "is whether Act 1103 as applied by the State of Arkansas to AstraZeneca in this post-enforcement, as-applied challenge . . . constitutes a taking by the State of Arkansas, *with which AstraZeneca did not voluntarily enter into any agreement or program*." MJOP Order at 17 (emphasis added). The product transfers required by Act 1103 "cannot reasonably be characterized as part of a . . . voluntary exchange" because neither Arkansas nor the statute confers any "benefit" on AstraZeneca in return for compliance. *Horne*, 576 U.S. at 366. Indeed, the Act gives AstraZeneca "no benefit at all." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1233 (D.C. Cir. 2023).

Defendants have no answer for this basic point. Instead, they simply recycle (at 69-70) the same set of precedents on which they previously relied, all of which involved cases where the sovereign that granted the benefit was the *same* sovereign that required the relinquishment of property rights in return. *See, e.g.*, *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984). Here, the benefit to AstraZeneca from participating in Section 340B comes from federal government, while its obligations under Act

1103 are imposed by the State. Defendants still cannot cite a single case that supports treating such a forced transfer in return for no benefit as anything other than a taking.

**Third,** Defendants puzzlingly assert that AstraZeneca has "explicitly recommended use of the contract pharmacy replenishment model," citing a notice on HRSA's website in which AstraZeneca stated that covered entities using replenishment models may count accumulations of a particular drug in a particular manner. Defs.' Br. 71-72 (quoting AstraZeneca, *Notice to 340B Covered Entities Regarding CALQUENCE Replenishment and CALQUENCE Capsule Formulation Discontinuation*, https://www.hrsa.gov/sites/default/files/hrsa/opa/calquence-notice-340b.pdf). This argument is a non sequitur: AstraZeneca is not challenging use of the replenishment model. AstraZeneca is challenging the new, costly obligations imposed by Act 1103, which requires AstraZeneca to offer its products at 340B-discounted prices for unlimited contract pharmacy sales.

**Finally,** Defendants contend (at 68) that Act 1103 does not work a taking because "it is the 340B statute, not Act 1103, that requires AstraZeneca to offer and sell 340B drugs to covered entities." But as the Third Circuit has explained, "Section 340B *does not* require" AstraZeneca to make 340B discounts available for sales of its patented drugs at "an unlimited number of contract pharmacies," *Sanofi*, 58 F.4th at 703 (emphasis added)—a fact that Defendants elsewhere acknowledge, *see* Defs. Br. 71. The requirement to make discounts available for unlimited contract pharmacy sales comes solely from Act 1103, not federal law.[7]

## II.   THE *PhRMA* LITIGATION DOES NOT PRECLUDE REACHING THE MERITS HERE

Just as DCMC argued in its Rule 12(c) motion for judgment on the pleadings, Dkt. No. 84, Defendants argue that AstraZeneca's claims are barred by the supposed preclusive effect of the

---

[7] Defendants devote the remainder of their brief (at 72-76) to arguments AstraZeneca has not advanced in its summary judgment motion.

*PhRMA* litigation. But this Court has now rejected that argument. MJOP Order. As this Court's Order explains, whereas "the *PhRMA* Case was a pre-enforcement, facial challenge to Act 1103," this case "involves a post-enforcement, as-applied challenge to Act 1103 by AstraZeneca against whom Act 1103 has now been enforced." *Id.* at 10. Thus, AstraZeneca now brings "distinct claims that require consideration of facts outside of the text of Act 1103," and these claims "could not have been part of the *PhRMA* Case [and] were not litigated in that facial challenge." *Id.* As a result, "none of AstraZeneca's current claims are barred by claim or issue preclusion." *Id.*

Defendants offer no basis to reconsider that conclusion. To the contrary, their current preclusion argument is just a rehash of the argument that DCMC previously made (and the Court has since rejected). As in that motion, Defendants fail to grapple with the differences between the pre-enforcement, facial challenge in *PhRMA* and the current case—an evidence-based challenge to Act 1103, *as applied* to AstraZeneca's contract pharmacy policy, asserting different constitutional claims. Indeed, AstraZeneca's policy is the only one to which the Act has *ever* been enforced.

Even beyond those differences, "later, concrete factual developments" bear on issues key to AstraZeneca's current claims. *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 602 (2016), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). The *PhRMA* litigation was conducted without a factual record; the Court accordingly had no evidence regarding (among other things): how 340B contract pharmacy purchases operate in the real world, including issues of title and agency; how Act 1103 applies to contract pharmacy policies like AstraZeneca's, including its effects on pricing; or how the Act actually affects manufacturers like AstraZeneca, including its financial consequences. Discovery in this case has now proven that key premises of the Eighth Circuit's decision were incorrect. And the factual record also shows that

even if (contrary to fact) the Eighth Circuit were right that Act 1103 regulates drug delivery rather than pricing, the Act *still* imposes an unconstitutional burden on AstraZeneca.

Similar considerations doom Defendants' half-hearted invocation of issue preclusion. None of the issues presented in this case were actually litigated in *PhRMA*. And even if they had been, "controlling facts or legal principles have changed significantly" since then. *Olsen v. Mukasey*, 541 F.3d 827, 831 (8th Cir. 2008). Defendants cannot use preclusion to stop this Court from evaluating AstraZeneca's as-applied claims on the completed factual record.

While AstraZeneca believes that the Court's ruling on DCMC's Rule 12(c) motion fully resolved any preclusion defense, AstraZeneca responds to Defendants' argument again here in an abundance of caution. AstraZeneca also presents a privity argument with respect to DCMC, which the Court rejected in its Rule 12(c) decision, solely for purposes of preservation.

### A. Defendants May Not Raise Preclusion as a Defense

Both issue and claim preclusion are "affirmative defense[s]." *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008); *see* Fed. R. Civ. P. 8(c). It is well-settled that a party's failure to timely assert either defense results in waiver. *See Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1266 (8th Cir. 1994) ("Because [the defendant] failed to plead the affirmative defense of estoppel, [the defendant] waived it."); *Nevels v. Hanlon*, 656 F.2d 372, 376 (8th Cir. 1981) (holding that the defendant "waived any res judicata defense he may have had" because he "clearly did not raise res judicata as an affirmative defense" in the pleadings or at trial); *see also Bissett v. Burlington N. R.R. Co.*, 969 F.2d 727, 731 (8th Cir. 1992) (determining that failure to plead an affirmative defense results in waiver of the defense and its exclusion from the case).

The Arkansas Insurance Commissioner has not asserted preclusion as a defense until now. He did not plead it as a defense in his answer. *See* Dkt. No. 11 at 10 (raising "affirmative defenses," but not issue or claim preclusion). He then filed a motion for judgment on the pleadings under

Rule 12(c), but *not* on the basis of preclusion. *See* Dkt. No. 21. The Commissioner had another chance when he submitted a second answer, but he failed to raise preclusion yet again. *See* Dkt. No. 55 ¶¶ 106-115 (identifying AID's "defenses," but not including collateral estoppel). Finally, DCMC improperly attempted to revive the defense on the Commissioner's behalf via a declaration attached to its reply in support of its motion for judgment on the pleadings, *see* Dkt. No. 102-1, but DCMC ultimately withdrew the declaration, *see* Dkt. No. 110 at 1, 6; *see also* MJOP Order at 7 ("The Court will not consider the declaration"). Having failed to raise preclusion despite multiple opportunities, the Commissioner has "waived this affirmative defense" several times over. *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1368 (8th Cir. 1991).[8]

### B. Claim Preclusion Does Not Apply

Even if Defendants could assert a claim preclusion defense here, it would fail on the merits, because PhRMA's case and this one are not "based upon the same claims or causes of action." *Midwest Disability Initiative v. JANS Enters., Inc.*, 929 F.3d 603, 607 (8th Cir. 2019) (citation omitted). Indeed, the two actions seek different relief, involve different claims, and are based on different records.

**1.** In *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016), the Supreme Court explained that claim preclusion prohibits only "'successive litigation of the *very same claim*' by the same parties." *Id.* at 599 (emphasis added) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). Applying that principle, the Court held that an earlier facial challenge to a state abortion law filed by certain providers in 2013 did not preclude a later as-applied challenge brought by many of the same plaintiffs in 2014. *Id.* at 603. While the earlier "preenforcement facial

---

[8] AstraZeneca also reasserts, for preservation purposes, its argument that DCMC cannot apply the *PhRMA* decision to preclude AstraZeneca's claims because it was not a party to that case and is not in privity with any party to that case. *But see* MJOP Order at 8 (rejecting this argument).

challenge" "rested on facts and evidence presented to the District Court in October 2013," the providers' "postenforcement as-applied challenge" in 2014 "rest[ed] in significant part upon later, concrete factual developments," including actual enforcement of the statute. *Id.* at 599, 602. As a result, the two challenges were "not the 'very same claim,'" and "the doctrine of claim preclusion consequently d[id] not bar [the] new challenge to the constitutionality of the [law]." *Id.* at 603 (quoting *New Hampshire*, 532 U.S. at 748).

In so ruling, the Supreme Court explained that the facial nature of the earlier suit, in itself, was sufficient to distinguish it from the later suit: "Later as-applied challenges can always deal with subsequent, concrete constitutional issues" without preclusion posing an obstacle. *Id.* at 602 (citation omitted). Importantly, that includes situations in which a prior court's determination of the "constitutionality of a statute" was "predicated upon the existence of a particular state of facts." *Id.* at 601 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938)). In such a case, if a subsequent plaintiff makes a "showing to the court that those facts have ceased to exist," the constitutionality of the same statute always "may be challenged" anew. *Id.*

**2.** The principles applied in *Whole Woman's Health* demonstrate why res judicata is inapplicable here. Since PhRMA's suit "was brought immediately upon the enactment of" Act 1103, but before it was enforced, the Eighth Circuit's "decision sustaining the law cannot be regarded as precluding a subsequent suit for the purpose of testing its validity in the lights of [AstraZeneca's] later actual experience" with enforcement of the law. *Id.* at 601 (cleaned up). Indeed, Defendants' claim preclusion defense fails here *a fortiori*.

***First***, AstraZeneca's constitutional claims in this case are wholly distinct from the ones raised in the *PhRMA* litigation. PhRMA had argued that Act 1103 was facially preempted by the federal 340B statute as to all policies and all drugs (including generic drugs) and that it violated

the dormant Commerce Clause. *PhRMA*, 95 F.4th at 1140 & n.3. AstraZeneca alleges that, as applied to AstraZeneca's policy and its patented products in particular, Act 1103 is preempted by federal patent law and violates the Takings and Contracts Clauses. *See* Dkt. 25 ¶¶ 90-105. There is thus no overlap in claims. In *Whole Woman's Health*, by contrast, the two suits raised the same causes of action and invoked the same constitutional rights.

*Second*, *PhRMA* involved a facial, pre-enforcement challenge to Act 1103. As such, it was not based on a factual record about how the Act actually operates or how it affects particular manufacturers or particular covered entities. Indeed, the Commissioner had stayed enforcement of the Act pending the litigation, so it was never applied while the *PhRMA* litigation was ongoing. Now that AID has pursued an enforcement proceeding against AstraZeneca, the "particular state of facts" on which the Eighth Circuit relied no longer "exist[s]." *Whole Woman's Health*, 579 U.S. at 601 (quoting *Carolene Prods. Co.*, 304 U.S. at 153). Instead, AstraZeneca's specific experience with the law raises "concrete constitutional issues" and shows that key factual premises of the Eighth Circuit's decision were mistaken. *Id.* at 602 (citation omitted); *cf. Sabri v. United States*, 541 U.S. 600, 609 (2004) (warning that facial challenges risk "'premature interpretatio[n] of statutes' on the basis of factually barebones records" (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

Despite Defendants' contrary assertion (at 25), discovery in this case has unearthed ample material, concrete facts. For example, the contracts between covered entities and contract pharmacies explicitly provide that covered entities *do not* maintain title to 340B drugs, which instead are held by contract pharmacies in their general inventories just like any other non-340B drugs. AZ SUMF ¶¶ 92-96. The evidence also shows that contract pharmacies are typically independent contractors, *not* agents of covered entities, with respect to the acquisition and sale of

340B drugs. AZ SUMF ¶¶ 97-98. The evidence further shows that AstraZeneca's contract pharmacy policy does not affect the *delivery* of 340B-discounted drugs, only the circumstances under which such drugs are *offered* for sale at the 340B price. *See* AZ SUMF ¶ 161. Based on these and other facts, AstraZeneca's policy of limiting 340B-priced sales to a single contract pharmacy does not restrict the *distribution* of its drugs, but merely the *pricing* at which they are offered. *See* AZ SUMF ¶¶ 34-36, 39, 74, 78, 86, 102, 161. In addition, the evidence shows that AstraZeneca plays no role in the delivery of drugs from wholesalers to contract pharmacies, *see* AZ SUMF ¶¶ 27-29, and that its contract pharmacy policy does not prohibit *anyone* from obtaining AstraZeneca's drugs, which remain fully accessible to Arkansas covered entities, their contract pharmacies, and their patients, *see* AZ SUMF ¶¶ 115, 119, 120, 122, 123. Finally, the evidence shows that AID interprets and applies Act 1103 to forbid AstraZeneca from restricting pricing offers in this manner, imposing a significant burden on AstraZeneca. *See* AZ SUMF ¶¶ 155-156, 161-166. None of these facts was before the Eighth Circuit at the time of its decision.

*Third*, as explained, *see* Section I, *supra*, AstraZeneca's patent-preemption, Contracts Clause, and Takings Clause claims succeed even if the Court is convinced that the Act merely imposes a delivery obligation. That is because, as AstraZeneca's evidence shows, the law imposes costly, unanticipated, and un-bargained-for obligations that go well beyond those imposed by the 340B program itself. By imposing such significant new burdens under state law—whether or not they are described as "delivery" obligations—the Act impairs AstraZeneca's right to sell its patented drugs under market conditions (patent preemption), its PPA with the Secretary of Health and Human Services (Contracts Clause), and its property rights (Takings Clause). In this respect, AstraZeneca's claims differ fundamentally from PhRMA's, because AstraZeneca would prevail even if Act 1103 *did not* regulate pricing.

44

**3.** Defendants' counterarguments are unavailing. They argue (at 24) that the Court should treat AstraZeneca's as-applied challenge as a facial one because it "alleged no factual matters that are unique to it" and that it "seeks to invalidate Act 1103 for all manufacturers." That is plainly false: This lawsuit is a challenge to how Arkansas has already applied Act 1103 *to AstraZeneca's policy*. That makes this case wholly unlike *PhRMA*, where the Act had not yet been applied. Indeed, AstraZeneca is the *only* manufacturer against whom AID has enforced the Act; the Commissioner's findings in those enforcement proceedings represent the first time the Act has been definitively interpreted and concretely applied to a manufacturer policy. AZ SUMF ¶¶ 155-169.

AID's enforcement of Act 1103 against AstraZeneca "make[s] all the difference." *Whole Woman's Health*, 579 U.S. at 602. Because the *PhRMA* Court considered the Act only on its face, it did not anticipate that AID would interpret and apply the Act as a prohibition on failing to offer 340B pricing. *See PhRMA*, 95 F.4th at 1145 (relying on assumptions that "Act 1103 does not require manufacturers to provide 340B pricing discounts to contract pharmacies" and that "Act 1103 does not set or enforce discount pricing"). Now that AID has enforced the law against AstraZeneca in precisely that manner, the "serious constitutionally relevant adverse consequences" that the *PhRMA* Court did not anticipate "*have in fact occurred.*" *Whole Woman's Health*, 579 U.S. at 602.

Next, Defendants contend (at 25-26) that the claims in the *PhRMA* litigation "relied on the same facts related to replenishment/virtual inventory that AstraZeneca asserts in this case" and "relied on similar evidence" on "whether covered entities retain title to 340B Drugs in contract pharmacy arrangements and whether contract pharmacies act as agents of covered entities in those arrangements." Not so. Put aside that *PhRMA* did not even contemplate virtual replenishment.

There was *no* evidence of *any* kind there—much less regarding replenishment, virtual inventory, title, or agency—because *PhRMA* was a purely legal facial challenge. *See* Statement of Material Facts in Supp. of Pl.'s Mot. for Summ. J., *PhRMA v. McClain*, No. 4:21-cv-864 (E.D. Ark. Aug. 6, 2022), Dkt. 25 (containing only legal background). That stands in stark contrast to the fact-laden record here, which shows (among other things) that AID applies Act 1103 to regulate pricing instead of delivery, that contract pharmacies take title to the drugs upon shipment to them, and that contract pharmacies are not agents of the covered entities. *See* AZ Br. 31-32.

For similar reasons, Defendants are wrong (at 33) that "AstraZeneca cannot raise a new set of legal arguments applied to the same set of facts" as *PhRMA*. That argument ignores the fundamentally different posture of this fact-based, as-applied challenge. Contrary to the facial, pre-enforcement challenge in *PhRMA*, here AstraZeneca challenges how AID has applied Act 1103 *to AstraZeneca*. That is not the same "nucleus of operative fact." *Landscape Props., Inc. v. Whisenhunt*, 127 F.3d 678, 683 (8th Cir. 1997). Indeed, AstraZeneca *could not have* challenged the Act's application to AstraZeneca at the time of the *PhRMA* litigation—since enforcement proceedings had not yet occurred. A prior judgment obviously "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).

Indeed, the contrast between this case and ones on which Defendants rely show just how inappropriate res judicata would be here. In *Healy v. Fox*, 46 F.4th 739 (8th Cir. 2022), the Eighth Circuit applied South Dakota preclusion law to bar a successive suit that raised claims arising from a dispute over ownership and control of a ranch. *See id.* at 742. Both suits alleged precisely the same wrongful conduct by members of the plaintiff's family related to control of the ranch, such that the two suits arose from an identical factual predicate; all that was different was the legal

theory. *See id.* at 744. *Healy* thus stands for the familiar principle that res judicata bars relitigation of "legal arguments" that "could have [been] raised" earlier, "but [were] not." Defs.' Br. 34 (citing *Healy*, 46 F.4th at 744). Their other cases stand for the same uncontroversial proposition. *See id.* (citing *Lane v. Peterson*, 899 F.2d 737, 744 (8th Cir. 2018); *Maddox v. U.S. Dep't of Def.*, No. 4:11-cv-696, 2011 WL 6027145, at *2 (E.D. Ark. Dec. 5, 2011)). But that rule does not apply here, for the reasons explained: AstraZeneca brings an as-applied action, based on its *own* contract pharmacy policy and based on AID's enforcement of Act 1103 *against AstraZeneca*, implicating different "act[s] or dispute[s]" from PhRMA's facial challenge.

Defendants also cite *Hicks v. O'Meara*, 31 F.3d 744 (8th Cir. 1994), for the proposition that two suits are "identical" for preclusion purposes if the "wrong sought to be redressed is the same in both actions." Defs. Br. 33 (quoting *Hicks*, 31 F.3d at 746). But *Hicks* actually *rejected* application of res judicata and reversed the district court for applying it. 31 F.3d at 745. The plaintiffs there had signed a one-year employment contract to manage a motel; were fired partway through the term; and brought a state-court wrongful termination action against their employers. *See id.* at 745-46. After the first case was dismissed, they then brought a federal statutory minimum-wage and overtime suit. *Id.* at 745. The Eighth Circuit *rejected* the employers' argument that the facts were the same on the ground that "liability for either a wrongful termination or an FLSA violation depends on what happened while the employee was working for the employer." *Id.* at 746. The Eighth Circuit explained that the employers' proposed approach to res judicata was "too simplistic and fail[ed] to consider all of the underlying facts necessary to prove each separate claim." *Id.* The two claims, the court held, were "supported by different underlying facts" and "involve[d] different wrongs and different evidence." *Id.* The "alleged wrong" in the first action was the plaintiffs' dismissal, which turned on the employment contract; for the second, it was

47

inadequate compensation, which turned on the hours worked and the wages paid. *Id.* Thus, although the two causes of action were "arguably related," they were "not the same." *Id.*

*Hicks* therefore confirms that res judicata is inapplicable here. AstraZeneca's case, even if "arguably related" to PhRMA's, relies on different underlying facts—including documents and testimony produced by AID, DCMC, the complaining covered entity in the AID proceeding (Community Clinic), and non-parties that AstraZeneca subpoenaed to prove its "separate" claims. *Id.* Defendants' assertion (at 33) that res judicata applies because "both cases are predicated on the shipment of 340B discounted drugs to contract pharmacies," thus mirrors the argument made by the defendant—and rejected by the Eighth Circuit—in *Hicks*: It is "too simplistic and fails to consider all of the underlying facts necessary to prove each separate claim." 31 F.3d at 746. The *PhRMA* case and this one are at most "arguably related," but "not the same." *Id*.

Defendants finally contend (at 33) that this lawsuit is precluded because "[b]oth lawsuits sought (seek) to invalidate Act 1103 and ask this Court to enjoin AID from enforcing it against drug companies." But Defendants offer no support for their remarkable position that different constitutional claims based on different factual predicates are barred merely because they attack the same law. Indeed, *Whole Women's Health* proves that the opposite is true: It held that res judicata *did not* bar the petitioners' as-applied challenge to a statute despite an earlier facial challenge by the same petitioners. *See* 579 U.S. at 599.

**C.  Issue Preclusion Does Not Apply**

Defendants' cursory invocation of issue preclusion in a single paragraph (at 34-35), is even less persuasive. Issue preclusion (also known as collateral estoppel) requires the party invoking it to satisfy five factors:

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have

been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment.

*Estrada-Rodriguez v. Lynch*, 825 F.3d 397, 402 (8th Cir. 2016) (citation omitted). The party seeking to impose collateral estoppel "has the burden 'to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.'" *Irving v. Dormire*, 586 F.3d 645, 648 (8th Cir. 2009) (quoting *Dowling v. United States*, 493 U.S. 342, 350 (1990)).

Defendants make virtually no effort to carry their burden, offering (at 34-35) only one "example" of an issue that was purportedly decided previously: "that Act 1103 regulates distribution" rather than pricing. Defendants assert that "PhRMA had the opportunity to litigate . . . all facts and conclusions of law underpinning [this] Court's determination that . . . the effects of the disputed provisions are limited to the distribution of and access to the discounted drugs." *Id.* (quoting *PhRMA*, 645 F. Supp. 3d at 901). But the Eighth Circuit's rejection of PhRMA's *facial* challenge to Act 1103 did not purport to resolve—and obviously could not have resolved—whether the Act has the practical effect, *as applied to AstraZeneca's contract pharmacy policy*, of restricting the price at which *AstraZeneca's* products are offered. That issue, which was addressed for the first time through the discovery in this case, bears directly on AstraZeneca's patent-law preemption, Contracts Clause, and Takings Clauses claims—none of which was "actually litigated" in *PhRMA*. *Fofana v. Mayorkas*, 4 F.4th 668, 671 (8th Cir. 2021). Collateral estoppel does not apply to such issues not "'raised, contested, and submitted for determination' in the prior proceeding." *Id.* (quoting *Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019)).[9]

---

[9] Defendants' unelaborated string citation (at 35) does not help their argument. *Berns v. O'Dell*, 726 F.2d 409, 410 (8th Cir. 1984) (per curiam), simply repeated and quoted a district court's application of straightforward preclusion principles. *Robinette v. Jones*, 476 F.3d 585, 589-90 (8th Cir. 2007), held that collateral estoppel can apply to preliminary rulings by district courts before voluntary dismissals, a principle with no clear relevance here. And *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, AFL-CIO*, 913 F.2d 544, 560-64 (8th Cir.

Even if (contrary to fact) the question of whether Act 1103 regulates the price of AstraZeneca's drugs *had been* conclusively decided in *PhRMA*, issue preclusion does not apply in the event of "'significant changes in controlling facts or legal principles' since the judgment." *Herrera v. Wyoming*, 587 U.S. 329, 343 (2019) (quoting *Montana v. United States*, 440 U.S. 147, 157-58 (1979)); *see Ginters v. Frazier*, 614 F.3d 822, 826-27 (8th Cir. 2010) ("[C]ollateral estoppel extends only to contexts in which the controlling facts and applicable legal rules remain unchanged.") (quoting *Montana*, 440 U.S. at 158). The reason is that "[c]ollateral estoppel 'is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally.'" *Olsen*, 541 F.3d at 831 (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599 (1948)). As noted, the factual context here is anything but static: AID is now actively enforcing Act 1103 against AstraZeneca; evidence from that proceeding and discovery in this case have generated an extensive factual record demonstrating that Act 1103 in fact regulates the price of AstraZeneca's patented drugs.

Finally, even if (contrary to fact) Defendants were correct (at 35) that collateral estoppel barred this Court from reconsidering whether "Act 1103 regulates distribution," that *still* would not make it appropriate for the Court to grant judgment in their favor. As explained *supra*, AstraZeneca can succeed on its constitutional claims by showing that the Act imposes significant new burdens on AstraZeneca under state law—regardless of whether those burdens are described as "pricing" obligations, "delivery" obligations, or something else. And as the record shows, the Act *does* impose such burdens. *See* pp. 14-15, *supra*.

---

1990), found that a jury verdict in the liability phase of a trial had preclusive effect in an arbitration held before the damages phase of the trial, rejecting the argument that there was no preclusion until the liability verdict was appealable.

## CONCLUSION

AstraZeneca's motion for summary judgment should be granted and Defendants' motion for summary judgment should be denied.

Dated: October 8, 2025            Respectfully submitted,

**ELDRIDGE BROOKS, PLLC**

Conner Eldridge, Ark. Bar No. 2003155
Emily A. Neal, Ark. Bar No. 2003087
ELDRIDGE BROOKS, PLLC
5115 West JB Hunt Drive, Suite 500
Rogers, AR 72758
(479) 553-7678 telephone
(479) 553-7553 facsimile
conner@eldridgebrooks.com
emily@eldridgebrooks.com

AND

Allon Kedem
Jeffrey L. Handwerker
Samuel I. Ferenc
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000 telephone
(202) 942-5999 facsimile
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com
sam.ferenc@arnoldporter.com

Carmela T. Romeo
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000 telephone
(212) 836-8689 facsimile
carmela.romeo@arnoldporter.com

*Attorneys for Plaintiff AstraZeneca*
*Pharmaceuticals LP*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October 2025, the foregoing document was filed

UNDER SEAL with the Clerk of Court. I will serve a copy on all interested parties via email.

Dated: October 8, 2025

_____

Conner Eldridge